# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------ X
ALICE GRIFFIN,                                         :    Case No. 1:19-cv-00775-RGA
                                                       :
            Appellant,                                 :
                                                       :
      v.                                               :
                                                       :
WMI LIQUIDATING TRUST                                  :
                                                       :
            Appellee.                                  :
------------------------------------------------------ X
------------------------------------------------------ X    Chapter 11
                                                       :    Case No. 08-12229 (MFW)
In re:                                                 :    (Jointly Administered)
                                                       :
WASHINGTON MUTUAL, INC., et al.,¹                      :
                                                       :
                                                       :
------------------------------------------------------ X
```

**BRIEF OF ALICE GRIFFIN IN SUPPORT OFAPPEAL FROM ORDER OVERRULING FIRST OMNIBUS OBJECTION OF ALICE GRIFFIN WITH RESPECT TO ALLOWED CLAIMS OF MORGAN STANLEY & CO., INCORPORATED, CREDIT SUISSE SECURITIES (USA) LLC, GOLDMAN, SACHS & CO., ON BEHALF OF THEMSELVES AND CERTAIN UNDERWRITERS**


Dated: June 21, 2019
Wilmington, Delaware


/s/ Alice Griffin_____
Appellant, *Pro Se*

121 East 12th Street, #7C
New York, New York 10003
(646) 337-3577
griffincounselpc@earthlink.net

---

¹ The Debtors, along with the last four digits of each Debtor's federal tax identification number, were: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1201 Third Avenue, Suite 3000, Seattle, Washington 98101.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 1

JURISDICTION ..................................................................................... 1

STATEMENT OF FACTS ...................................................................... 2

SUMMARY OF ARGUMENT ............................................................... 4

    1.   This Court Should Reverse the Bankruptcy Court's Laches Ruling and Rule on the Merits of Appellant's Objection ............................................... 7

    2.   Appellant Has Provided Valuable Services to the Debtors' Estates and the Trust and is Entitled to Compensation Commensurate with the Award Paid Interest Holders Who Have Provided Similar Benefits to Class 19 ....................... 7

I.   The Bankruptcy Court Erred in Determining that the Trust's Disclosures Regarding the Final Stipulation Provided Adequate Notice for Laches ........................ 8

II.   Laches Ruling Must Be Reversed ....................................................... 10

  A.   The Trust Did Not Raise Laches in Either its Response or at the Hearing .... 11

  B.   The Bankruptcy Court Abused Its Discretion by Imposing Laches Against Appellant ........................................................................................... 11

    1.   It Was Improper for the Bankruptcy Court to Raise Laches ......................... 12

    2.   The Bankruptcy Court Did Not Satisfy the Required Elements for the Imposition of Laches ........................................................................ 13

      a.   The Bankruptcy Court Erroneously Interpreted Facts It Used to Support Its Imposition of Laches Against Appellant's Objection to (i) the Underwriters Claim and (ii) the Final Stipulation .............................................. 14

      b.   Appellant's Delay in Filing the Objection was Not 'Outrageous' or 'Inexcusable' .................................................................................. 16

      c.   The Bankruptcy Court Made No Finding of Prejudice .............................. 18

      d.   The Bankruptcy Court Abused Its Discretion by Refusing to Take Judicial Notice of Section 1.170 ...................................................................... 19

  C.   Merits Favor Reversal of Laches ................................................... 20

    1.   Appellant's Claim is Meritorious .................................................. 20

    2.   The Definition of 'Preferred Equity Interest' Must Override the Underwriters' Bargain ........................................................................................... 20

  D.   The Judicial Integrity of Federal Courts Requires Reversal of the Laches Ruling ............................................................................................... 23

III.   Under Third Circuit Law the Underwriters Would Not Have Prevailed on the $72 Million Claim for Settlement Reimbursement ........................................ 24

IV.   Class 19 is Not Better Off With $72 million in Underwriters' Claims in Class 19 Than With $96 million in Class 18 .................................................... 26

V.    The Final Stipulation is Invalid.............................................................. 28

   A.    The Bankruptcy Court Approval Requirement was Not Satisfied, and the Final
   Stipulation was Never Modified to Dispose of that Requirement ............................ 28

   B.    Prohibited Grant of Class 19 Interests Invalidates the Final Stipulation and
   Cannot be Severed ............................................................................... 29

VI.    The Bankruptcy Court Erred in Voicing its Opinions About the Validity of the
Final Stipulation and the Actions of the Trustee ............................................ 29

   A.    The Bankruptcy Erred in Opining it was Appropriate for the Trustee to Settle
   the Underwriters' Claim by Granting the Underwriters Class 19 Interests .............. 29

   B.    The Bankruptcy Court Erred in Opining that by Placing the Underwriters'
   Claim in Class 19 the Trustee and the Trust's TAB did not, with Respect to Class
   19: (1) Breach Their Fiduciary Duty; (2) Act in Bad Faith; and/or (3) Commit an
   Ultra Vires Act.................................................................................... 30

      1.    Breach of Fiduciary Duty to Class 19 .......................................... 31

      2.    Bad Faith Against Class 19 ....................................................... 31

      3.    The Final Stipulation was an Ultra Vires Act ................................. 32

VII.    This Court Must Adjudicate Fiduciary Issues Even if the Trust Takes Remedial
Action to Remove the Underwriters from Class 19 ....................................... 32

VIII.    Appellant Need Not Prove Equity Classes Will Receive a Recovery to Prevail
on the Question of the Placement of the Propriety of Placement of Underwriters' Claim
in Class 19 .......................................................................................... 33

IX.    Matters on Which the Bankruptcy Court Opined But Did Not Rule Should Not
be Remanded....................................................................................... 34

X.    Stipulation Granting the TPS Group Compensation is Precedent for Payment of
Compensation to Appellant..................................................................... 34

CONCLUSION ..................................................................................... 35

APPENDICES

TABLE OF AUTHORITIES

**Cases**

*Adams v. Trustees, NJ Brewery Trust Fund*, 29 F. 3d 863 (3d Cir. 1994) ...................... 19

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)................................................ 24

*Churma v. United States Steel Corporation*, 514 F. 2d 589 (3d Cir. 1975) ................... 14

*Connecticut v. Doehr*, 501 U.S. 1 (1991) ........................................................................ 35

*Cook v. Wikler*, 320 F. 3d 431 (3d Cir. 2003)................................................................. 11

*Eichenholtz v. Brennan*, 52 F.3d 478 (3d Cir.1995)....................................................... 27

*Gardner v. Panama Railroad Co.*, 329 U.S. 29 (1951)................................................... 14

*Globus v. Law Research Service, Inc.*, 418 F. 2d 1276 (2d Cir. 1969).......................... 26

*Gruca v. United States Steel Corporation*, 495 F. 2d 1252 (3d Cir. 1974) .................... 12

*Hildebrand v. Allegheny County*, No. 18-1760, ___ F.3d ___, 2019 WL 1783540 (3d Cir. April 24, 2019)............................................................................................... 19, 21

*In re Bressman*, 874 F. 3d 142 (3d Cir. 2017) ................................................................ 12

*In re Cendant Corp. Litigation*, 264 F. 3d 286 (3d Cir. 2001) ....................................... 27

*In re Granite Partners, LP*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998) .................................. 25

*In re Ira Haupt & Co.*, 361 F.2d 164 (2d Cir. 1966) ...................................................... 25

*Kleinknecht v. Gettysburg College*, 989 F. 2d 1360 (3d Cir. 2003) ............................... 11

*Kobell v. Suburban Lines*, Inc., 731 F. 2d 1076 (3d Cir. 1984)...................................... 16

*Offutt v. United States*, 348 U.S. 11 (1954) .................................................................... 24

*Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863 (3d Cir. 1984)............................ 21

*Republican Party of Minn. v. White*, 536 U.S. 765 (2002)............................................. 24

*Santana Products v. Bobrick Washroom Equipment*, 401 F.3d 123 (3d Cir. 2005)......... 11

*Scarborough v. Eubanks*, 747 F. 2d 871 (3d Cir. 1984) ...................................... 12, 19, 21

*Temsa Ulasim Araclari Sanayi Ve Ticaret As v. Ch Bus Sales, LLC*, 18-cv-698-RGA (August 31, 2018) ...................................................................................................... 14

*U.S. v. Dupree*, 617 F.3d 724 (3d Cir. 2010)................................................................... 35

*University of Pittsburgh v. Champion Products Inc.*, 686 F. 2d 1040 (3d Cir. 1982)......... 12-13,16

*Ware v. Rodale Press, Inc.*, 322 F. 3d 218 (3d Cir. 2003)............................................... 20

*Williams-Yulee v. Florida Bar*, 575 U.S. ___ (2015) .................................................... 25

*Zelson v. Thomforde*, 412 F.2d 56 (3d Cir. 1969)..................................................... 11, 13

**Statutes**

28 U.S.C. § 157.................................................................................................................... 1

28 U.S.C. § 158.................................................................................................................... 1

11 U.S.C. § 502........................................................................................................... *passim*

11 U.S.C. § 502(j) .............................................................................................................. 10

**Rules**

D. Del. LR 7.1.3................................................................................................................... 1

Del. Bankr. L.R. 7007-2....................................................................................................... 1

Federal Rule of Bankruptcy Procedure 8009(a) ................................................................. 2

Federal Rule of Bankruptcy Procedure 8002(a)(1)............................................................. 1

**Other Authorities**

The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton)................................ 15

iii

## PRELIMINARY STATEMENT

Alice Griffin ("Appellant") files this brief pursuant to D. Del. LR 7.1.3. and Del. Bankr. L.R. 7007-2 in support of her appeal from the order dated April 24, 2019 (the "Appeal") of the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") denying the *First Omnibus Objection (Substantive) of Alice Griffin, Class 19 Interest Holder, to Claims (Nos. 3935 and 4045) Allowed Pursuant to a Stipulation Dated March 28, 2013 Between the WMI Liquidating Trust and Morgan Stanley & Co., Incorporated, Credit Suisse Securities (USA) LLC, and Goldman, Sachs & Co., on Behalf of Themselves and Certain Underwriters* (the "Objection") [B.C.D.I. 12595].[2]

## JURISDICTION

The Bankruptcy Court had jurisdiction to hear the Objection as a core matter under 28 U.S.C. § 157. When the order denying the Objection (the "Order") [B.C.D.I. 12619] became final on April 24, 2019, Appellant could appeal it as of right. 28 U.S.C. § 158. Appellant filed her Notice of Appeal on April 29, 2019 pursuant to Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 8002(a)(1). This Court has jurisdiction to hear the Appeal. 28 U.S.C. § 158.[3]

---

[2] References to the Document Index of the District Court are designated "D.I." and references to the Document Index of the Bankruptcy Court are designated "B.C.D.I.". B.C.D.I. documents are available here: https://www.kccllc.net/wamu/document/list/3853.

[3] On May 11, 2019 Appellant filed her Designation of the Record and Statement of Issues on Appeal ("Designation") [B.C.D.I. 12633] with the Bankruptcy Court as mandated by Bankruptcy Rule 8009(a), but did not file it with the Court as she was unaware that such a filing was required. When, on May 21, 2019, she contacted the clerk of the United States District Court of the District of Delaware to inquire why the Designation had not been forwarded from the United States Bankruptcy Court for the District of Delaware, she was informed that there is a standing order of this Court requiring simultaneous filing. Appellant filed the Designation with the United States District Court for the District of Delaware [D.I. 6] the same day, including disclosure of Appellant's previous non-compliance with a request that it be regarded as harmless error.

## STATEMENT OF FACTS

On September 25, 2008, the Federal Deposit Insurance Corporation (the "FDIC") seized the two banking subsidiaries of Washington Mutual, Inc. ("WMI"). The next day WMI and its wholly owned subsidiary, WMI Investment Corp. (collectively, WMI and WMIIC are "the Debtors"), each filed a petition in the District of Delaware for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On February 23, 2012 the Bankruptcy Court entered an order confirming the Debtors' *Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, Dated December 11, 2011*, as amended (the "Plan") [B.C.D.I. 9759]. Upon confirmation two new entities emerged: (1) WMI Holding Corp., the reorganized WMI ("WMIH"); and (2) the WMI Liquidating Trust (the "Trust" or "Appellee"). The Trust's function is to marshal all legal and equitable interests of the Debtors, settle and pay claims against the Debtors, and distribute any remaining assets to the Trust's two equity classes. Pursuant to the Plan and the Trust's Liquidating Trust Agreement (the "Trust Agreement"),[4] William C. Kosturos, the Debtors' former Chief Restructuring Officer, was appointed as the Liquidating Trust's trustee (the "Trustee"). Pursuant to the Trust Agreement an advisory board was appointed to provide limited oversight to the Trustee (the "TAB"). Members of the TAB were appointed by the various stakeholder constituencies.

Pursuant to the Plan, in exchange for broad releases of JP Morgan Chase & Co., the FDIC, and others, holders of the Debtors' equity securities, preferred and common, received (a) common equity in WMIH and (b) a proportionate share of any residue.

---

[4] The Trust Agreement is attached as Appendix A.

Specifically, preferred equity was assigned to Class 19 and received 75% each of the 200 million shares of WMIH common stock and any residue, and Class 22 received 25% each of WMIH common stock and any residue. Pursuant to the Plan Class 19 and Class 22 are *pari passu* so they receive the benefits of any future distributions simultaneously and there is no limit to the amount a Class 19 or Class 22 interest can receive.

The one point of difference between the two equity classes is that one is inelastic. The definition of a 'Preferred Equity Interest', as set forth in Section 1.170 of the Plan, does not allow any Preferred Equity Interest to be created after the date the Debtors filed their respective petitions, September 26, 2008 (the "Petition Date"). By contrast, the definition of a 'Common Equity Interest' permits creation of new Common Equity Interests.[5]

Notwithstanding the Plan's prohibition of new Class 19 interests, on March 28, 2013, the Trust executed a stipulation (the "Final Stipulation") with Morgan Stanley & Co., Incorporated, Goldman, Sachs & Co., and Credit Suisse Securities (USA) LLC, on behalf of themselves and twelve other underwriters of certain securities issued by the Debtors (the "Underwriters"), settling $96 million in indemnification claims of the Underwriters against the Debtors in exchange for $72 million in Class 19 interests.[6] Insertion of the

---

[5] "1.73 Common Equity Interest: Collectively, (a) an Equity Interest represented by the 3,000,000,000 authorized shares of common stock of WMI, including, without limitation, one of the 1,704,958,913 shares of common stock of WMI issued and outstanding as of the Petition Date, or any interest or right to convert into such an Equity Interest or acquire any Equity Interest of WMI that was in existence immediately prior to or on the Petition Date or *(b) a Claim, other than with respect to the Dime Warrants, which pursuant to a Final Order, has been subordinated to the level of Equity Interest in accordance with section 510 of the Bankruptcy Code or otherwise and whose shall count, for purposes of calculating Pro Rata Share of distributions, shall be determined by dividing the amount of an Allowed Claim* by the per share price of WMI common stock as of either (a) the Petition Date, (b) the close of business on the day immediately preceding the Petition Date, (c) December 12, 2011, or (3) such other date as determined by the Bankruptcy Court." (Emphasis added.)

[6] The Final Stipulation is attached as Appendix B.

Underwriters' claim into Class 19 increased the claims in that class from $7,500,000,000 to $7,571,953,536.09; dilution of approximately one percent. In addition, pursuant to the Plan, as putative holders of Class 19 interests, on May 1, 2013 the Underwriters received a distribution of approximately 1.4 million shares of WMIH common stock.

On March 22, 2019, as a holder of Class 19 interests, Appellant filed her Objection to the Liquidating Trust's settlement with the Underwriters and the Underwriters' claim, pursuant to Section 502 of the Bankruptcy Code. The Liquidating Trustee filed a response (the "Response") [B.C.D.I. 12604], the Underwriters filed a joinder (the "Joinder") [B.C.D.I. 12605], and the Appellant filed a reply [B.C.D.I. 12609] (the "Reply"), which Reply included the entire text of the definition of 'Preferred Equity Interest'. A hearing was held on the Objection before the Bankruptcy Court on April 22, 2019 (the "Hearing"). During the Hearing Appellant directed the Bankruptcy Court's attention to the definition of Preferred Equity Interest which the Bankruptcy Court read and acknowledged, which acknowledgement is set forth in the transcript of the Hearing. Notwithstanding, in a bench ruling the Bankruptcy Court denied the Objection on the grounds of laches and took the opportunity to state that it would have denied the Objection on the merits if it had been made in 2013 because, in its opinion, the Final Stipulation was in the best interests of creditors and equity interest holders of the Liquidating Trust. The transcript of the Hearing ("Tr.")) [B.C.D.I. 12617] is attached as Appendix C.

On April 29, 2019 Appellant filed her Notice of Appeal.

## **SUMMARY OF ARGUMENT**

This Appeal arises from the Bankruptcy Court's denial of Appellant's Objection to: (a) the Trust's allowance of the Underwriters' $72 million in indemnification claims;

and (b) the Final Stipulation, specifically its inclusion of the Underwriters' claim with preferred equity.

Appellant objected to the Trust's allowance of the Underwriters' $72 million claim because prior to executing the Final Stipulation the Trust had argued vociferously that the Underwriters' claim could not be paid under any circumstances. *See* the Trust's September 14, 2012 objection [B.C.D.I. 10666]. The Trust's position was based on the weight of legal authority – including Third Circuit precedent – which denies indemnification to a securities underwriter unless it prevails at trial: i.e., absolves itself of wrongdoing in connection with the offering in question. However, at the Hearing the Bankruptcy Court rejected Appellant's argument and, *sua sponte*, cited *Second Circuit* precedent which the Bankruptcy Court incorrectly said allowed such indemnification in limited circumstances.

Appellant objected to the Final Stipulation itself because it inserted the Underwriters' $72 million claim in with Class 19, preferred equity, and the Plan's definition of 'Preferred Equity Interest' expressly provides that no Preferred Equity Interest can be created after the Petition Date. Accordingly, the terms of the Final Stipulation purporting to grant the Underwriters Class 19 interests – on March 28, 2013 – violate the Plan. The Bankruptcy Court read Section 1.170 during the hearing – apparently for the first time – but ignored it by basing the decision to overrule the Objection on laches.

Although the Bankruptcy Court cited laches as the basis for its ruling, in neither the Trust's Response nor the Underwriters' Joinder did either the Trust or the Underwriters plead laches as an affirmative defense or state any facts which would give rise to an inference of inexcusable delay and prejudicial effect, the two elements required to sustain a laches defense under Third Circuit law. Likewise, neither the Trust nor the Underwriters

asserted laches or any facts in support thereof at the Hearing. Even though the Trust and the Underwriters forfeited this affirmative defense in both their respective pleadings and at the Hearing, the Bankruptcy Court, in violation of Third Circuit precedent, invoked the doctrine as the basis for denying the Objection. It is Appellant's position that not only was it an abuse of discretion for the Bankruptcy Court to assert laches – an affirmative defense – but the laches ruling was defective as the Bankruptcy Court failed to make the required findings, i.e., that Appellant's delay in filing the Objection was inexcusable and had a prejudicial effect on the Trust or the Underwriters.

As for the delay element, the record is bereft of any effort by the Bankruptcy Court to determine whether, considering the circumstances, the delay was inexcusable either with respect to (a) the Underwriters' claim or (b) the Final Stipulation's execution. With respect to the former, as Section 502 of the Bankruptcy Code sets no deadline for an objection, the Objection could not be untimely under that provision unless the Debtors' bankruptcy cases were closed, and they remain open at this writing. As for Appellant's challenge to the Final Stipulation, in her Reply to the Response the Appellant argued exhaustively that the Trust's disclosures for the Final Stipulation were defective as a matter of law because they were false and misleading under federal securities law and therefore, as a matter of equity, could not support a laches defense. Neither the Trust nor the Underwriters provided anything to rebut Appellant's argument that the Trust's disclosures were false and misleading and the Bankruptcy Court made no reference to Appellant's arguments about the notice being in violation of securities law or, if so, the impact legal consequence of a notice containing false and misleading information on a laches defense. Finally, with respect to the required

finding of prejudice, the Bankruptcy Court made no such finding and such a finding is impossible on the now immutable record.

1. **This Court Should Reverse the Bankruptcy Court's Laches Ruling and Rule on the Merits of Appellant's Objection**

After issuing the laches ruling the Bankruptcy Court took the opportunity to state that even if the Objection were not time barred it would have approved the Final Stipulation and other opinions on the merits of the Objection, including: (1) the Final Stipulation was in the best interests of all creditors and equity classes; (2) Class 19 fares better if the Underwriters are allowed into that class rather than placed in Class 18 – a creditor class; and (3) the Trustee did not breach his fiduciary duty or commit an *ultra vires* act by executing the Final Stipulation.

The Bankruptcy Court's statements were dicta, but if this Court reverses the laches ruling and remands the legal issues (i.e., the merits) to the Bankruptcy Court those opinions will be blueprints for that court's adjudication of the merits. It is Appellant's position that if this Court reverses the Bankruptcy Court's laches ruling the merits of Appellant's Objection will be ripe for adjudication by this Court, and that result is in the interests of justice as this Court will be free of any preconceptions with respect to the legal issues or the parties.

2. **Appellant Has Provided Valuable Services to the Debtors' Estates and the Trust and is Entitled to Compensation Commensurate with the Award Paid Interest Holders Who Have Provided Similar Benefits to Class 19**

Appellant seeks reasonable compensation for bringing the Objection and the Appeal. If she prevails she will have lifted a $72 million dilution burden off Class 19 and will be entitled to compensation commensurate with that received by the Class 19

shareholders group known as the 'TPS Funds' who succeeded in increasing the recovery for Class 19 from 70% to 75%.

## ARGUMENT

I.      **The Bankruptcy Court Erred in Determining that the Trust's Disclosures Regarding the Final Stipulation Provided Adequate Notice for Laches**

Appellant herein incorporates by reference her Reply, in which she argues that as the '34 Act Filings (defined below) contain false and misleading information they (a) were legally insufficient to provide notice of the Final Stipulation and (b) provide an unclean hands defense to laches. *See* Reply, pp. 2 - 5.

At the Hearing the Trust's counsel argued that the Trust's disclosures regarding the Final Stipulation in the Trust's 2012 10-K and March 31, 2013 Quarterly Statement Report (collectively, the "34 Act Filings") provided adequate notice of the Final Stipulation. Tr. at 31 - 32. The Trust also asserted that it was under no duty to file '34 Act reports. Assuming that was a true statement, whether or not such '34 Act Filings were mandatory or discretionary the Trust was required to make all particulars in any disclosures pertaining to the Final Stipulation not false or misleading. It did not. The '34 Act Filings contained information that was false *and* misleading, and while the Trust's statement that "the Underwriters' $72.0 million Class 19 [sic] will be allowed in full" (Reply, at p. 3) that disclosure is inadequate to disclose the economic effect of that placement, i.e., that any recovery to Class 19 would be diluted by 1%.

Although the Appellant's Reply put the veracity, accuracy, and scope of the '34 Act Filings at issue the Bankruptcy Court did not question the Trust's counsel about whether the contents of the '34 Act Filings contained false or misleading information or

whether, as a matter of law, false or misleading information would (x) constitute notice sufficient to commence the time period necessary to support a laches defense, or (y) by its character, provide an unclean hands defense to laches. As both this Court and the Bankruptcy Court know, and as Appellant argued in the Objection, laches is an equitable defense and it is not available if the party seeking it has unclean hands. *See* Objection, ¶¶ 21 – 27, pp. 8 – 11.

In the Objection Appellant argued that the Final Stipulation should have been disclosed in an 8-K filing – which heralds an extraordinary event –the proper vehicle as 10-Ks and the Quarterly Statement Reports the Trust disseminates do not suggest urgency or importance and may go unread.[7] However, as Appellant stated in her Reply, even if the Trust had put the same information in an 8-K it would have been false and misleading and therefore both inadequate to start the clock ticking on laches and sufficient to give rise to an inference of unclean hands.

False, misleading, and inadequate (i.e., the Trust made no disclosure of the material dilution) disclosures should not be deemed sufficient to start the clock ticking on laches, and even if Appellant had actual or constructive notice of the Final Stipulation equity demands that the time duration for laches be negated by unclean hands because of the false and misleading information in the '34 Act Filings and the Trust's failure to do everything it could to make the disclosure adequate (i.e., filing an 8-K and disclosing the economic consequences on Class 19).

Accordingly, the Bankruptcy Court erred in determining that the Trust's disclosures regarding the Final Stipulation were sufficient to support its laches ruling.

---

[7] Appellant pointed out in the Objection at decretal ¶23, p. that the Trust had previously announced extraordinary events connected with Class 19 (preferred equity) and Class 22 (common equity).

## II.      Laches Ruling Must Be Reversed

Consistent with the overwhelming weight of legal authority, the Third Circuit has held that laches, is an affirmative defense which must be raised or is waived. Accordingly, the Trust and/or the Underwriters had the affirmative duty to plead each element of a laches defense in either the Response or the Joinder, respectively, but no mention of laches or prejudice appears in either filing and neither inexcusable delay nor prejudice was mentioned by either the Trust's or Underwriters' counsel at the Hearing.

The Third Circuit has also ruled that a court cannot raise a statute of limitations if a defendant fails to do so. The corollary to this precedent is that laches, the equitable counterparty of a statute of limitations defense, cannot be raised by a court *sua sponte*.

In the instant case, it is Appellant's position that the Bankruptcy Court improperly invoked laches and even if so doing was not improper, the Bankruptcy Court failed to make any finding of prejudicial delay. As the Third Circuit has held that a finding of prejudice is indispensable, the Bankruptcy Court's ruling was an abuse of discretion and reversible legal error.

Furthermore, the Third Circuit has held that even if the elements of laches are satisfied the merits of a claim must be considered before laches may be imposed. In the instant case if this Court reaches the merits then the Trust's execution of the Final Stipulation comes toe to toe with Plan Section 1.170, and exposes the Final Stipulation as a violation of the Plan, an *ultra vires* act, and a breach of fiduciary duty to Class 19. Indeed, it was precisely at the point in the Hearing that the Bankruptcy Court read Section 1.170, that the Bankruptcy Court recognized the absolute prohibition against creation of new

Preferred Equity Interests, commenced its summation, and invoked laches against Appellant.

### A. The Trust Did Not Raise Laches in Either its Response or at the Hearing

Laches is an affirmative defense, and the onus was on the Trust to raise it. *Santana Products v. Bobrick Washroom Equipment*, 401 F.3d 123, 139 (3d Cir. 2005). The Objection contained adequate information to allow the Trust to determine whether to assert laches or forfeit that defense. Indeed, the Objection raised the issue, but neither the Trust nor the Underwriters did so either in responsive pleadings or at the Hearing, nor did either make any statements that would constitute a laches defense. Accordingly, both the Trust and the Underwriters forfeited laches as a defense. *See Cook v. Wikler*, 320 F. 3d 431, 438 (3d Cir. 2003); *Kleinknecht v. Gettysburg College*, 989 F. 2d 1360, 1373 (3d Cir. 2003) ("[A]ll affirmative defenses must be pled".); *Zelson v. Thomforde*, 412 F.2d 56, 59 (3d Cir. 1969).

### B. The Bankruptcy Court Abused Its Discretion by Imposing Laches Against Appellant

In *In re Bressman* the Third Circuit stated: "Laches is a defense developed by courts of equity to protect defendants against unreasonable, prejudicial delay in commencing suit. The defense applies in those extraordinary cases where the plaintiff unreasonably delays in filing a suit, and, as a result, causes unjust hardship to the defendant. Its purpose is to avoid inequity." *In re Bressman*, 874 F. 3d 142, 149 (3d Cir. 2017) (internal quotes omitted). Upon appeal, absent a showing that the lower court abused its discretion in applying the doctrine of laches, the appellate court will not disturb the ruling. *Id.*

The Third Circuit has held that imposition of laches has the same effect as dismissing a complaint, and therefore is an extreme sanction that must be imposed with great care. *See Scarborough v. Eubanks*, 747 F. 2d 871, 874 – 875 (3d Cir. 1984). The Third Circuit has also said that "its application is inextricably bound up with the nature and quality of the . . . claim on the merits". *University of Pittsburgh v. Champion Products Inc.*, 686 F. 2d 1040, 1044 (3d Cir. 1982) (citing *Gruca v. United States Steel Corporation*, 495 F. 2d 1252, 1258 (3d Cir. 1974)). As will be discussed in detail later in this brief, the merits of the instant case are whether (a) the Trust should have settled the Underwriters' claim for any value, and (b) if it was proper to place the Underwriters' claim in Class 19. During the Hearing the Bankruptcy Court read the definition of 'Preferred Equity Interest', which are the Class 19 interests. The Bankruptcy Court appeared unfamiliar with it even though it was cited it in its entirety in the pleadings. The definition of 'Preferred Equity Interest' forbids creation of such interests after the Petition Date, which disqualifies the Underwriters' claims from entering that class. This, without more, means that on the merits Appellant must prevail. Indeed, only laches could prevent such a result and Appellant contends that is why the Bankruptcy Court invoked the doctrine to overrule Appellant's objection.

By failing to acknowledge that it was impossible under the Plan to place the Underwriters in Class 19 the Bankruptcy Court ignored the directive of *University of Pittsburgh* to consider the merits and, in what must be regarded as an abuse of discretion, the Bankruptcy Court, *sua sponte*, inappropriately imposed the affirmative defense of laches.

### 1. It Was Improper for the Bankruptcy Court to Raise Laches

The Bankruptcy Court, *sua sponte*, raised laches in its summation and used it as the basis for denying the Objection. Tr. at 42. The Third Circuit has held that while subject matter jurisdictional objections may be raised *sua sponte* by a court at any time, laches, the equitable counterpart of a statute of limitations, is an affirmative defense that must be raised by the party opposing the requested relief. *Zelson*, at 59 ("The raising of the defense of a statute of limitations . . . is a personal privilege of the defendant. If it fails to take advantage of that privilege . . . it is waived. It was no concern of the district court and that court had no right to apply the statute of limitations *sua sponte*."). If laches was available to defeat the Objection, then it is an affirmative defense. If it is an affirmative defense, then it should have been raised by the Trust. *Id*. It was not raised by the Trust and was therefore forfeit. *Id*. The Bankruptcy Court committed legal error by asserting laches on the Trust's behalf. *Id*.

> **2.      The Bankruptcy Court Did Not Satisfy the Required Elements for the Imposition of Laches**

Even if it was not improper for the Bankruptcy Court to raise laches that court failed to make findings required for imposition of laches. In the Third Circuit to impose the doctrine to bar a claim for equitable relief a court must find that the claimant's delay (1) was outrageous and inexcusable and (2) has a prejudicial effect on the party against whom claimant seeks relief.

The Third Circuit has also held that "its application is inextricably bound up with the nature and quality of the plaintiff's claim on the merits". *University of Pittsburgh*, at 1044. This is consistent with the U.S. Supreme Court's ruling that the doctrine of laches

is not to be applied mechanically, but with discretion and within narrowly defined parameters.[8]

   a. *The Bankruptcy Court Erroneously Interpreted Facts It Used to Support Its Imposition of Laches Against Appellant's Objection to (i) the Underwriters Claim and (ii) the Final Stipulation*

  The Bankruptcy Court stated that Appellant objected to (a) the Underwriters' claim and (b) the Final Stipulation. Tr., at 42. As to the Underwriters' claim, the Bankruptcy Court observed that "the classification [of the claim as a Preferred Equity Interest] was settled in February of 2011 over eight years ago."

  This is incorrect because the stipulation negotiated between the Trust and the Underwriters dated February 3, 2011 (the "Original Stipulation"), though executed and approved by the Bankruptcy Court, became a nullity when the then underlying plan of reorganization, the Sixth Amended Plan, was not approved. Accordingly, the Bankruptcy Court's factual finding that classification of the Underwriters' claim as a Preferred Equity Interest was settled when she approved the Original Stipulation is clearly erroneous as a factual matter (i.e., one settlement agreement may differ greatly from a subsequent agreement between the same parties concerning the same matter(s)) and therefore as a basis for finding inexcusable delay. The earliest relevant date for purposes of assessing laches

---

[8] "Though the existence of laches is a question primarily addressed to the discretion of the trial court, the matter should not be determined merely by a reference to and a mechanical application of the statute of limitations. The equities of the parties must be considered as well. Where there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant has ensued from the mere passage of time, there should be no bar to relief." *Churma v. United States Steel Corporation*, 514 F. 2d 589 (3d Cir. 1975) (citing *Gardner v. Panama Railroad Co.*, 329 U.S. 29, 30 – 31, 72 S.Ct. 12, 13, 96 L.Ed. 31 (1951). This Court has held that "[l]aches is not determined by the mere passage of time . . . [i]nstead, there must be an unreasonable delay that is prejudicial to the defendant. *Temsa Ulasim Araclari Sanayi Ve Ticaret As v. Ch Bus Sales, LLC*, 18-cv-698-RGA (August 31, 2018). (Citations omitted.)

is March 28, 2013, the date of the Final Stipulation. Accordingly, there is a six-year interval between that date and the filing of the Objection on March 22, 2019.[9]

Further, and with respect to the Underwriters' claim, the Bankruptcy Court observed that "the objection is to the settlement, not to the underlying claims". Tr. at 42. This assessment by the Bankruptcy Court was incorrect because the Objection clearly stated that Appellant objected to the Underwriters' claim pursuant to Section 502 of the Bankruptcy Code. Furthermore, the Bankruptcy Court's finding that the objection is "not to the underlying claims" is inconsistent with that court's recognition of the Appellant's standing as a party in interest under Section 502 (*see* Tr. at 41) and Appellant's vociferous and repeated assertions that the Underwriters' claim was worthless on the merits.

The Bankruptcy Court imposed laches against Appellant's Section 502 objection without analyzing when laches applies against a claim brought under Section 502. The Bankruptcy Court merely stated that the Underwriters' claim was allowed eight years ago. However, Section 502 does not time bar an objection, so presumably, under that section the Trustee or any other party in interest can object to a claim until the bankruptcy case is closed.

Similarly, the Bankruptcy Court also imposed laches against Appellant's objection to the Final Stipulation with no analysis of the legal standard for imposition of laches; i.e., whether, under Third Circuit law, the Appellant's delay in bringing the objection was unreasonable and would be prejudicial against the Underwriters.

---

[9] The Original Stipulation can only be regarded as a blueprint for the Final Stipulation. Accordingly, the Bankruptcy Court erred in referring to the eight years between the time of Execution of the Original Stipulation and the Objection as having any relevance to laches.

       *b.*     *Appellant's Delay in Filing the Objection was Not 'Outrageous' or 'Inexcusable'*

Laches requires a showing of delay by plaintiff which the Third Circuit has held must rise "to the level of outrageous and inexcusable delay which will bar all relief even absent a showing of detriment to [the defendant]". *University of Pittsburgh,* at 1044.[10] In the instant case, Section 502 has no time bar so with regard to Appellant's objection to the Underwriters' claim the only conceivable delay that would qualify under *University of Pittsburgh* would occur when there was such a great passage of time that a member of Class 19 could not file an objection, and this could occur only when the order closing the bankruptcy case is final and unappealable. Accordingly, so long as the case is open an objection to a claim may be filed under Section 502 of the Bankruptcy Code,[11] and therefore the delay in filing the objection to the Underwriters' claim was not inexcusable to negate the necessity of a finding of prejudice. *Id.*

With respect to the delay in objecting to the Final Stipulation itself, as pursuant to Section 502 Appellant could have filed an objection to the Underwriters' claim at any time before the case's close, and the objection was to the merits of the claim – i.e., whether the claim should be allowed – the fact that laches could not bar that objection precludes use of laches to bar Appellant's opposition to the Final Stipulation which is the vehicle for settlement of the Underwriters' claim.

---

[10] However, the Third Circuit has held that even 'outrageous' and 'inexcusable' delay may not be enough to defeat the need to show prejudice. *See Kobell v. Suburban Lines,* Inc., 731 F. 2d 1076, 1091 (3d Cir. Cir. 1984), n. 27 ("[L]aches [,] that traditional basis for denying equitable relief[,] applies *only* where there is prejudice to the opposing party."). (Emphasis added.)

[11] The bankruptcy court rejected the Trust's contention that Section 26.1 of the Plan gives the Trustee exclusive right to object to a claim post-confirmation, so it could be anticipated that an interest holder could object to a claim. Moreover, Section 502(j) allows allowed claims (execution of the Final Stipulation constitutes allowance) to be reconsidered for cause. 11 U.S.C. § 502(j). Accordingly, Congress did not intend to create a time bar for objection to claims – even claims that have previously been allowed.

Further, it would be ludicrous to assert that Appellant can never be time barred to object to the Underwriters' claim but can be time barred to object to imposition of that claim in Class 19. Section 38.1(e) of the Plan governs the Bankruptcy Court's jurisdiction over post-confirmation claim objections and objections to classification of equity interests.[12] Bankruptcy judges do not raise claim objections or classifications *sua sponte*; these matters are raised to a court's attention by a party in interest. The Bankruptcy Court is authorized to hear an objection pursuant to Section 502 post-confirmation and is also authorized to hear a post-confirmation objection to classification pursuant to Section 38.1(e). Therefore, as anticipated by Section 38.1(e) Appellant had the right to bring both her objection to the Underwriters' claims and placement of those claims in Class 19 and the delay in bringing both six years after the Final Stipulation was executed was not inexcusable.

Finally, Appellant was one of several thousand Class 19 Trust interest holders who did not raise an objection to the Final Stipulation for six years. Appellant did not recall the issue being discussed on the Internet message boards (the central exchanges for all information about the Debtors and WMIH) and if it was it was not discussed exhaustively until late 2018 because most retail interest holders were focused on the prospects of their publicly-traded WMIH common stock. It was only in late 2018 that the issue of the Underwriters' presence in Class 19 became of great interest to retail when a retail interest

---

[12] Section 38.1(e): "[The Bankruptcy Court shall retain and have exclusive jurisdiction . . . ] to hear and determine any timely objection to any Claim or Equity Interest, whether such objection is filed before or after the Confirmation Date, ***including any objection to the classification of any Claim or Equity Interest***, and to allow, disallow, determine, liquidate, classify, estimate, or establish the priority of or secured or unsecured status of any Claim or Equity Interest, in whole or in part". (Emphasis added.) Accordingly, as Section 502 of the Bankruptcy Code allowed Appellee to object to the allowance of the Underwriters' claim it also allowed Appellant to object to the *classification* of that claim as a Class 19 interest.

holder raised the subject, discussed it in detail, and Appellant realized the import of the information.  To hold Appellant responsible for the delay in bringing the Objection is like holding a single member of the House of Representatives or the Senate responsible for the death of a piece of legislation in her chamber.  Prior to confirmation retail equity's interests were protected by an official equity committee, which was represented in legal matters by Susman Godfrey LLP.  Upon confirmation retail had no professionals to protect its interests or to advise on which matters were important and required attention – or intervention – and most retail interest holders assumed that the presence of Michael Willingham and Douglas Southard on the TAB was sufficient to protect retail's interests.  *See* Objection, p. 9 at ¶22 and Note 12.  Furthermore, Appellant doesn't review all the Trust's '34 Act Filings; she usually follows only 8-Ks and press releases because of their urgent character.  As set forth in the Objection, the Trust has issued two 8-Ks that disclosed similar events and should have done so with respect to the Final Stipulation.  *See* Objection, p. 9 at ¶23.  Where no individual within a group has the sole responsibility for vigilance a matter can easily fall between cracks.  As Section 502 has no time bar for bringing a claims objection and there has been no prejudice to the Trust or the Underwriters it is no affront to equity to excuse Appellant's delay in bringing the Objection.

c.      *The Bankruptcy Court Made No Finding of Prejudice*

The Bankruptcy Court, *sua sponte*, raised the issue of laches, which Appellant contends was an abuse of discretion.  However, even if it was not improper for the Bankruptcy Court to raise laches Third Circuit precedent required the Bankruptcy Court to

make a finding that allowing a hearing on the merits of the Objection would have a prejudicial effect on the Trust or the Underwriters.[13]

In the instant case, the Bankruptcy Court did not, as required by Third Circuit precedent, indicate that prejudice to the Trust or the Underwriters was a factor in her decision to impose laches against Appellant. In any event it would have been impossible to make such a finding because at the Hearing Appellant had made the argument that the Underwriters' claim, by the Plan's own terms, should have been placed in Class 22. This remedy would have bestowed the identical economic benefit as placement in Class 19 because Class 22 is *pari passu* with Class 19, and therefore the remedy for negating any possible prejudice against the Underwriters has always resided with the Trust.

As the Bankruptcy Court made no finding of prejudice, its laches ruling was erroneous.

> ### d. The Bankruptcy Court Abused Its Discretion by Refusing to Take Judicial Notice of Section 1.170

Appellant called the Bankruptcy Court's attention to Section 1.170, the definition of 'Preferred Equity Interest', with which the Bankruptcy Court was obviously unfamiliar even though provision was cited in it is entirety in the pleadings. When Appellant directed the Bankruptcy Court's attention to Section 1.170 the court acknowledged that Class 19

---

[13] "If there has been true prejudice to a party by its adversary's failure to file a timely or adequate pleading, discovery response, or pretrial statement, that factor would bear substantial weight in support of a dismissal or default judgment. Examples of such prejudice are the irretrievable loss of evidence, the inevitable dimming of witnesses' memories, or the excessive and possibly irremediable burdens or costs imposed on the opposing party." *Adams v. Trustees, NJ Brewery Trust Fund*, 29 F. 3d 863, 874 (3d Cir. 1994) (citing *Scarborough v. Eubanks*, 747 F. 2d 871, 876 (3d Cir. 1984). Appellant's delay has in no way impeded Appellee's or the Underwriters' ability to prepare effectively a full and complete defense. *See Hildebrand v. Allegheny County*, No. 18-1760, ___ F.3d ___, 2019 WL 1783540 (3d Cir. April 24, 2019) (citing *Ware v. Rodale Press, Inc.*, 322 F. 3d 218, 222 (3d Cir. 2003).

interests cannot be created after the Petition Date by stating on the record: "I understand your argument."

## C. Merits Favor Reversal of Laches

Laches is not to be viewed in isolation from the merits. In the instant case the merits – i.e., the fact that the Plan forbids placement of dilution of Class 19 interests – overwhelmingly favor Appellant.

### 1. Appellant's Claim is Meritorious

A claim, or defense, will be deemed meritorious when the allegations of the pleadings, if established at trial, would support recovery by plaintiff or would constitute a complete defense. *Hildebrand v. Allegheny County*, No. 18-1760, ___ F.3d ___, 2019 WL 1783540 (3d Cir. April 24, 2019) (citing *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 870 (3d Cir. 1984)). In the instant case Appellant must prevail on the merits of her objection to the Underwriters' inclusion in Class 19 on the basis of the definition of 'Preferred Equity Interest' alone, and in the Third Circuit, where a claim is facially meritorious, doubts should be resolved in reaching a decision on the merits. *Scarborough v. Eubanks*, 747 F. 2d 871, 878 (3d Cir. 1984).

### 2. The Definition of 'Preferred Equity Interest' Must Override the Underwriters' Bargain

The Underwriters filed proofs of claim totaling $96 million based on indemnification provisions in underwriting agreements. Of that figure $24 million was for legal expenses incurred in defending litigation related to issuing WMI securities. The remaining $72 million was for amounts paid to settle that litigation. The Original Stipulation provided that the Debtors reserved their rights to object to the Underwriters'

claims and the plan version on the table at the time the Original Stipulation was executed – the Sixth Amended Plan – was not confirmed, so the Original Stipulation never became valid.

On September 14, 2012 the Trust filed an objection to 100% of the $96 million. Specifically, it objected to the $24 million because the Underwriters had not provided adequate documentation. The Trust objected to the other $72 million because under the weight of legal authority indemnification is not available for underwriters who settle securities fraud claims. Notwithstanding, just six months later, on March 28, 2013 the Underwriters and the Trust executed the Final Stipulation.

Both the plan version on the table at the time the Original Stipulation was executed – the Sixth Amended Plan – and the Plan would have been seen by lawyers representing all constituent groups but apparently either (a) no one noticed that its definition of 'Preferred Equity Interest' limits preferred equity to interests created prior to the Petition Date or (b) the violation was noticed but the parties proceeded nonetheless.[14] Also, under the Sixth Amended Plan there was no recovery for preferred equity, then placed in Class 20. Under the Original Stipulation the Underwriters would have received $24 million in Class 18, the class holding subordinated claims, only. Accordingly, the Underwriters' original bargain was that they would receive no portion of the $72 million claim – when they executed the Original Stipulation.

In the Final Stipulation there is no Class 18 claim; only a $72 million claim in Class 19, and the Bankruptcy Court pointed out that if the Underwriters did not get to share in

---

[14] The definition of 'Preferred Equity Interest' in the Sixth Amended Plan is identical to the definition of 'Preferred Equity Interest' on the Plan. Appellant made this point clear during the Hearing.

Class 19 escrow distributions they would not get the benefit of their bargain negotiated through the Final Stipulation. Tr. at 24.

That logic is good – as far as it goes. It must be balanced against the bargain struck by Class 19 when it voted for the Plan. Class 19 – preferred equity – voted for the Plan's definition of "Preferred Equity Interest" set forth in Section 1.170, including its anti-dilutive language. That was Class 19's bargain. Why should the Underwriters get the benefit of their bargain and Class 19 – who voted for the Plan – not get the benefit of theirs? Where is the 'equity' in that? Also, and again, the Plan is immutable and the Final Stipulation's purported grant of Class 19 interests to the Underwriters is prohibited. Accordingly, while the Bankruptcy Court was concerned with whether the Underwriters got the benefit of their bargain, that court expressed no concern for the fact that the rights of persons holding interests in Class 19 created on or before the Petition Date was violated by the terms of the Final Stipulation.

Even if this Court upholds the Bankruptcy Court's support of the Underwriters' right to a $72 million claim, that claim cannot be placed in Class 19. Knowledge of the Plan's contents, including the definition of 'Preferred Equity Interests', must be imputed to both the Underwriters and the Trust (i.e., the Underwriters performed their own due diligence and knew or should have known of the Plan's contents and the Trust must be held to have known the contents of the Plan) and a material part of their agreement depends on doing something that they knew or should have known could not be done without violating the Plan. Ironically, the Final Stipulation does not contain a severability provision (which

could be used to replace the language assigning the Underwriters' claim to Class 19), so even if the Final Stipulation were valid it could not be amended.

Finally, it is impossible to believe that the Trustee and the Trust's internal counsel, Charles Edward Smith, Esq., and its external counsel, Quinn Emanuel, did not understand the definition of 'Preferred Equity Interest' when they executed the Original Stipulation and later the Final Stipulation. Accordingly, the Trustee and the Trust's attorneys executed the two settlement documents when they knew or should have known their (x) terms violated the Plan and (y) execution was a breach of fiduciary duty to Class 19.[15]

### D. The Judicial Integrity of Federal Courts Requires Reversal of the Laches Ruling

Public perception of judicial integrity is a matter of concern to the U.S. Supreme Court, which has written extensively on the subject, and this compelling interest must be a matter of concern for any federal court.[16]

---

[15] Knowledge of this definition must be imputed to the Appellee and the Bankruptcy Court. In Paragraph 41, p. 21 of Appellee's Response Appellee recites the definition of 'Preferred Equity Interest', "[a]n Equity Interest represented by an issued and outstanding share of preferred stock of WMI prior to or on the Petition Date . . . ." Accordingly, Appellee conceded that Class 19 interest could not be created after the Petition Date.

[16] "Courts, in our system, elaborate principles of law in the course of resolving disputes. The power and the prerogative of a court to perform this function rest, in the end, upon the respect accorded to its judgments. The citizen's respect for judgments depends in turn upon the issuing court's absolute probity. Judicial integrity is, in consequence, a state interest of the highest order." *Republican Party of Minn. v. White*, 536 U.S. 765, 793, 122 S.Ct. 2528, 153 L.Ed.2d 694 (2002) (KENNEDY, J., concurring).

"We have recognized the "vital state interest" in safeguarding "public confidence in the fairness and integrity of the nation's elected judges." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 889, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009) (internal quotation marks omitted). The importance of public confidence in the integrity of judges stems from the place of the judiciary in the government. Unlike the executive or the legislature, the judiciary 'has no influence over either the sword or the purse; . . . neither force nor will but merely judgment.' The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton) (capitalization altered). The judiciary's authority therefore depends in large measure on the public's willingness to respect and follow its decisions. As Justice Frankfurter once put it for the Court, "justice must satisfy the appearance of justice." *Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954). It follows that public perception of judicial integrity is "a state interest of the highest order." Caperton, 556 U.S., at 889, 129 S.Ct. 2252 (quoting *Republican Party of Minn.*, 536 U.S., at 793, 122 S.Ct. 2528 (KENNEDY, J., concurring))." *Williams-Yulee*

The Hearing was not observed by only by the persons in the courtroom. It was observed in real time via audio throughout the world as have been virtually all hearings in connection with the Debtors' cases. There are thousands of holders of Trust interests worldwide who avidly follow all details concerning those Trust interests and given that the Objection had the potential to either benefit or burden them the Hearing was eagerly anticipated and widely discussed before and after on message boards, both public and private. The Bankruptcy Court is aware of the public interest and said as much during the Plan's confirmation proceedings.

Accordingly, when the Bankruptcy Court realized during the Hearing that Section 1.170 of the Plan prohibits the Trustee from placing the Underwriters' claims in Class 19 it had a duty to determine whether reaching the merits was required to protect the Bankruptcy Court's judicial integrity. In other words, the Bankruptcy Court had a duty to be concerned with whether employing laches – a 'technicality' in the eyes of non-lawyers – to avoid the impact of the Plan's prohibition on creating Class 19 interests would be perceived by the public as unfair to Class 19. Obviously, if the Bankruptcy Court did have such a concern it set it aside in making the laches ruling.

## III. Under Third Circuit Law the Underwriters Would Not Have Prevailed on the $72 Million Claim for Settlement Reimbursement

At the Hearings and in her pleadings the Appellant argued that the Underwriters' claims are worthless. Specifically, the Appellant argued that that indemnification is

---

*v. Florida Bar*, 575 U.S. ___, 135 S.Ct. 1656, 1666 (2015). *See also*, Reply, ¶24, p. 8 (citing *In re Granite Partners, LP*, 219 B.R. 22, 38 (Bankr. S.D.N.Y. 1998) ("The conduct of bankruptcy proceedings not only should be right but must seem right.") (citing Judge Friendly in *In re Ira Haupt & Co.*, 361 F.2d 164, 168 (2d Cir. 1966)).

unavailable where an underwriter has settled a claim rather than successfully adjudicating it on the merits. Notwithstanding, the Bankruptcy Court cited a Second Circuit case, *Globus v. Law Research Service, Inc.*, 418 F. 2d 1276 (2d Cir. 1969) for the proposition that "an indemnity claim [can] be allowed for defense of a securities litigation" if it can show it was "not the tortfeaser", but was "nothing more than simply negligent". Tr. at 43, ln 14 – 19.

Again, and for clarification purposes, the Underwriters originally filed proofs of claim for $24 million in litigation expenses and $72 million in settlement costs. In the Original Stipulation the $24 million in litigation expenses was classified as a creditor claim and was placed among Class 18 claims which holds Section 510(b) subordinated claims. Under that stipulation the $72 million in settlement costs were placed in Class 20, preferred equity.

In the Final Stipulation the $24 million in litigation expenses was disallowed so except as an historical matter, litigation expenses were irrelevant to the Hearing. Only the $72 million in *settlement claims* was relevant.

However, the Bankruptcy Court refers to defense claims, only, so its interpretation of *Globus* must be interpreted as *Globus* applying to the $24 million in disallowed litigation expenses, not the $72 million in settlement costs.

In any case, nothing in *Globus* supports the Bankruptcy Court's interpretation that indemnification of underwriters for litigation expenses is permissible and, in any case, Globus has no *stare decisis* effect on this Court.

In *Eichenholtz v. Brennan*, 52 F.3d 478, 484 (3d Cir.1995) the Third Circuit cites *Globus* for the opposite of the Bankruptcy Court's reading of that decision ("Generally, federal courts disallow claims for indemnification because such claims run counter to the policies underlying the federal securities acts."). Appellant has located no Third Circuit case that impairs *Eichenholtz*'s disfavor of indemnification of underwriters. *See In re Cendant Corp. Litigation*, 264 F. 3d 286, 301 (3d Cir. 2001) (citing *Eichenholtz*'s statement that "federal courts disallow claims for indemnification because such claims run counter to the policies underlying the federal securities acts"). Moreover, the Third Circuit makes no distinction between indemnification costs and settlement payments.

The litigation costs and the settlement costs were bifurcated and while the Trust stated that in no event could the $72 million in settlement costs be paid it conceded that payment of the $24 million in litigation costs might be paid. Accordingly, the Trust implied the $24 million in litigation expenses was the more meritorious of the two types of claims. Notwithstanding, the Trust capitulated and allowed the $72 million in settlement costs and inappropriately placed them in Class 19. If this Court sets aside the laches ruling it will reach the merits of whether allowance of the $72 million in settlement costs was reasonable in light of Third Circuit precedent and whether that claim should remain in Class 19.

Accordingly, although the Bankruptcy Court did not reach the merits of the Objection its stated opinion that the Trust was justified in allowing the Underwriters' settlement payments because *Globus* lends support to that decision, was erroneous.

## IV.     Class 19 is <u>Not</u> Better Off With $72 million in Underwriters' Claims in Class 19 Than With $96 million in Class 18

The Bankruptcy Court discussed at length the possibility of $96 million (the total of the Underwriters' litigation expenses and settlement payments) being placed in Class 18 but that scenario never occurred in either the Original Stipulation or the Final Stipulation. Apparently the Debtors (and later the Trust) stood firm on refusing to allow the full $96 million, so the Bankruptcy Court's hypothesis would never have been realized. The Final Stipulation reveals that the Underwriters were probably given an 'either or' choice between $24 million in Class 18 (the lowest creditor class) and $72 million in Class 19, and took the latter. Nothing in the pleadings or at the Hearing suggests that the Trust was fearful it might have to face a situation of a court ruling with $96 million in Class 18.

The Bankruptcy Court stated that it had "a lot of difficulty" in trying to understand why the preferred shareholders would be better off if $96 million in Underwriters' claims were placed in Class 18 versus $72 million in Class 19, only. Tr. pp. 16 –18, 44 – 45. In the first place, if the Underwriters' claim is moved to Class 18 then it will be paid before *both* Class 19 and Class 22 receive any value, so the entire burden of the Underwriters won't be imposed on Class 19 alone. Second, the more money that comes into the waterfall the less significant the loss of $75 million (i.e., Class 19's portion of the $100 million required to pay off the Underwriters) because more money means a higher numerator being divided by a constant denominator; *viz*, with the Underwriters in Class 19 the denominator is $7.572 billion but only $7.5 billion without the Underwriters. Accordingly, as the numerator increases the effect of the loss of $75 million to satisfy the Underwriters is diminished.[17]

---

[17] The Trust admitted on its website in February that it filed an application with the FDIC for a portion of any money the FDIC recovers from its LIBOR litigation. This disclosure was made over two months before the Hearing when Brian S. Rosen, Esq., the Trust's counsel's asserted during the Hearing that "there are no assets coming from the FDIC to the Trust" (Tr. at 29) and "we do not see the likelihood of a distribution going to

## V.     The Final Stipulation is Invalid

The Final Stipulation is invalid by its own terms because (a) the provision it contains requiring Bankruptcy Court approval was never satisfied and (b) the purported grant of Class 19 interests invalidates the Final Stipulation and cannot be severed from the Final Stipulation.

### A.     The Bankruptcy Court Approval Requirement was Not Satisfied, and the Final Stipulation was Never Modified to Dispose of that Requirement

As Appellant argued in her pleadings and at the Hearing[18], the Final Stipulation never became valid by its own terms because ¶7 of the Final Stipulation expressly states that "[t]his Stipulation is subject to the approval of the [Bankruptcy] Court and shall be of no force or effect unless and until it is approved."  Although counsel for the Trust asserted that there is an email in which the Trust and the Underwriters agreed to dispense with the court approval requirement the Trust failed to provide that documentary evidence among its pleadings or at the Hearing.  Accordingly, as no evidence was provided that such an email ever existed the Bankruptcy Court should have regarded the Trust's counsel's statement as hearsay.

The Final Stipulation also provides that it "may not be modified other than a signed writing executed by the Parties hereto or by further order of the Court."  The Bankruptcy Court never ordered any modification of the Final Stipulation and the fictional email as an unsigned document would not suffice to modify the Final Stipulation to dispense with the court approval requirement.

---

any holders of Class 19 or 21 or 22 claims other than the stock that has already been provided on the effective date of the Plan"

[18] Oral argument of John McLaughlin, Esq., Ciardi Ciardi & Astin, local counsel for Appellant, at the Hearing.  *See* Tr. at 9-13, 36, and 41.

### B. Prohibited Grant of Class 19 Interests Invalidates the Final Stipulation and Cannot be Severed

Finally, the Final Stipulation does not contain a severability provision so the offending grant of Class 19 interests cannot be removed to avoid invalidating the entire agreement.

## VI. The Bankruptcy Court Erred in Voicing its Opinions About the Validity of the Final Stipulation and the Actions of the Trustee

In its summation the Bankruptcy Court voiced its opinions about how it would have ruled had the Final Stipulation been presented for approval in 2013, and though the statements are dicta, Appellant hereby responds to each opinion in turn, and requests that this Court adjudicate these matters. There is an actual case and controversy with respect to each of the matters set forth below.

### A. The Bankruptcy Erred in Opining it was Appropriate for the Trustee to Settle the Underwriters' Claim by Granting the Underwriters Class 19 Interests

The Plan became immutable 180 days post-confirmation. The Trust's sole function is to implement the Plan, and the Plan and the Trust Agreement are the Trustee's Charter. The Trust Agreement describes the authority and duties of the Trust's leadership, and the Plan and the Trust Agreement describe the interests of the Trust's beneficiaries, i.e., holders of creditor and equity claims against the Debtors. The Trust Agreement expressly states that (a) the Trustee can only exercise his power in a fiduciary capacity for the benefit of interest holders and (b) each member of the TAB is a fiduciary for all interest holders.

Accordingly, in addition the prohibition against violating the Plan, the Trustee and TAB as fiduciaries for each class of interests are forbidden from preferring one class over another.

Notwithstanding, when the Trust authorized execution of the Final Stipulation it completely disregarded the fact that the definition of Class 19 interests – Section 1.170 of the Plan[19] – is anti-dilutive and placed the Underwriters in that class. This was a clear violation of the Plan. Accordingly, the Trust's purported grant of Preferred Equity Interests – i.e., Class 19 interests – to the Underwriters is invalid.

While the Bankruptcy Court did not rule on the issue of whether the Trustee's grant of Class 19 interests to the Underwriters violated the Plan and the Trust Agreement by opining that it would have approved the Final Stipulation the Bankruptcy Court admits it would have authorized an action that would violate the Plan.

**B.** **The Bankruptcy Court Erred in Opining that by Placing the Underwriters' Claim in Class 19 the Trustee and the Trust's TAB did not, with Respect to Class 19: (1) Breach Their Fiduciary Duty; (2) Act in Bad Faith; and/or (3) Commit an *Ultra Vires* Act**

By placing the Underwriters in Class 19 in violation of the Plan the Trustee essentially abdicated his fiduciary and ethical duties to protect Class 19's interests. In so doing, he and the Trust's general counsel have effectively outsourced the Trust's Chief Ethics and Chief Compliance functions to Appellant, who, through her effort to reverse

---

[19] Class 19 is the equity class that contains Preferred Equity Interests. Section 1.170 of the Plan defines a 'Preferred Equity Interest' as : "An Equity Interest represented by an issued and outstanding share of preferred stock of WMI prior to or on the Petition Date, including, without limitation, those certain (i) Series K Perpetual Non-Cumulative Floating Rate Preferred Stock and (ii) Series R Non-Cumulative Perpetual Convertible Preferred Stock, but not including the REIT Series." (Emphasis added.) By contrast, Section _ of the Plan, which defines a 'Common Equity Interest' permits dilution. Obviously, this was the equity class the Plan's drafters originally intended would expand to include claims below Class 18 subordinated claims.

this injustice is functioning in those capacities. If it was improper for the Trustee to place the Underwriters' claim in Class 19 then the fitness of the Trustee, the Trust's general counsel, the members of the TAB, and any Trust professionals or employees who were involved in those actions is a matter that is ripe for adjudication and must necessarily be decided. In other words, whoever was responsible for the violation of the Plan and breach of fiduciary duties to Class 19 should be removed regardless of the fact that the actions were taken six years ago and the Trust Agreement imposes no time limit on Trustee or TAB malfeasance remedies.

### 1. Breach of Fiduciary Duty to Class 19

As set forth in the Objection, the Trustee and each member of the TAB has a duty of loyalty to each holder of a Trust interest and that duty of loyalty forbids the Trustee or a TAB member from benefiting an interest holder or class of interest holders at the expense of another. However, that is precisely what the Trustee and TAB did when they placed the Underwriters' claim in Class 19 in both the Original Stipulation and the Final Stipulation. Either they did not read Section 1.170 or they read it and simply disregarded it. In either case they breached their duty to protect Class 19's interests as a fiduciary has a duty to inform himself about anything affecting his beneficiary's interests and to protect those interests.

### 2. Bad Faith Against Class 19

At the Hearing Benjamin Finestone, Esq. of Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), counsel for the Trust, admitted that he drafted both the Original Stipulation and the Final Stipulation. It strains credulity to suggest that a member of a firm of Quinn Emanuel's caliber would not read the definitions of the terms he inserted in those

stipulations or that the Trust's general counsel, Charles E. Smith, wouldn't either. At a minimum, those lawyers must have understood that both stipulations violated Section 1.170 but both approved its execution. Mr. Smith, whose familiarity with every particular of the Plan must be assumed, was the last line of defense both for protecting Class 19's interests and the Trust from breaching its fiduciary duty to Class 19 and engaging in an *ultra vires* transaction. In addition, the Underwriters were represented by counsel, Gibson Dunn & Crutcher LLP, who, as part of their due diligence would have had to determine if the Trust was legally able to engage in the contemplated transaction, so it must be assumed this leading law firm understood that Section 1.170 prohibited the Trust from granting the Underwriters Class 19 interests. Based on the foregoing there is a strong presumption of gross negligence and actual malpractice at best, or bad faith at worst.[20]

### 3. The Final Stipulation was an *Ultra Vires* Act

In the Bankruptcy Court's summation it took the opportunity to express its opinion that the Trustee did not commit an *ultra vires* act by executing the Final Stipulation. However, no interpretation of Section 1.170 can support that opinion. That provision indicts both the Trustee and the TAB (which would have voted in favor of executing the Final Stipulation) for violation of the express terms of the Plan. Accordingly, by violating their fiduciary obligations to Class 19 the Trustee and the TAB also committed *ultra vires* acts.

### VII. This Court Must Adjudicate Fiduciary Issues Even if the Trust Takes Remedial Action to Remove the Underwriters from Class 19

---

[20] There was certainly bad faith after the fact in the Trust's recalcitrance in providing the Final Stipulation to Appellant. Appellant was forced to issue a subpoena and to make repeated requests for the whereabouts of the Trustee in order to serve it. The Trust should have published the Final Stipulation in 2013, and its refusal to treat Appellant as a fiduciary should treat its beneficiary was bad faith.

If the Trust violated the Plan when it exercised its fiduciary duties then the issue of whether the Trust's agents should remain in their respective capacities arises, and that issue would survive and remain a matter for adjudication before this Court even if the Underwriters' claim is removed from Class 19 (except if placed in Class 18 because that still is an economic burden on Class 19), or some other type of remedial action is taken to rectify the economic impact of the Final Stipulation.

Furthermore, if Appellant is barred by a statute of limitations from bringing a suit for damages against the Trustee and the other fiduciaries for breach of fiduciary duty, she is not precluded from seeking adjudication for whether such persons should remain in their respective capacities for actions that clearly violated the Trust Agreement, which has no such time bar and which, in any case could not be enforced or imposed as a matter of public policy, the equitable principles underlying the Bankruptcy Code, and the plain language of the Plan and the Trust Agreement.

## VIII.  Appellant Need Not Prove Equity Classes Will Receive a Recovery to Prevail on the Question of the Placement of the Propriety of Placement of Underwriters' Claim in Class 19

The Trust contended at the Hearing and in its Response that based on the Trust's disclosures in its '34 Act Filings there is no recovery forthcoming to Class 19. In the first place the information in those '34 Act Filings was inadmissible as hearsay to which the Bankruptcy Court should have objected. Second, as argued by Appellant's counsel at the Hearing, the question whether the placement of the Underwriters' claim in Class 19 was appropriate is independent of whether any recovery comes to Class 19. Even if nothing comes to the equity classes the Trust violated the Plan and its fiduciary duty to Class 19 by placing the Underwriters' claim in Class 19.

## IX.  Matters on Which the Bankruptcy Court Opined But Did Not Rule Should Not Be Remanded

If this Court overrules the Bankruptcy Court's laches ruling there will have to be adjudication of the merits.  As the Bankruptcy Court has already indicated how it would rule judicial economy dictates that this Court should adjudicate the merits and the merits would be ripe for adjudication.  Furthermore, the Bankruptcy Court's opinions indicate a lack of judicial disinterestedness.  Whether or not the opinions were dicta when made they would not be dicta if this Court reverses the laches ruling. [21]  Those opinions would clearly indicate the Bankruptcy Court predisposition if that court were tasked with adjudicating the merits on remand.

## X.  Stipulation Granting the TPS Group Compensation is Precedent for Payment of Compensation to Appellant

In late 2011 and into 2012 a group of holders of Class 19 interests (the "TPS Group") filed and defended objections to the Debtors' efforts to confirm the Plan.  The TPS Group tried to halt confirmation through various appellate court filings, culminating in a request for mandamus from the Third Circuit to compel the District Court to expedite the TPG Group's appeal from the Bankruptcy Court order characterizing its interests.  As a practical matter what the TPS Group wanted from the Debtors was more of the residual for Class 19, because originally the ratio of the residual was 70 (preferred):30 (common).  The Third Circuit's rebuff exhausted all the TPS Group's legal weapons to delay confirmation of the Plan.  However, the TPS Group's agitation resulted in the Debtors'

---

[21] According to the United States Supreme Court the Bankruptcy Court's opinions about the merits were dicta because due to the laches ruling they were "discussions of abstract and hypothetical situations not before [the court]".  *Connecticut v. Doehr*, 501 U.S. 1, 30, 111 S.Ct. 2105, 115 L.Ed.2d 1 (1991).  Similarly, the Third Circuit has held that "[d]icta are "judicial comment[s] made while delivering a judicial opinion, but one[s] that [are] unnecessary to the decision in the case and therefore not precedential...." *U.S. v. Dupree*, 617 F.3d 724, 704-741 (3d Cir. 2010) (internal citations omitted).

reducing the portion for common equity to 25%. Effectively the TPS Group enriched Class 19 by moving 5% of any residual over to Class 19, an increase for Class 19 of 7%.

Despite the fact that the TPG Group never achieved a legal victory, nor made a request for compensation in their pleadings, by stipulation approved by the Bankruptcy Court on February 17, 2012 (the "TPS Stipulation"), the TPS Group was given an allowed claim of (a) $3,000,000 payable upon execution of the TPS Stipulation and (b) $12,000,000 in Class 18.[22] The TPS Stipulation (including all the particulars of the TPG Group's litigation and the recalculation of the preferred/common residual ratio) is attached as Appendix D.

The TPS Stipulation is precedent for payment of compensation to Appellant – whether or not Appellant's appeal is granted (in whole or part) – who seeks to protect Class 19 from 1% dilution – the equivalent of a $72 million claim in that class – of its share of any residue that reaches the Trust's two equity classes. Without Appellant's efforts that 1% would go to the Underwriters.[23] Accordingly, Appellant hereby requests compensation from Appellee equivalent to (1) one-third (33.3%) of the $72 million Underwriters' claim, or (2) twenty percent (20%) of the $15 million owed to the TPS Group pursuant to the TPS Stipulation, whichever is greater, payable as an administrative expense, Class 18 interests, and Class 22 interests, subject to agreement between Appellant and Appellee.

## **CONCLUSION**

---

[22] The 5% recovered for Class 19 was the equivalent of a $500 million claim based on the fact that the entire face value of Class 19 securities is $7.5 billion and the implied value of Class 22's 25% is $2.5 billion.

[23] If successful Appellant will have recovered 20% of the value the TPS Group obtained for Class 19.

If this Court does not reverse the Bankruptcy Court's laches ruling the Trustee will have effectively amended the Plan to pay a type of claim the Third Circuit has said should not be paid and deprived Class 19 – a class that voted against dilution – of 1% of their recovery. The Trustee's action in allowing the $72 million Underwriters' in indemnification claim settlement payments was a breach of its fiduciary duty to Class 19 and an *ultra vires* act, both grave malfeasances, and this Appeal is essentially a motion for an order to show cause why the Trustee and the TAB should not be replaced.

Accordingly, Appellant hereby requests that this Court enter an order: (1) reversing the laches ruling; (2) nullifying the Final Stipulation; (3) holding that the Trustee, TAB, and their professionals violated the Plan, breached their fiduciaries duty to Class 19, and committed an *ultra vires* act by authorizing execution of the Final Stipulation; and (4) ruling that Appellant is entitled to compensation for services to the Trust, the Debtors, and Class 19 in amount commensurate with the award granted the TPS Funds for their.

# Appendix A

EX-10.1 2 mm03-1212_8ke101.htm EX.10.1 - WMI LIQUIDATING TRUST AGREEMENT

EXHIBIT 10.1

EXECUTION VERSION

WMI LIQUIDATING TRUST AGREEMENT

WMI LIQUIDATING TRUST AGREEMENT, dated as of March 5, 2012 (this "Trust Agreement"), is by and among Washington Mutual, Inc. ("WMI") and WMI Investment Corp. ("WMI Investment" and, together with WMI, the "Debtors"), as debtors and debtors-in-possession, William C. Kosturos, as liquidating trustee (together with any successor or additional trustee appointed under the terms hereof, the "Liquidating Trustee"), and CSC Trust Company of Delaware as the Delaware resident trustee (together with any successor Delaware resident trustee appointed under the terms hereof, the "Resident Trustee" and collectively with the Liquidating Trustee, the "Trustees") of the WMI Liquidating Trust (the "Liquidating Trust"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Debtors' Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated December 12, 2011, as confirmed (including all exhibits thereto, as the same may be further amended, modified, or supplemented from time to time, the "Plan").

BACKGROUND

A.      On September 26, 2008, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

B.      On December 12, 2011, the Debtors filed the Plan and the disclosure statement relating to the Plan (as amended, the "Disclosure Statement") with the Bankruptcy Court.

C.      On February 24, 2012, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order").

D.      The Plan provides for the creation of a liquidating trust on or before the Effective Date to hold, manage and administer the Liquidating Trust Assets and distribute the proceeds thereof, if any, to the Liquidating Trust Beneficiaries, in accordance with the terms of this Trust Agreement, the Plan and the Confirmation Order.

E.      The Liquidating Trust is being created on behalf of, and for the benefit of, the Liquidating Trust Beneficiaries.

F.      The Liquidating Trustee shall have all powers necessary to implement the provisions of this Trust Agreement and administer the Liquidating Trust, including, without limitation, the power to: (i) prosecute for the benefit of the Liquidating Trust Beneficiaries through Trust Professionals (as defined herein) any causes of action that may from time to time be held by the Liquidating Trust; (ii) preserve, maintain and liquidate the Liquidating Trust Assets; (iii) distribute the Liquidating Trust proceeds to the Liquidating Trust Beneficiaries; and (iv) otherwise perform the functions and take the actions provided for in this Trust Agreement or permitted in the Plan and/or the Confirmation Order or in any other agreement executed pursuant to the Plan, in each case

subject to the provisions of <u>Sections 6.3</u>, <u>6.4</u>, <u>6.5</u> and <u>6.6</u> of this Trust Agreement regarding limitation on the Liquidating Trustee and the oversight and consent rights of the Trust Advisory Board (as defined herein), the Litigation Subcommittee (as defined herein) and the Bankruptcy Court as provided for herein.

      G.      The Liquidating Trust is organized for the sole purpose of liquidating and distributing the Liquidating Trust Assets, with no objective to conduct a trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

      H.      The Liquidating Trust is intended to qualify as a "liquidating trust" under the Internal Revenue Code of 1986, as amended (the "<u>IRC</u>") and the regulations promulgated thereunder (the "<u>Treasury Regulations</u>"), specifically Treasury Regulations section 301.7701-4(d) and, as such, as a "grantor trust" for United States federal income tax purposes with the Liquidating Trust Beneficiaries treated as the grantors and owners of the Liquidating Trust.

## AGREEMENT

      NOW, THEREFORE, in consideration of the promises and the mutual covenants contained herein, the Debtors and the Liquidating Trustee agree as follows:

## ARTICLE I

## <u>DECLARATION OF TRUST</u>

      1.1 <u>Creation of Trust</u>.  The Debtors and the Liquidating Trustee, pursuant to the Plan and the Confirmation Order and in accordance with the applicable provisions of chapter 11 of the Bankruptcy Code, hereby constitute and create the Liquidating Trust, which shall bear the name "WMI Liquidating Trust."  In connection with the exercise of the Liquidating Trustee's power hereunder, the Liquidating Trustee may use this name or such variation thereof as the Liquidating Trustee sees fit.

      1.2 <u>Purpose of Liquidating Trust</u>.  The sole purpose of the Liquidating Trust is to implement the Plan on behalf, and for the benefit, of the Liquidating Trust Beneficiaries, and to serve as a mechanism for liquidating, converting to Cash and distributing the Liquidating Trust Assets in accordance with Treasury Regulations section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust.

      1.3 <u>Transfer of Liquidating Trust Assets</u>.  On the Effective Date, the Debtors shall transfer, for the sole benefit of the Liquidating Trust Beneficiaries, pursuant to Bankruptcy Code sections 1123(a)(5)(B) and 1123(b)(3)(B) and in accordance with the Plan and the Confirmation Order, the Liquidating Trust Assets to the Liquidating Trust, free and clear of any and all liens, claims, encumbrances and interests (legal, beneficial or

2

otherwise) of all other entities to the maximum extent contemplated by and permissible under Bankruptcy Code section 1141(c); provided, however, that the Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in the Plan, Confirmation Order or as otherwise provided herein.  On the Effective Date, there shall be set aside out of the Liquidating Trust Assets the amount of Cash that was reasonably determined by the Debtors and the Creditors' Committee following consultation with the Equity Committee prior to the Effective Date to be necessary to fund the activities of the Liquidating Trust, which amount shall be Sixty Million Dollars ($60,000,000.00) (the "Funding"); provided, however, that the Funding may be increased from time to time during the term of the Liquidating Trust upon the request of the Liquidating Trustee and the approval of a Supermajority of the Trust Advisory Board.  A "Supermajority" shall mean the affirmative vote of seven (7) of the nine (9) members of the Trust Advisory Board (excluding the Holdco Member); provided, however, that if the Trust Advisory Board is reduced to five (5) members pursuant to Section 6.4(e), a "Supermajority" shall mean the affirmative vote of three (3) of the five (5) members of the Trust Advisory Board.  Twenty Million Dollars ($20,000,000.00) of the Funding (the "Litigation Funding") shall be allocated to the Litigation Subcommittee, with both the first Ten Million Dollars ($10,000,000.00) of the Litigation Funding and the second Ten Million Dollars ($10,000,000.00) of the Litigation Funding (the "Second Tranche") to be used for the prosecution of the Recovery Claims (as defined herein); provided, however, that, prior to the allocation and use of any portion of the Second Tranche, the Litigation Subcommittee shall obtain the approval of the Trust Advisory Board as to the reasonable expenditure of such funds; provided, further, that the Litigation Funding may be increased during the term of the Liquidating Trust upon the request of the Litigation Subcommittee and the approval of a Supermajority of the Trust Advisory Board, which approval may be granted or withheld by the Trust Advisory Board in its sole and absolute discretion, and provided that any additional Litigation Funding that is approved shall be deducted from any remaining portion of the Administrative Funding (as defined herein); provided, further, that nothing herein shall preclude the Trust Advisory Board or the Litigation Subcommittee from seeking additional financing from sources other than the Liquidating Trust Assets in the discharge of their fiduciary duties; provided, further, that any portion of the Funding, including the Litigation Funding, that is not used to fund the activities of the Liquidating Trust shall be distributed in accordance with Section 4.3 hereof.  The transfer of the Liquidating Trust Assets shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar Tax, pursuant to section 1146(a) of the Bankruptcy Code.  Upon delivery of all Liquidating Trust Assets to the Liquidating Trust, the Debtors shall be discharged and released from all liability with respect to the delivery of such distributions, and exculpated as provided in Section 41.8 of the Plan.  In connection with the receipt of the Liquidating Trust Assets, the Liquidating Trust shall acquire and assume all of WMI's rights and obligations pursuant to Section 2.4 of the Global Settlement Agreement, and WMI shall have no further liability or obligations thereunder.  The Liquidating Trust Assets and all other property held from time to time by the Liquidating Trust under this Trust Agreement and any earnings, including without limitation, interest, on any of the foregoing are to be applied by the Liquidating Trustee in accordance with the terms hereof, the Plan and the

3

Confirmation Order for the benefit of the Liquidating Trust Beneficiaries, and for no other party, subject to the further covenants, conditions and terms hereinafter set forth.

1.4 <u>Appointment and Acceptance of Liquidating Trustee</u>.  As set forth in the Confirmation Order, the members of the Trust Advisory Board hereby designate William C. Kosturos in connection with the applicable provisions of the Delaware Statutory Trust Act, 12 <u>Del. C.</u> § 3801 <u>et seq</u>., as the same may from time to time be amended, or any successor statute (the "<u>Trust Act</u>") to serve as the initial Liquidating Trustee under the Plan.  The Liquidating Trustee shall be deemed to be appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).  The Liquidating Trustee accepts the Liquidating Trust created by this Trust Agreement and the grant, assignment, transfer, conveyance and delivery to the Liquidating Trustee, on behalf, and for the benefit, of the Liquidating Trust Beneficiaries, by the Debtors of all of their respective right, title and interest in the Liquidating Trust Assets, upon and subject to the terms and conditions set forth herein, in the Plan and in the Confirmation Order.  The Liquidating Trustee's powers are exercisable solely in a fiduciary capacity consistent with, and in furtherance of, the purpose of the Liquidating Trust and not otherwise.  The Liquidating Trustee shall have the authority to bind the Liquidating Trust within the limitations set forth herein, but shall for all purposes hereunder be acting in the capacity as Liquidating Trustee, and not individually.

1.5 <u>Liquidation of Liquidating Trust Assets</u>.  The Liquidating Trustee shall, in an expeditious but commercially reasonable manner and subject to the provisions of the Plan (including, without limitation, Section 31.14 of the Plan), the Confirmation Order and the other provisions of this Trust Agreement, liquidate and convert to Cash the Liquidating Trust Assets, make timely distributions in accordance with the terms hereof and the Plan and not unduly prolong the existence of the Liquidating Trust.  The Liquidating Trustee shall exercise reasonable business judgment and liquidate the Liquidating Trust Assets to maximize net recoveries; <u>provided</u>, <u>however</u>, that the Liquidating Trustee shall be entitled to take into consideration the risks, timing, and costs of potential actions in making determinations as to the maximization of recoveries and the determinations and actions of the Liquidating Trustee shall in all cases be subject to the limitations provided elsewhere herein.  Subject to the terms of this Trust Agreement, such liquidations may be accomplished through the prosecution, compromise and settlement, abandonment or dismissal of any or all claims, rights or causes of action of the Liquidating Trust or through the sale or other disposition of the Liquidating Trust Assets (in whole or in combination, and including the sale of any claims, rights or causes of action of the Liquidating Trust).  The Liquidating Trustee may incur any reasonable and necessary expenses in connection with the liquidation and conversion of the Liquidating Trust Assets into Cash or in connection with the administration of the Liquidating Trust and, to the extent that any Administrative Funding (as defined herein) is available, such expenses shall first be deducted from the Administrative Funding.

1.6 <u>No Reversion to Debtors</u>.  In no event shall any part of the Liquidating Trust Assets revert to or be distributed to any Debtor or Reorganized Debtor.

1.7 <u>Incidents of Ownership</u>.  Except as provided in <u>Section 1.6</u> hereof, the Liquidating Trust Beneficiaries shall be the sole beneficiaries of the Liquidating Trust and the Liquidating Trust Assets, and the Liquidating Trustee shall retain only such incidents of ownership as are necessary to undertake the actions and transactions authorized herein, in the Plan and in the Confirmation Order, including, but not limited to, those powers set forth in <u>Section 6.2</u> hereof.

1.8 <u>Privileges and Obligation to Respond to Ongoing Investigations</u>.  All Privileges shall be transferred, assigned, and delivered to the Liquidating Trust, without waiver, and shall vest in the Liquidating Trustee solely in its capacity as such (and any other individual whom the Liquidating Trustee, with the consent of the Trust Advisory Board or the Litigation Subcommittee, as applicable, may designate, it being understood that, as of the date of this Trust Agreement, the Liquidating Trustee shall designate the Trust Advisory Board and the Litigation Subcommittee, solely in their capacities as such, as well as any other individual designated in this Trust Agreement).  Pursuant to Federal Rule of Evidence 502(d) (to the extent Rule 502(d) is relevant notwithstanding the fact that the Debtors, the Liquidating Trustee, the FDIC Receiver and JPMC are joint holders of certain attorney-client privileges, work product protections, or other immunities or protections from disclosure), no Privileges shall be waived by disclosure to the Liquidating Trustee, the Trust Advisory Board and/or the Litigation Subcommittee of the Debtors' information subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure, or by disclosure among the Debtors, the Liquidating Trustee, the Trust Advisory Board, the Litigation Subcommittee, the FDIC Receiver, and/or JPMC of information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure jointly held by the Debtors, the FDIC Receiver, the Liquidating Trustee, the Trust Advisory Board, the Litigation Subcommittee and/or JPMC.  The Liquidating Trustee shall be obligated to respond, on behalf of the Debtors, to all Information Demands.  The FDIC Receiver and JPMC shall take reasonable steps to cooperate with the Liquidating Trustee in responding to Information Demands, and such cooperation shall include, for example, taking all steps necessary to maintain and avoid waiver of any and all Privileges (including, without limitation, any Privileges that are shared jointly among or between any of the parties).  The Liquidating Trustee, with the consent of the Trust Advisory Board or the Litigation Subcommittee, as applicable, may waive Privileges that are held solely by the Debtors and/or the Liquidating Trust, but not jointly held with the FDIC Receiver and/or JPMC, in the event and to the extent the Liquidating Trustee, with the consent of the Trust Advisory Board or the Litigation Subcommittee, as applicable, determines in good faith that doing so is in the best interests of the Liquidating Trust and its beneficiaries.  The Liquidating Trustee, the FDIC Receiver and JPMC may disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the FDIC Receiver and/or JPMC only (i) upon written permission from the Liquidating Trustee, the FDIC Receiver and JPMC, as the case may be; (ii) pursuant to an order of a court of competent jurisdiction, subject to the procedure described in the next sentence insofar as it applies; or (iii) as otherwise required by law, subject to the procedure

described in the next sentence insofar as it applies. If the Liquidating Trustee, the Trust Advisory Board, the Litigation Subcommittee, the FDIC Receiver or JPMC receives a request from a third party to disclose information that is subject to attorney-client privileges, work product protections, or other immunities or protections from disclosure that are jointly held with the Liquidating Trustee, the Trust Advisory Board, the Litigation Subcommittee, the FDIC Receiver and/or JPMC, the party or parties who receives such request will (w) pursue all reasonable steps to maintain the applicable privileges or protections from disclosure, including, if necessary, to maintain the privileges or protections from disclosure by seeking a protective order against and/or otherwise objecting to the production of such material, (x) notify the Liquidating Trustee, the Trust Advisory Board, the Litigation Subcommittee, the FDIC Receiver and/or JPMC, as the case may be, (y) allow the Liquidating Trustee, the Trust Advisory Board, the Litigation Subcommittee, the FDIC Receiver and/or JPMC, as the case may be, reasonable time under the circumstances to seek a protective order against and/or otherwise object to the production of such material, and (z) unless required by law, not disclose the materials in question unless and until any objection raised by the Liquidating Trustee, the Trust Advisory Board, the Litigation Subcommittee, the FDIC Receiver and/or JPMC is resolved in favor of disclosure.

       1.9 <u>Liquidating Trustee's Administration and Rights with Respect to Runoff Notes</u>. Until such time as any Runoff Notes that are held by the Liquidating Trust are distributed to any Liquidating Trust Beneficiaries entitled thereto in accordance with the Plan, the Liquidating Trustee shall (i) not sell, convey, dispose or otherwise transfer the Runoff Notes except as expressly provided for in the Plan and (ii) exercise any remedies available to Holders (as defined in the Indenture) under the Indenture or any Security Document (as defined in the Indenture) as the Liquidating Trustee deems necessary and advisable solely to protect the interests of such Liquidating Trust Beneficiaries.

ARTICLE II

<u>LIQUIDATING TRUST BENEFICIARIES</u>

       2.1 <u>Conflicting Claims</u>. If any conflicting claims or demands are made or asserted with respect to a Liquidating Trust Interest, the Liquidating Trustee shall be entitled, at his sole election, to refuse to comply with any such conflicting claims or demands. In so refusing, the Liquidating Trustee, at his sole election, may elect to make no payment or distribution with respect to the Liquidating Trust Interest subject to the claims or demands involved, or any part thereof, and the Liquidating Trustee shall refer such conflicting claims or demands to the Bankruptcy Court, which shall have exclusive jurisdiction over resolution of such conflicting claims or demands. In so doing, the Liquidating Trustee shall not be or become liable to any party for its refusal to comply with any of such conflicting claims or demands. The Liquidating Trustee shall be entitled to refuse to act until either (i) the rights of the adverse claimants have been adjudicated by a Final Order of the Bankruptcy Court (or such other court of proper jurisdiction) or (ii) all differences have been resolved by a written agreement among all

6

of such parties and the Liquidating Trustee, which agreement shall include a complete release of the Liquidating Trust and the Liquidating Trustee (the occurrence of either (i) or (ii) in this <u>Section 2.1</u> being referred to as a "<u>Dispute Resolution</u>").  Promptly after a Dispute Resolution is reached, the Liquidating Trustee shall transfer the payments and distributions, if any, together with any interest thereon to be paid in accordance with <u>Section 4.6</u> hereof, in accordance with the terms of such Dispute Resolution.  Any payment of any interest or income should be net of any taxes attributable thereto in accordance with <u>Section 5.4</u>.

2.2 <u>Rights of Liquidating Trust Beneficiaries</u>.  Each Liquidating Trust Beneficiary shall be entitled to participate in the rights and benefits due to a Liquidating Trust Beneficiary hereunder according to the terms of its Liquidating Trust Interest.  The interest of a Liquidating Trust Beneficiary is hereby declared and shall be in all respects personal property.  Except as expressly provided hereunder, a Liquidating Trust Beneficiary shall have no title to, right to, possession of, management of or control of the Liquidating Trust or the Liquidating Trust Assets or to any right to call for a partition or division of such assets or to require an accounting.  No surviving spouse, heir or devisee of any deceased Liquidating Trust Beneficiary shall have any right of dower, homestead or inheritance, or of partition, or any other right, statutory or otherwise, in the Liquidating Trust Assets, but the whole title to the Liquidating Trust Assets shall be vested in the Liquidating Trustee and the sole interest of the Liquidating Trust Beneficiaries shall be the rights and benefits given to such person under this Trust Agreement and the Plan.

2.3 <u>Evidence of Liquidating Trust Interest</u>.  Ownership of a Liquidating Trust Interest in the Liquidating Trust will be evidenced by the recording of such ownership in an electronic book-entry system (the "<u>Book Entry System</u>") maintained either by the Liquidating Trust or an agent of the Liquidating Trust.  A Liquidating Trust Beneficiary shall be deemed the "holder of record" (hereinafter "<u>holder</u>") of such Liquidating Trust Beneficiary's Liquidating Trust Interest(s) for purposes of all applicable United States federal and state laws, rules and regulations.  The Liquidating Trustee shall, upon the written request of a holder of a Liquidating Trust Interest, provide reasonably adequate documentary evidence of such holder's Liquidating Trust Interest, as indicated in the Book Entry System.  The expense of providing such documentation shall be borne by the requesting holder.

2.4 <u>Transfers of Liquidating Trust Interests</u>.

(a) <u>General</u>.  Liquidating Trust Interests shall not be transferable or assignable except by will, intestate succession or operation of law.

(b) <u>Book Entry System</u>.  Pursuant to the Book Entry System, the Liquidating Trust shall maintain, or cause the agent of the Liquidating Trust to maintain, a register (which may be electronic) setting forth the names and addresses of the Liquidating Trust Beneficiaries, and the amount and class of their Liquidating Trust Interests from time to time.  Any transfer or assignment of a Liquidating Trust Interest by will, intestate succession or operation of law shall not be effective unless and until such

7

transfer or assignment is recorded in the Book Entry System, which shall be completed as soon as practicable.  Subject to Section 2.4(d), the entries in the Book Entry System shall be conclusive absent manifest error, and the Liquidating Trust and the Liquidating Trustee shall treat each person whose name is recorded in the Book Entry System pursuant to the terms hereof as the owner of Liquidating Trust Interests indicated therein for all purposes of this Trust Agreement, notwithstanding notice to the contrary.

(c) Registration.  If the Liquidating Trustee, with the consent of the Trust Advisory Board and upon advice of counsel, determines that any class of Liquidating Trust Interests may be subject to registration pursuant to section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), the Liquidating Trustee shall pursue relief from such registration by obtaining either an exemptive order, a no-action letter or an interpretive letter from the Securities and Exchange Commission or its staff or, absent its ability to achieve that objective or in lieu thereof, shall register such class pursuant to section 12 of such statute (it being understood and agreed that the Liquidating Trustee with the consent of the Trust Advisory Board shall be authorized, among other things, to register such class and to seek relief from one or more of the requirements then applicable subsequent to such registration  and to de-register such class).  To the extent that any Administrative Funding is available, any expenses that are associated with such application for relief and/or registration shall first be deducted from the Administrative Funding.

(d) Further Limitations on Transfer.  Notwithstanding any other provision to the contrary, the Liquidating Trustee may disregard any purported transfer or assignment of Liquidating Trust Interests by will, intestate succession or operation of law if sufficient necessary information (as reasonably determined by the Liquidating Trustee), including applicable Tax-related information, is not provided by such purported transferee or assignee to the Liquidating Trustee.

2.5 Limited Liability.  No provision of this Trust Agreement, the Plan or the Confirmation Order, and no mere enumeration herein of the rights or privileges of any Liquidating Trust Beneficiary, shall give rise to any liability of such Liquidating Trust Beneficiary solely in its capacity as such, whether such liability is asserted by any Debtor, by creditors, employees, or equity interest holders of any Debtor, or by any other Person.  Liquidating Trust Beneficiaries are deemed to receive the Liquidating Trust Assets in accordance with the provisions of this Trust Agreement, the Plan and the Confirmation Order in exchange for their Allowed Claims or Equity Interests, as applicable, without further obligation or liability of any kind, but subject to the provisions of this Trust Agreement.

8

ARTICLE III

DURATION AND TERMINATION OF LIQUIDATING TRUST

3.1 Duration.  The Liquidating Trust shall become effective upon the Effective Date of the Plan and shall remain and continue in full force and effect until dissolved as provided for in Section 27.14(d) of the Plan.

3.2 Dissolution of the Liquidating Trust.  The Liquidating Trustee and the Liquidating Trust shall be discharged or dissolved, as the case may be, on the earlier to occur of (i) all of the Liquidating Trust Assets having been distributed pursuant to the Plan and this Trust Agreement, (ii) the Liquidating Trustee having determined, with the consent of the Trust Advisory Board, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all distributions required to be made by the Liquidating Trustee under the Plan and this Trust Agreement having been made; provided, however, that in no event shall the Liquidating Trust be dissolved later than three (3) years from the Effective Date unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of any extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee and the Trust Advisory Board that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.  If at any time the Liquidating Trustee determines, in reliance upon such Trust Professionals as the Liquidating Trustee may retain, that the expense of administering the Liquidating Trust so as to make a final distribution to the Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in the Liquidating Trust, the Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidating Trust, (ii) donate any balance to a charitable organization (A) of the type described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) that is not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, the Reorganized Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (iii) dissolve the Liquidating Trust.  Upon receipt of such authority from the Bankruptcy Court, the Liquidating Trustee shall (X) notify each Liquidating Trust Beneficiary, (Y) file a Certificate of Cancellation with the Secretary of State of the State of Delaware and (Z) provide a copy of the evidence of such cancellation to the Resident Trustee.

3.3 Continuance of Liquidating Trust for Winding Up.  After the dissolution of the Liquidating Trust and solely for the purpose of liquidating and winding up the affairs of the Liquidating Trust, the Liquidating Trustee shall continue to act as such until its duties have been fully performed.  Upon distribution of all the Liquidating Trust Assets, the Liquidating Trustee shall retain the books, records and files that shall

9

have been delivered to or created by the Liquidating Trustee.  At the Liquidating Trustee's discretion, all of such records and documents may be destroyed at any time following the date that is six (6) years after the final distribution of the Liquidating Trust Assets, subject to any joint prosecution and common interests agreement(s) to which the Liquidating Trustee may be party.

ARTICLE IV

ADMINISTRATION OF LIQUIDATING TRUST

4.1 <u>Payment of Claims, Expenses and Liabilities</u>.  Subject to the Budget (as defined below) from time to time approved by the Trust Advisory Board in accordance with <u>Section 4.14(b)</u> hereof, and subject to the approval of the Bankruptcy Court in accordance with <u>Sections 6.4(m)</u>, 6.5(k), <u>6.8(b)</u>, <u>6.11(c)</u> and <u>7.7</u>, and except as otherwise provided herein, the Liquidating Trustee shall use the Funding (i) to pay reasonable costs and expenses of the Liquidating Trust that are incurred (including, but not limited to, the costs and expenses associated with the administration of the Disputed Equity Escrow (excluding any Taxes), any Taxes imposed on the Liquidating Trust, the actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Liquidating Trust Assets, as provided in <u>Section 6.8</u> hereof, and the preservation of books and records of the Liquidating Trust); (ii) to satisfy other obligations or other liabilities incurred or assumed by the Liquidating Trust (or to which the Liquidating Trust Assets are otherwise subject) in accordance with the Plan, the Confirmation Order, the Global Settlement Agreement or this Trust Agreement, including fees and costs incurred in connection with the protection, preservation, liquidation and distribution of the Liquidating Trust Assets and the costs of investigating, prosecuting, resolving and/or settling any Claims; (iii) as reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (iv) to satisfy any other obligations of the Liquidating Trust expressly set forth in the Plan, this Trust Agreement, the Confirmation Order, and the Global Settlement Agreement.

4.2 <u>BB Liquidating Trust Interests</u>.  On the Effective Date, the Liquidating Trustee shall immediately distribute the funds on account of the BB Liquidating Trust Interests, subject to consensual release by the parties pursuant to Section 2.4 of the Global Settlement Agreement of such funds from the tax escrow account.

4.3 <u>Distributions</u>.

(a) <u>Generally</u>.  Subject to <u>Section 4.4(b)</u> hereof, the Liquidating Trustee is required to distribute to the Liquidating Trust Beneficiaries on account of their Liquidating Trust Interests, on each Distribution Date (as defined below) all unrestricted Cash then on hand (including any Cash received from the Debtors on the Effective Date, and treating any permissible investment as Cash for purposes of this <u>Section 4.3</u>), except (i) the Funding, (ii) such other amounts as are allocable to or retained

10

on account of Disputed Claims in accordance with Section 26.3 of the Plan, and (iii) after taking into account the Funding, such additional amounts (A) as are reasonably necessary to meet contingent liabilities and to maintain the value of the Liquidating Trust Assets pending their liquidation during the term of the Liquidating Trust, (B) as are necessary to pay reasonably incurred or anticipated expenses (including, but not limited to, any Taxes imposed on or payable by the Debtors or the Liquidating Trust or in respect of the Liquidating Trust Assets), or (C) as are necessary to satisfy other liabilities incurred or anticipated by the Liquidating Trust in accordance with the Plan, the Global Settlement Agreement, or this Trust Agreement; provided, that the amounts listed in clause (iii) shall be subject to the approval of a Supermajority of the Trust Advisory Board; provided, further, that the Liquidating Trustee shall not be required to make a distribution pursuant to this Section 4.3 if the aggregate, net amount of unrestricted Cash available for distribution (taking into account the above listed exclusions) is such as would make the distribution impracticable as reasonably determined by the Liquidating Trustee, with the consent of the Trust Advisory Board, in accordance with applicable law, and so long as such aggregate amount is less than Twenty-Five Million Dollars ($25,000,000.00); and provided, further, that the Liquidating Trustee, with consent of the Trust Advisory Board, may decide to forego the first quarterly distribution to those Liquidating Trust Beneficiaries with respect to which the Liquidating Trustee, in its reasonable judgment, is not administratively prepared to make such distribution, in which case, such distribution shall be made to such holders as soon as practicable after the Liquidating Trustee is administratively prepared to do so. "Distribution Date" means the 1st day of the second month in each fiscal quarter during the term of the Liquidating Trust or such other dates that the Liquidating Trustee determines, in consultation with the Trust Advisory Board, are appropriate from time to time; provided, however, that there shall be at least one such date in each fiscal quarter during the term of the Liquidating Trust.

(b) Payment of Distributions. Subject to Section 4.2, each Liquidating Trust Beneficiary's share of the Liquidating Trust Interests as determined pursuant to the Plan (including any Cash to be received on account of any Liquidating Trust Interests) shall be allocated and distributed, and the Liquidating Trust Assets shall be allocated and distributed, in accordance with Article XXXI of the Plan and Annex C hereto. Any distribution that is to be made to a Liquidating Trust Beneficiary who elected to forego fifty percent (50%) of such Liquidating Trust Beneficiary's Litigation Proceeds Interest shall be adjusted as required pursuant to Sections 6.2(b), 7.2(b), 16.2(b)(ii), 18.2(b), 19.1(b) and 20.2 of the Plan.

(c) De Minimis Distributions. No Cash payment shall be made to any holder of a Liquidating Trust Interest until such time, if ever, as the amount payable thereto, in any distribution from the Liquidating Trust, is equal to or greater than ten dollars ($10.00). Any holder of a Liquidating Trust Interest on account of which the amount of Cash to be distributed pursuant to any distribution from the Liquidating Trust is less than ten dollars ($10.00) shall be deemed to have no claim for such distribution against the Debtors, the Reorganized Debtors, the Liquidating Trust or the Liquidating Trust Assets. Subject to Section 4.6 hereof, any Cash not distributed pursuant to this

11

Section 4.3 shall be the property of the Liquidating Trust free of any restrictions thereon, and shall be available for distribution to the other Liquidating Trust Beneficiaries, in accordance with the Plan and this Trust Agreement.

(d) Runoff Notes.  To the extent the Liquidating Trust Assets include Runoff Notes that are not allocable to the Liquidating Trust Claims Reserve, the Liquidating Trustee shall distribute such Runoff Notes in accordance with Section 31.14 of the Plan.

4.4 Undeliverable Property.

(a) Holding of Undeliverable Distributions:  For purposes of this Trust Agreement, an "undeliverable" distribution shall include, without limitation, a check that is sent to a holder in respect of a distribution to such holder, which check has not been negotiated within six (6) months following the date on which such check was issued.  Subject to Section 4.4(b), if any distribution to the holder of a Liquidating Trust Interest is undeliverable, no further distribution shall be made to such holder unless and until the Liquidating Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address.  Undeliverable distributions shall remain in the possession of the Liquidating Trustee (or its duly authorized agent) until such time as a distribution becomes deliverable or as set forth in Section 4.4(b) below.  All Entities ultimately receiving an undeliverable distribution shall not be entitled to any interest or other accruals of any kind on account of the delay in payment resulting from the undeliverable status of such distribution.  Except as required by law, the Liquidating Trustee (or its duly authorized agent) shall not be required to attempt to locate any holder of a Liquidating Trust Interest.

(b) Failure to Claim Undeliverable Distributions:  If (i) a check is sent to a holder in respect of a distribution and such check is not negotiated within six (6) months following the date on which the check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Liquidating Trustee (or its duly authorized agent) shall, no later than seven (7) months after the sending of the un-negotiated check or other form of undeliverable distribution, send a written notice (a "Missing Holder Notice") to such holder at the address shown on the Book Entry System with respect to such holder.  The Missing Holder Notice shall state that (i) the holder has been sent a check or other form of distribution that has not yet been negotiated or is otherwise undeliverable, (ii) no further distributions will be made to such holder unless and until the Liquidating Trustee (or its duly authorized agent) is notified, in writing, of such holder's then-current address, and (iii) that unless such holder notifies the Liquidating Trustee (or its duly authorized agent) of the holder's then-current address within thirty (30) days of the date of the Missing Holder Notice, such holder shall have its entitlement to such undeliverable distribution and the Liquidating Trust Interest or Interests to which such undeliverable distribution relates cancelled and shall be forever barred from asserting any entitlement with respect thereto pursuant to the Plan, this Trust Agreement or otherwise against the Debtors, the Reorganized Debtors, the Liquidating

12

Trust, or their respective property.  In such case, any consideration held for distribution on account of such Liquidating Trust Interest(s) shall revert to the Liquidating Trustee for redistribution to other holders of Liquidating Trust Interests in accordance with the terms and provisions of this Trust Agreement, the Plan and the Confirmation Order.

4.5  Interest on Liquidating Trust Interests.  As set forth in the Plan, interest shall not accrue and be paid on the Liquidating Trust Interests themselves, but only with respect to and to the extent provided in the Plan with respect to an Allowed Claim ("Interest").  Interest may, as an incremental adjustment on the maximum amount the Liquidating Trust distributes in respect of a Liquidating Trust Interest, accrue up to and including the date of final payment in full of the Allowed Claim related to the Liquidating Trust Interest as provided in the Plan.

4.6  Setoffs.  The Liquidating Trustee may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Liquidating Trust Interest and the distributions to be made pursuant to the Plan on account thereof (before any distribution is made on account of such Liquidating Trust Interest by the Liquidating Trustee), the claims, rights, and causes of action of any nature that one or more of the Debtors, Debtors in Possession, the Liquidating Trustee or the Reorganized Debtors may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors, Debtors in Possession, the Liquidating Trustee or the Reorganized Debtors of any such claims, rights, and causes of action that the Debtors, Debtors in Possession, the Liquidating Trustee or the Reorganized Debtors may possess against such holder; and, provided, further, that nothing contained herein is intended to limit the ability of any Liquidating Trust Beneficiary to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment.

4.7  Distributions After the Effective Date.  Distributions made after the Effective Date to holders of Liquidating Trust Interests on account of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XXXI of the Plan.

4.8  Compliance with Laws.  Any and all distributions of Liquidating Trust Assets shall be in compliance with applicable laws, including but not limited to, applicable federal and state tax and securities laws.

4.9  Fiscal Year.  Except for the first and last years of the Liquidating Trust, the fiscal year of the Liquidating Trust shall be the calendar year.  For the first and last years of the Liquidating Trust, the fiscal year of the Liquidating Trust shall be such portion of the calendar year that the Liquidating Trust is in existence.

4.10  Books and Records.  The Liquidating Trustee shall retain and preserve the Debtors' books, records and files that shall have been delivered to or created

13

by the Liquidating Trustee. Subject to Section 3.3 hereof, the Liquidating Trustee shall maintain, in respect of the Liquidating Trust and the Liquidating Trust Beneficiaries and all others to receive distributions under this Trust Agreement, books and records relating to the assets and the income of the Liquidating Trust and the payment of expenses of, liabilities of, and claims against or assumed by, the Liquidating Trust and the Liquidating Trustee, in such detail and for such period of time as may be necessary to enable it to make full and proper reports in respect thereof in accordance with the provisions of this Trust Agreement and applicable provisions of law, including but not limited to applicable Tax, securities and other federal and state laws. Except as otherwise provided herein or in the Plan, nothing in this Trust Agreement requires the Liquidating Trustee to file any accounting or seek approval of any court with respect to the administration of the Liquidating Trust, or as a condition for making any payment or distribution out of the Liquidating Trust Assets. The Liquidating Trustee shall provide any member of the Trust Advisory Board with access to such books and records during normal business hours as may be reasonably requested with five (5) days' advance notice. Liquidating Trust Beneficiaries shall have the right upon thirty (30) days' prior written notice delivered to the Liquidating Trustee to inspect such books and records; provided, that, if so requested, all costs associated with such inspection shall be paid in advance by such requesting Liquidating Trust Beneficiary and such Liquidating Trust Beneficiary shall have entered into a confidentiality agreement reasonably satisfactory in form and substance to the Liquidating Trustee.

       4.11 <u>Cash Payments</u>. Subject to Section 26.3 of the Plan and <u>Section 4.3(d)</u> hereof, all distributions required to be made by the Liquidating Trustee to the Liquidating Trust Beneficiaries shall be made in Cash denominated in United States dollars by checks drawn on a domestic bank selected by the Liquidating Trustee or, at the option of the Liquidating Trustee, by wire transfer from a domestic bank selected by the Liquidating Trustee or as otherwise required or provided in applicable agreements; provided, however, that Cash payments to foreign holders of Liquidating Trust Interests may be made, at the option of the Liquidating Trustee, in such funds as and by such means as are necessary or customary in a particular foreign jurisdiction.

       4.12 <u>Insurance</u>. The Liquidating Trust shall maintain customary insurance coverage for the protection of the Liquidating Trustee, the members of the Trust Advisory Board, employees and any such other persons serving as administrators and overseers of the Liquidating Trust on and after the Effective Date. The Liquidating Trustee also may obtain insurance coverage it deems necessary and appropriate with respect to real and personal property which may become Liquidating Trust Assets, if any.

       4.13 <u>Disputes</u>. To the extent a dispute arises between the Liquidating Trustee, the Trust Advisory Board and/or the Litigation Subcommittee concerning the performance of any of the powers, duties, and/or obligations herein, the Liquidating Trustee, the Trust Advisory Board or the Litigation Subcommittee may file a motion and/or other pleadings with the Bankruptcy Court and obtain advice and guidance or such other relief as may be appropriate concerning a resolution of the matter(s) in dispute between the parties. In the event of a dispute, the Liquidating Trustee, the Trust

14

Advisory Board and the Litigation Subcommittee, as applicable, shall have the right to engage legal counsel to advise it with respect to the matter(s) in dispute and the reasonable fees and expenses of such legal counsel shall be reimbursed by the Liquidating Trustee from the Funding (excluding the Litigation Funding, the "Administrative Funding")) or, in the event the Administrative Funding has been spent, any other unrestricted Cash in the Liquidating Trust, subject to the approval of a Supermajority of the Trust Advisory Board and subject to Section 7.6 hereof.

     4.14 Reports.

     (a) The Liquidating Trustee shall deliver reports to members of the Trust Advisory Board not later than thirty (30) days following the end of each fiscal quarter. Such reports shall specify in reasonable detail (i) the status of any Causes of Action, Claims and litigation involving the Liquidating Trust or the Liquidating Trust Assets, including, without limitation, Avoidance Actions, including any settlements entered into by the Liquidating Trust, (ii) the costs and expenses of the Liquidating Trust that are incurred (including, but not limited to, any Taxes imposed on the Liquidating Trust or actual reasonable out-of-pocket fees and expenses incurred by Trust Professionals in connection with the administration and liquidation of the Liquidating Trust Assets and preservation of books and records as provided in Section 4.10 hereof) during the preceding fiscal quarter and the remaining amount (if any) of the Administrative Funding and the Litigation Funding, (iii) the amounts listed in clause (ii) incurred since the Effective Date, (iv) the amount of Cash and other assets received by the Liquidating Trust during the prior fiscal quarter, (v) the Liquidating Trustee's estimate as of the end of the most recent fiscal quarter of the uncollected Tax Refunds and all other Liquidating Trust Assets, (vi) the aggregate amount of Cash and other assets received by the Liquidating Trust since the Effective Date, (vii) the calculation of the estimated amount of the Cash and other assets to be distributed on the next Distribution Date, including any Cash on hand that is not to be distributed pursuant to Section 4.3(a) above, (viii) the aggregate amount of distributions from the Liquidating Trust to the Liquidating Trust Beneficiaries since the Effective Date, and (ix) such other information as the Trust Advisory Board or the Litigation Subcommittee may reasonably request from time to time. The Liquidating Trustee shall also timely prepare, file and distribute such additional statements, reports and submissions (A) as may be necessary to cause the Liquidating Trust and the Liquidating Trustee to be in compliance with applicable law or (B) as may be otherwise reasonably requested from time to time by the Trust Advisory Board.

     (b) The Liquidating Trustee shall prepare and submit to the Trust Advisory Board (or, pursuant to Section 6.5(c)(z), the Litigation Subcommittee, as applicable) for approval an annual plan and budget at least thirty (30) days prior to the commencement of each fiscal year of the Liquidating Trust; provided, however, that the first such report shall be submitted no later than forty-five (45) days after the Effective Date of the Plan. Such annual plan and budget shall set forth in reasonable detail: (i) the Liquidating Trustee's anticipated actions to administer and liquidate the Liquidating Trust Assets; and (ii) the anticipated expenses, including the expenses of Trust

15

Professionals, associated with conducting the affairs of the Liquidating Trust.  Such annual plan and budget shall be updated and submitted to the Trust Advisory Board (or, pursuant to <u>Section 6.5(c)(z)</u>, the Litigation Subcommittee) for review and approval on a quarterly basis, and each such quarterly update shall reflect the differences between the anticipated actions described in the annual report and actual operations of the Liquidating Trust to date.  Any such annual plan and budget as approved by the Trust Advisory Board (or, pursuant to <u>Section 6.5(c)(z)</u>, the Litigation Subcommittee) is referred to herein as the "<u>Budget</u>".  All actions by the Liquidating Trustee must be substantially consistent with the then current Budget, provided that the Liquidating Trustee may take action outside the Budget with the prior approval of the Trust Advisory Board (or the Litigation Subcommittee with respect to <u>Section 6.5(c)(z)</u>).

4.15 Until such time as the Liquidating Trust is dissolved in accordance with Section 27.14(d) of the Plan (or otherwise in accordance with this Agreement), the Liquidating Trust shall file with (or furnish to, as the case may be) the Securities and Exchange Commission (the "<u>SEC</u>") such periodic reports as the Liquidating Trust is required to file pursuant to the Exchange Act.  In addition, until the Chapter 11 Cases are closed, the Liquidating Trust shall file Post-Confirmation Quarterly Summary Reports for each of the Chapter 11 Cases with the Bankruptcy Court and, thereafter, and until such time as the Liquidating Trust is dissolved in accordance with Section 27.14(d) of the Plan (or otherwise in accordance with this Agreement), the Liquidating Trust shall file with (or furnish to, as the case may be) the SEC or otherwise make available to the Liquidating Trust Beneficiaries quarterly reports that are substantially similar to such Post-Confirmation Quarterly Summary Reports.

ARTICLE V

<u>TAX MATTERS</u>

5.1 <u>Liquidating Trustee's Tax Power for Debtors</u>.

(a) For all taxable periods ended on or before December 31, 2009, the Liquidating Trustee shall have full and exclusive authority and responsibility in respect of all Taxes of the Debtors (including, without limitation, as the common parent or other agent of any consolidated, combined or unitary Tax group of which the Debtors were the agent), to the same extent as if the Liquidating Trustee were the Debtors.  Without limiting the foregoing, each of the Debtors shall execute, on or prior to the Effective Date, a power of attorney authorizing the Liquidating Trustee to correspond with any Tax authority on behalf of such Debtor and to sign, collect, negotiate, settle, and administer Tax payments and Tax returns.

(b) In furtherance of the transfer of the Liquidating Trust Assets to the Liquidating Trust on the Effective Date, the Liquidating Trust shall be entitled to all Tax Refunds of the Debtors (and the Liquidating Trust shall bear responsibility for (i) all Tax liabilities of the Debtors for taxable years ended on or before December 31, 2009, to the extent not discharged by the Plan or provided for payment in

16

the Plan or the Global Settlement Agreement and (ii) WMI's obligations pursuant to Section 2.4 of the Global Settlement Agreement), it being understood that the Liquidating Trustee only shall have whatever rights the Debtors have pursuant to the terms of the Global Settlement Agreement, and the Liquidating Trustee shall be contractually bound to all restrictions in the Global Settlement Agreement with respect to Tax filings.

(c) Following the Effective Date, the Liquidating Trustee shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors, all Tax Returns required to be filed or that the Liquidating Trustee otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds for all taxable periods ended on or before December 31, 2009.

5.2 <u>Liquidating Trust Assets Treated as Owned by Liquidating Trust Beneficiaries</u>.  For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, the Reorganized Debtors, the Liquidating Trustee, and the Liquidating Trust Beneficiaries) shall treat the transfer of the Liquidating Trust Assets to the Liquidating Trust as (1) a transfer of the Liquidating Trust Assets (subject to any obligations relating to those assets) directly to the Liquidating Trust Beneficiaries and, to the extent Liquidating Trust Assets are allocable to Disputed Claims, to the Liquidating Trust Claims Reserve, followed by (2) the transfer by such beneficiaries to the Liquidating Trust of the Liquidating Trust Assets (other than the Liquidating Trust Assets allocable to the Liquidating Trust Claims Reserve) in exchange for Liquidating Trust Interests.  Accordingly, the Liquidating Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to the Liquidating Trust Claims Reserve, discussed below).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

5.3 <u>Tax Reporting</u>.

(a) The Liquidating Trustee shall file Tax Returns for the Liquidating Trust treating the Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with this <u>Article V</u>.  The Liquidating Trustee also will annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for United States federal income tax purposes and will instruct all such holders to use such information in preparing their United States federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their United States federal income tax returns.  The Liquidating Trustee shall also file (or cause to be filed) any other statement, return or disclosure relating to the Liquidating Trust that is required by any governmental unit.

(b) On or before the Effective Date, the Debtors shall provide the Liquidating Trustee with a good-faith valuation of the Tax Refunds as of the Effective Date or shall otherwise arrange for such a valuation to be provided to the Liquidating

17

Trustee as soon as practicable after the Effective Date by such third party professionals as the Debtors deem appropriate. The Liquidating Trustee, in consultation with the Trust Advisory Board, will then in good faith value all other Liquidating Trust Assets, and shall make all such values (including the Tax Refund values) publicly available from time to time (by posting on a website or otherwise), to the extent relevant, and such values shall be used consistently by all parties to the Liquidating Trust (including, without limitation, the Debtors, the Liquidating Trustee, and Liquidating Trust Beneficiaries) for all United States federal income tax purposes.

(c) Allocations of Liquidating Trust taxable income among the Liquidating Trust Beneficiaries (other than taxable income allocable to the Liquidating Trust Claims Reserve) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to the Liquidating Trust Claims Reserve) to the holders of the Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for purposes of this Section 5.3(c) shall equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(d) Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of a private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee shall (i) timely elect to treat any Liquidating Trust Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Liquidating Trustee, the Debtors, and the Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(e) The Liquidating Trustee shall be responsible for payment, out of the Liquidating Trust Assets, of any Taxes imposed on the Liquidating Trust or its assets, including the Liquidating Trust Claims Reserve. In the event, and to the extent, any Cash retained on account of Disputed Claims in the Liquidating Trust Claims Reserve is insufficient to pay the portion of any such Taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims (including any income that may arise upon the distribution of the assets from the Liquidating Trust Claims Reserve), such Taxes may be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent

18

such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Liquidating Trustee as a result of the resolution of such Disputed Claims.

(f) The Liquidating Trustee may request an expedited determination of Taxes of the Liquidating Trust, including the Liquidating Trust Claims Reserve, or the Debtors under section 505(b) of the Bankruptcy Code for all Tax Returns filed for, or on behalf of, the Liquidating Trust or the Debtors for all taxable periods through the dissolution of the Liquidating Trust.

5.4 <u>Tax Withholdings by Liquidating Trustee</u>.  The Liquidating Trustee may withhold and pay to the appropriate Tax Authority all amounts required to be withheld pursuant to the IRC or any provision of any foreign, state or local tax law with respect to any payment or distribution to the holders of Liquidating Trust Interests.  All such amounts withheld and paid to the appropriate Tax Authority (or placed in escrow pending resolution of the need to withhold) shall be treated as amounts distributed to such holders of Liquidating Trust Interests for all purposes of the Trust Agreement. The Liquidating Trustee shall be authorized to collect such tax information from the holders of Liquidating Trust Interests (including, without limitation, social security numbers or other tax identification numbers) as in its sole discretion the Liquidating Trustee deems necessary to effectuate the Plan, the Confirmation Order, and the Trust Agreement. In order to receive distributions under the Plan, all holders of Liquidating Trust Interests (including, without limitation, holders of Allowed Senior Notes Claims, Allowed Senior Subordinated Notes Claims, Allowed CCB-1 Guarantees Claims, Allowed CCB-2 Guarantees Claims, Allowed General Unsecured Claims, Allowed Late-Filed Claims, Allowed PIERS Claims, Allowed WMB Senior Notes Claims, Allowed Preferred Equity Interests, Allowed Common Equity Interests, holders of Dime Warrants, and Accepting Non-Filing WMB Senior Note Holders, who in each case, deliver a release in accordance with the provisions of Section 41.6 of the Plan) shall be required to identify themselves to the Liquidating Trustee and provide tax information and the specifics of their holdings, to the extent the Liquidating Trustee deems appropriate in the manner and in accordance with the procedures from time to time established by the Liquidating Trustee for these purposes.  This identification requirement generally applies to all holders, including those who hold their Claims in "street name."  The Liquidating Trustee may refuse to make a distribution to any holder of a Liquidating Trust Interest that fails to furnish such information in a timely fashion, and until such information is delivered may treat such holder's Liquidating Trust Interests as disputed; <u>provided</u>, <u>however</u>, that, upon the delivery of such information by a holder of a Liquidating Trust Interest, the Liquidating Trustee shall make such distribution to which the holder of the Liquidating Trust Interest is entitled, without additional interest occasioned by such holder's delay in providing tax information; and, <u>provided</u>, <u>further</u>, that, if such information is not furnished to the Liquidating Trustee within six (6) months of the original request to furnish such information, no further distributions shall be made to the holder of such Liquidating Trust Interest; and, <u>provided</u>, <u>further</u>, that, if the Liquidating Trustee fails to withhold in respect of amounts received or distributable with respect to

19

any such holder and the Liquidating Trustee is later held liable for the amount of such withholding, such holder shall reimburse the Liquidating Trustee for such liability (to the extent such amounts were actually distributed to such holder).

## ARTICLE VI

### POWERS OF AND LIMITATIONS ON THE TRUSTEES

6.1 <u>Liquidating Trustee</u>.

(a) "<u>Liquidating Trustee</u>" means William C. Kosturos so long as he continues in office, and all other individuals who have been duly elected and qualify as liquidating trustees of the Liquidating Trust hereunder pursuant to Section 1.4 or <u>Article VIII</u> hereof, but shall not include the Resident Trustee.  Subject to <u>Article VIII</u> hereof, the Liquidating Trustee shall hold office until the termination of the Liquidating Trust in accordance with the terms set forth herein.  References herein to the Liquidating Trustee shall refer to the individual or individuals serving as the Liquidating Trustee solely in its or their capacity as trustees hereunder.

(b) Subject to the express limitations set forth herein, any actions of the Liquidating Trustee contemplated by this Trust Agreement shall be decided and conducted by the Liquidating Trustee only.

6.2 <u>Powers of the Liquidating Trustee</u>.

(a) Pursuant to the terms of the Plan, the Confirmation Order and this Trust Agreement, the Liquidating Trustee shall have various powers, duties and responsibilities concerning the prosecution of certain litigation claims, the disposition of assets, the resolution of claims, and numerous other obligations relating to maximizing the proceeds of the Liquidating Trust Assets and the administration of the Liquidating Trust.

(b) The Liquidating Trustee shall have only such rights, powers and privileges expressly set forth in the Confirmation Order, the Plan and this Trust Agreement and as otherwise provided by applicable law.  Subject to the Confirmation Order, the Plan, the Global Settlement Agreement and the provisions of this Trust Agreement, including, without limitation, the oversight and approvals by and of the Trust Advisory Board, the Litigation Subcommittee and the Bankruptcy Court provided herein, the Liquidating Trustee shall be expressly authorized to undertake the following actions (and, except with respect to <u>Section 6.2(b)(iii)</u> and <u>Section 6.2(b)(vi)</u>, to delegate such authority to such representatives or agents of the Liquidating Trustee as the Liquidating Trustee may nominate from time to time):

(i) to open bank accounts, and to hold, manage, convert to Cash, and distribute the Liquidating Trust Assets,

20

including prosecuting and resolving the Claims and Causes of Action belonging to the Liquidating Trust;

(ii) to hold the Liquidating Trust Assets for the benefit of the Liquidating Trust Beneficiaries, whether their Claims or Interests are Allowed on or after the Effective Date;

(iii) in the Liquidating Trustee's reasonable business judgment, to investigate, prosecute, settle and/or abandon rights, Causes of Action, Claims, or litigation of the Liquidating Trust, including, without limitation, Avoidance Actions;

(iv) to monitor and enforce the implementation of the Plan;

(v) to file all Tax and regulatory forms, returns, reports, and other documents required with respect to the Liquidating Trust;

(vi) in the Liquidating Trustee's reasonable business judgment, to object to Claims, and manage, control, prosecute, and/or settle on behalf of the Liquidating Trust, objections to Claims on account of which the Liquidating Trustee (as Disbursing Agent) will be responsible (if Allowed) for making distributions under the Plan;

(vii) to take all actions and create any document necessary to implement the Plan;

(viii) to hold, manage, and distribute Cash or non-Cash Liquidating Trust Assets obtained through the exercise of its power and authority;

(ix) to act as a signatory to the Debtors for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of the Debtors' assets; and

(x) to take all necessary actions and file all appropriate motions to obtain an order closing the Chapter 11 Cases.

(c) In all circumstances, the Liquidating Trustee shall comply with all of the Debtors' obligations under the Global Settlement Agreement and in accordance with applicable law and shall otherwise act in the best interest of all Liquidating Trust Beneficiaries, and the Liquidating Trustee shall act in furtherance of the purpose of the Liquidating Trust. With the consent of the Trust Advisory Board, the Liquidating Trustee may serve on the board of directors of any subsidiary of the

21

Liquidating Trust, provided the subsidiary's objective is consistent with that of the Liquidating Trust (i.e. to sell its assets and distribute the proceeds in liquidation) (the "<u>Objective</u>").

        (d) Except as otherwise provided in this Trust Agreement, the Liquidating Trustee will not be required to obtain the order or approval of the Bankruptcy Court, or any other court of competent jurisdiction in, or account to the Bankruptcy Court or any other court of competent jurisdiction for, the exercise of any right, power or privilege conferred hereunder.  Notwithstanding the foregoing, where the Liquidating Trustee determines, in its reasonable discretion, that it is necessary, appropriate or desirable, the Liquidating Trustee will have the right to submit to the Bankruptcy Court any question or questions regarding any specific action proposed to be taken by the Liquidating Trustee with respect to this Trust Agreement, the Liquidating Trust, or the Liquidating Trust Assets, including, without limitation, the administration and distribution of the Liquidating Trust Assets and the termination of the Liquidating Trust.  Pursuant to the Plan, the Bankruptcy Court has retained jurisdiction for such purposes and may approve or disapprove any such proposed action upon motion by the Liquidating Trustee.

        6.3 <u>Limitations on Liquidating Trustee</u>.

        (a) The Liquidating Trustee shall, on behalf of the Liquidating Trust, hold the Liquidating Trust out as a trust in the process of liquidation and not as an investment company.  The Liquidating Trustee shall be restricted to the liquidation of the Liquidating Trust Assets on behalf, and for the benefit, of the Liquidating Trust Beneficiaries and the distribution and application of Liquidating Trust Assets for the purposes set forth in, and the conservation and protection of the Liquidating Trust Assets and the administration thereof in accordance with, the provisions of this Trust Agreement, the Plan and the Confirmation Order.

        (b) Notwithstanding anything in this Trust Agreement to the contrary, and subject to any powers that are expressly vested in the Litigation Subcommittee pursuant to this Trust Agreement, the Liquidating Trustee shall submit to the Trust Advisory Board for its approval the following matters and any other matters that expressly require the approval of the Trust Advisory Board pursuant to the other terms of this Trust Agreement:

        (i) Any transaction involving the sale, assignment, transfer or abandonment of any Liquidating Trust Asset or Assets having a value in excess of $500,000.00;

        (ii) Any incurrence of any cost, expense or fee in excess of $500,000.00 (covering services to be rendered or products utilized by the Liquidating Trustee within a one month period);

(iii) Subject to <u>Section 6.8(b)</u>, any determination to retain Trust Professionals and any compensation arrangements for such Trust Professionals, it being understood that the Liquidating Trustee initially intends to engage Weil, Gotshal & Manges LLP, Quinn Emanuel Urquhart & Sullivan, LLP and such other counsel as may be appointed by the Trust Advisory Board from time to time to litigate Disputed Claims;

(iv) Determination of the amount and timing of any distribution to the Liquidating Trust Beneficiaries;

(v) Any determination to initiate lawsuits or proceedings; and

(vi) The dissolution of the Liquidating Trust.

The foregoing shall not limit the Liquidating Trustee's ability to make determinations and take actions regarding compliance with tax withholding requirements (including remittances).

(c) The Liquidating Trustee shall submit any proposed settlement, disposition or abandonment of any Claims asserted against the Debtors or the Debtors' estates to the Trust Advisory Board or to the Litigation Subcommittee, as applicable, for consideration and approval as provided in this <u>Section 6.3(c) and in Section 6.6(a)</u>, other than (i) any proposed final settlement, disposition or abandonment that was made or accepted by the Debtors prior to the Effective Date, the principal terms of which have been evidenced in writing (whether or not such offer or acceptance is conditioned upon approval of any supervising authority), and (ii) any settlement, disposition or abandonment of a GUC Claim (as defined below) where the proposed settlement, disposition or abandonment amount with respect to such GUC Claim is $2,000,000.00 or less (each such GUC Claim, a "<u>De Minimis GUC Claim</u>"). Proposed settlements, dispositions or abandonments of (A) Claims asserted against the Liquidating Trust (other than de Minimis GUC Claims), (B) Claims previously asserted against the Debtors or the Debtors' estates within Class 12 (General Unsecured Claims) of the Plan (the "<u>GUC Claims</u>") or (C) Claims, that if litigated, could result in the classification of such Claim within Class 12 (General Unsecured Claims), including claims related to Dime Warrants, in each case, shall be submitted to the Trust Advisory Board for consideration and approval and the Trust Advisory Board shall promptly, and in any event within twenty (20) Business Days of such submission, make a determination regarding the proposed settlement, disposition or abandonment. Subject to the provisions of Section 6.6(a) hereof, proposed settlements, abandonments or dispositions of Claims asserted against the Liquidating Trust (other than De Minimis GUC Claims) or claims previously asserted against the Debtors or the Debtors' estates within Class 17A (WMB Senior Notes Claims), Class 17B (WMB Subordinated Notes Claims) and Class 18 (Subordinated Claims) of the Plan (collectively, the "<u>Junior Disputed Claims</u>"), shall be submitted to the Litigation Subcommittee for the consideration and approval of the

23

Litigation Subcommittee (provided, however, that such Claims shall not be submitted to the Litigation Subcommittee if, when litigated, such litigation could result in the classification of such Claim within Class 12 (General Unsecured Claims)) and the Litigation Subcommittee shall promptly, and in any event within twenty (20) Business Days of such submission, make a determination regarding the proposed settlement, disposition or abandonment. If the Litigation Subcommittee does not approve, within twenty (20) Business Days of its submission to the Litigation Subcommittee, a settlement offer that the Liquidation Trustee believes in good faith should be accepted, the Liquidating Trustee may submit the settlement offer to the Trust Advisory Board for consideration and approval.

6.4 <u>Establishment of Trust Advisory Board.</u>

(a) The "<u>Trust Advisory Board</u>" means the board to be appointed in accordance with, and to exercise the duties set forth in, this Trust Agreement, which duties shall be (i) to oversee the liquidation and distribution of the Liquidating Trust Assets by the Liquidating Trustee in accordance with this Trust Agreement, the Plan and the Confirmation Order, (ii) to approve (or withhold approval) of those matters submitted to it for approval in accordance with the terms of this Trust Agreement, and (iii) to remove and appoint any successor to the Liquidating Trustee as provided for in this Trust Agreement.

(b) The Trust Advisory Board initially shall be comprised of (A) three (3) members, to be selected by the Creditors' Committee (together with any successors and the Additional CC Member, the "<u>CC Members</u>"); (B) four (4) members, to be selected by the Equity Committee (together with any successors, the "<u>EC Members</u>"), with one (1) such member to be named by the TPS Funds (as defined below) before being selected (together with any successors, the "<u>TPS Member</u>"); (C) one (1) member, to be selected by the Creditors' Committee and approved by the Equity Committee, such approval not to be unreasonably withheld (together with any successors, the "<u>CC-EC Member</u>"); (D) one (1) member to be selected by Tricadia Capital Management, LLC (the "<u>Tricadia Member</u>"); and (E) one (1) ex officio member, to be selected by Holdco Advisors, L.P., subject to the execution of appropriate agreements regarding confidentiality, non-disclosure and restrictions on trading, with limited member rights consisting solely of the right of observation and the review of materials provided to the Trust Advisory Board and, subject to the agreement of the other members of the Trust Advisory Board, a right of participation in discussions of the Trust Advisory Board but with no right to vote (the "<u>Holdco Member</u>"). The "<u>TPS Funds</u>" means, collectively, Black Horse Capital LP, Black Horse Capital Master Fund Ltd, Greywolf Capital Partners II LP, Greywolf Capital Overseas Master Fund, Greywolf Opportunities Fund II LP, Greywolf Structured Products Master Fund, Ltd., Greywolf Capital Overseas Fund II, Pines Edge Value Investors Ltd., Pine River Convertibles Master Fund Ltd. (f/k/a Nisswa Convertibles Master Fund Ltd.), Pine River Fixed Income Master Fund Ltd. (f/k/a Nisswa Fixed Income Master Fund Ltd.), Pine River Master Fund Ltd. (f/k/a Nisswa Master Fund Ltd.), LMA SPC for and on behalf of the MAP 89 Segregated Portfolio, Visium Global Master Fund, Ltd., Visium Catalyst Credit Master Fund, Ltd., VR Global

24

Partners, L.P., Scoggin Worldwide Fund Ltd., Scoggin Capital Management II LLC, Scoggin International Fund Ltd, Karnak Partners, L.P., Ermitage Selz Fund, Ltd., GAM Selection Hedge Investments, Inc., and Varana Onshore, LP.  The initial members of the Trust Advisory Board are set forth on <u>Annex A</u> hereto.  Each member of the Trust Advisory Board shall have a fiduciary duty to act in the best interests of the Liquidating Trust Beneficiaries as a whole.

       (c) If, during the term of the Liquidating Trust, all Allowed CCB-2 Guarantees Claims are paid in full in Cash or through the issuance of Runoff Notes and Reorganized Common Stock in accordance with the Plan, the Tricadia Member shall, without any further action by the Liquidating Trustee, the Trust Advisory Board, the Bankruptcy Court or any other Person, resign immediately, and one (1) new member of the Trust Advisory Board shall be selected by (i) the Creditors' Committee, as notified in writing to the Trust Advisory Board and the Liquidating Trustee within ten (10) Business Days, or (ii) if the Creditors' Committee has been dissolved, by the other CC Members, as notified in writing to the Trust Advisory Board and the Liquidating Trustee within ten (10) Business Days (the "<u>Additional CC Member</u>").  The Holdco Member shall, without any further action by the Liquidating Trustee, the Trust Advisory Board, the Bankruptcy Court or any other Person, resign immediately upon the earlier to occur of (A) all Allowed CCB-1 Guarantees Claims being paid in full and (B) the two (2) year anniversary of the Effective Date.

       (d) If, during the term of the Liquidating Trust, the aggregate outstanding amount of the Liquidating Trust Interests representing (i) Allowed Claims, (ii) the greater of Intercreditor Interest Claims or Postpetition Interest Claims in respect of such Allowed Claims, (iii) Disputed Claims, (iv) the greater of Intercreditor Interest Claims or Postpetition Interest Claims in respect of such Disputed Claims, and (v) contingent, unliquidated Claims, is $50,000,000.00 or less, (X) one (1) CC Member who is not a CC Subcommittee Member (as defined below) shall without any further action by the Liquidating Trustee, the Trust Advisory Board, the Bankruptcy Court or any other Person, resign, and (Y) within twenty (20) Business Days of such event, the EC Members shall appoint a new member of the Trust Advisory Board and notify the Liquidating Trustee of the identity of the new member in writing.  Solely for the purposes of this subsection (d), (A) the amount of any Disputed Claim shall be (1) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (2) if the Bankruptcy Court has estimated the amount of the Disputed Claim pursuant to Section 502 of the Bankruptcy Code in an amount that constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim (such estimated amount, the "<u>Disputed Claim Estimate</u>"), the Disputed Claim Estimate, or (3) if the Liquidating Trustee and the holder of such Disputed Claim have agreed upon an amount (the "<u>Agreed Amount</u>"), the Agreed Amount and (B) the amount of any contingent, unliquidated Claim shall be the amount agreed by a majority of the Trust Advisory Board and a majority of the Litigation Subcommittee or, in the event that a majority of the Trust Advisory Board and a majority of the Litigation Subcommittee do not agree as to the amount within twenty (20) Business Days, the amount estimated by the Bankruptcy Court at the request

of any member of the Trust Advisory Board or the Litigation Subcommittee. For the purposes of this subsection (d), Disputed Claims and contingent, unliquidated Claims shall include any claims that are withdrawn as of the date hereof but that, pursuant to stipulation with the Debtors and by order of the Bankruptcy Court, may be refiled and asserted in Class 18 (Subordinated Claims) of the Plan.

(e) If, during the term of the Liquidating Trust, all Liquidating Trust Interests representing Allowed Claims and Postpetition Interest Claims in respect of such Allowed Claims are paid in full, (X) any remaining CC Members shall, without any further action by the Liquidating Trustee, the Trust Advisory Board, the Bankruptcy Court or any other Person, resign immediately and (Y) within twenty (20) Business Days of such event, the remaining members of the Trust Advisory Board shall (i) appoint such number of new members of the Trust Advisory Board as is equal to the number of resigning CC Members and notify the Liquidating Trustee in writing of the identity of such members, or (ii) elect to continue without such replacement members and so notify the Liquidating Trustee in writing.

(f) The authority of the members of the Trust Advisory Board shall be effective as of the Effective Date and shall remain and continue in full force and effect until the Liquidating Trust is dissolved in accordance with Section 3.2 hereof. The service of the members of the Trust Advisory Board shall be subject to the following:

(i) subject to Section 6.4(d) and Section 6.4(e), the members of the Trust Advisory Board shall serve until death or resignation pursuant to clause (ii) below, or removal pursuant to clause (iii) below;

(ii) a member of the Trust Advisory Board may resign at any time by providing a written notice of resignation to the remaining members of the Trust Advisory Board. Such resignation shall be effective when a successor is appointed as provided herein;

(iii) a member of the Trust Advisory Board may be removed by the unanimous vote of the other members for (a) fraud or willful misconduct in connection with the affairs of the Liquidating Trust or (b) cause, which shall include a breach of fiduciary duty other than as specified in the foregoing clause (a). Such removal shall be effective immediately upon such vote.

(iv) subject to Section 6.4(d) and Section 6.4(e), in the event of a vacancy in a member's position (whether by removal, death or resignation), a new member may be appointed, (A) in the case of a CC Member, by (i) the Creditors' Committee, as notified in writing to the Trust Advisory Board and the Liquidating Trustee within ten (10) Business Days, or (ii) if the Creditors' Committee

26

has been dissolved, the CC Members, as notified in writing to the Trust Advisory Board and the Liquidating Trustee within ten (10) Business Days; or (iii) if there are no remaining CC Members, the Liquidating Trustee, as notified in writing to the Trust Advisory Board within ten (10) Business Days, (B) in the case of an EC Member (other than the TPS Member), by the other EC Members; (C) in the case of a TPS Member, by the TPS Funds as notified in writing to the Trust Advisory Board and the Liquidating Trustee within ten (10) Business Days, (D) in the case of the CC-EC Member, by (i) the Creditors' Committee subject to the approval of the EC members (such approval not to be unreasonably withheld), as notified in writing to the Trust Advisory Board and the Liquidating Trustee within ten (10) Business Days, or (ii) if the Creditors' Committee has been dissolved, the CC Members subject to the approval of the EC Members (such approval not to be unreasonably withheld), as notified in writing to the Trust Advisory Board and the Liquidating Trustee within ten (10) Business Days, or (iii) if there are no remaining CC Members, the Liquidating Trustee subject to the approval of the EC Members (such approval not to be unreasonably withheld), as notified in writing to the Trust Advisory Board within ten (10) Business Days. In each case, the appointment of a successor member of the Trust Advisory Board (including any appointment pursuant to Section 6.4(d) and Section 6.4(e)) shall be evidenced by the filing with the Bankruptcy Court by the Liquidating Trustee of a notice of appointment, which notice shall include the name, address, and telephone number of the successor member of the Trust Advisory Board; and

(v) immediately upon appointment of any successor member of the Trust Advisory Board, all rights, powers, duties, authority, and privileges of the predecessor member of the Trust Advisory Board hereunder shall be vested in and undertaken by the successor member of the Trust Advisory Board without any further act; and the successor member of the Trust Advisory Board shall not be liable personally for any act or omission of the predecessor member of the Trust Advisory Board.

(g) Each member of the Trust Advisory Board shall designate (i) one or more representatives who shall attend meetings of and participate in other activities of the Trust Advisory Board and (ii) an alternate representative to attend meetings and participate in other activities of the Trust Advisory Board when the representatives designated pursuant to clause (i) above are unavailable.

(h) Notwithstanding anything in this Trust Agreement to the contrary, the Trust Advisory Board shall not take any action which will cause the

27

Liquidating Trust to fail to qualify as a "liquidating trust" for United States federal income tax purposes.

(i) A quorum for meetings of the Trust Advisory Board shall consist of a majority of the non-recused, voting members of the Trust Advisory Board then serving; provided, however, that, for purposes of determining whether a quorum is present at such a meeting, a voting member of the Trust Advisory Board shall be deemed present if a representative of the member is attending in person, by telephone or by proxy.

(j) Except as expressly provided herein, the affirmative vote of a majority of the non-recused, voting members of the Trust Advisory Board shall be the act of the Trust Advisory Board with respect to any matter that requires the determination, consent, approval or agreement of such board. If an equal number of the non-recused voting members of the Trust Advisory Board vote for and against a particular matter, the Liquidating Trustee shall only in such circumstances have the authority to cast a vote with respect to such matter. Any or all of the members of the Trust Advisory Board may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any member of the Trust Advisory Board participating in a meeting by this means is deemed to be present in person at the meeting. In all matters submitted to a vote of the Trust Advisory Board, each Trust Advisory Board member (excluding the Holdco Member) shall be entitled to cast one vote, which vote shall be cast personally by such Trust Advisory Board member or by proxy. In a matter in which the Liquidating Trustee cannot obtain direction or authority from the Trust Advisory Board, the Liquidating Trustee may file a motion requesting such direction or authority from the Bankruptcy Court; provided, however, that any member of the Trust Advisory Board may oppose such motion.

(k) A Trust Advisory Board member and its representative shall be recused from the Trust Advisory Board's deliberations and votes on any and all matters as to which such member has a conflicting interest. If a Trust Advisory Board member or its representative does not recuse itself from any such matter, that Trust Advisory Board member and its representative may be recused from such matter by the majority vote of the remaining, voting members of the Trust Advisory Board that are not recused from the matter.

(l) Any action required or permitted to be taken by the Trust Advisory Board at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Trust Advisory Board (excluding the Holdco Member) as evidenced by one or more written consents describing the action taken, signed by the Trust Advisory Board and filed with the minutes or proceedings of the Trust Advisory Board.

(m) The members of the Trust Advisory Board shall be compensated as set forth in the attached Annex B from the Administrative Funding.  Any member of the Trust Advisory Board shall also be reimbursed by the Liquidating Trustee from the Administrative Funding for its actual, reasonable out-of-pocket expenses incurred for serving on such board and for reasonable legal fees incurred by any member of the Trust Advisory Board in their capacity as such with respect to outside counsel in the same manner and priority as the compensation and expenses of the Liquidating Trustee under this Trust Agreement, in accordance with the Budget, after submission of reasonably detailed receipts or invoices evidencing such expenses and the approval of such expenses by the Bankruptcy Court.  Except as provided for in this Section 6.4, the members of the Trust Advisory Board shall not be entitled to receive any other form of compensation for their services provided as such members.  The Budget shall include a reserve for the fees and expenses of the Trust Advisory Board.

6.5 The Litigation Subcommittee

(a) The "Litigation Subcommittee" means the subcommittee of the Trust Advisory Board appointed in accordance with Section 6.5(b) of this Agreement to exercise the duties set forth in Section 6.5(c) of this Trust Agreement.

(b) The Litigation Subcommittee initially shall be comprised of (A) two (2) members, to be selected by the Creditors' Committee (together with any successors, the "CC Subcommittee Members"), with Joel Klein and Marc. S. Kirschner to be the initial CC Subcommittee Members; (B) two (2) members, to be selected from the EC Members (excluding the TPS Member) (together with any successors, the "EC Subcommittee Members"), with Hon Douglas Southard and Michael Willingham to be the initial EC Subcommittee Members; and (C) one (1) member, who shall be the TPS Member.  The initial members of the Litigation Subcommittee are set forth on Annex A hereto.  Each member of the Litigation Subcommittee shall (i) continue to act as a member of the Litigation Subcommittee until he or she is no longer a member of the Trust Advisory Board, and (ii) have a fiduciary duty to act in the best interests of the Liquidating Trust Beneficiaries as a whole.

(c) The Litigation Subcommittee shall oversee (i) the prosecution of, subject to the exculpation and release provisions of the Plan, (A) claims against present and former officers and directors of the Debtors for actions arising during the period prior to the Petition Date (the "D&O Claims"), (B) claims against professionals and representatives retained by the Debtors with respect to conduct that occurred prior to the Petition Date; and (C) claims based on conduct that occurred prior to the commencement of the Debtors' bankruptcy cases against third-parties for any non-contractual breach of duty to WMI, including, but not limited to, antitrust claims and business tort claims (collectively categories (A), (B), and (C) are the "Recovery Claims") and (ii) the defense of Junior Disputed Claims including Disputed Claims of WMB Noteholders for misrepresentation, which Disputed Claims are classified in Class 18 (Subordinated Claims) pursuant to the Plan (the "WMB Claims"); provided, however, that the Litigation Subcommittee shall not pursue business tort Claims that were released

29

against JPMC and its Related Persons pursuant to the Global Settlement Agreement.  In connection with the foregoing, and subject to the review and approval of the Bankruptcy Court, upon notice and a hearing, the Litigation Subcommittee shall have discretion over the following matters:  (x) retention of counsel and professionals in conjunction with the Recovery Claims and the Junior Disputed Claims; provided, however, that the prosecution of any D&O Claims shall be the responsibility of Klee, Tuchin, Bogdanoff, & Stern LLP and the defense of any Junior Disputed Claims shall be the responsibility of Weil, Gotshal & Manges LLP, Quinn Emanuel Urquhart & Sullivan, LLP and such other counsel as may be appointed from time to time; (y) subject to the provisions set forth in Section 6.3(c) and Section 6.6(a) hereof, prosecution and settlement of the Recovery Claims; and (z) establishment of budgets and expenditure of the first Ten Million Dollars ($10,000,000.00) of the Litigation Funding and of the second Ten Million dollars ($10,000,000) if authorized by the Trust Advisory Board.  In the event that all of the Litigation Funding has been spent, the Litigation Subcommittee may request additional funds from the Trust Advisory Board which shall have the sole and absolute discretion as to whether to allocate such additional funds.  To the extent the Litigation Funding or any additional funds that are allocated to the Litigation Subcommittee are unused, such funds shall be distributed by the Liquidating Trust in accordance with the terms and conditions of the Plan.

(d) Any proceeds that are obtained with respect to any Recovery Claims (whether by settlement, judgment or otherwise) shall be retained by the Liquidating Trust and distributed by the Liquidating Trustee in accordance with the terms and conditions of this Liquidating Trust Agreement and the Plan.

(e) If any member of the Litigation Subcommittee is not a natural person, it shall designate (i) one or more representatives who shall attend meetings of and participate in other activities of the Litigation Subcommittee and (ii) an alternate representative to attend meetings and participate in other activities of the Litigation Subcommittee when the representatives designated pursuant to clause (i) above are unavailable.

(f) Notwithstanding anything in this Trust Agreement to the contrary, the Litigation Subcommittee shall not take any action which will cause the Liquidating Trust to fail to qualify as a "liquidating trust" for United States federal income tax purposes.

(g) A quorum for meetings of the Litigation Subcommittee shall consist of a majority of the non-recused, voting members of the Litigation Subcommittee then serving; provided, however, that, for purposes of determining whether a quorum is present at such a meeting, a voting member of the Litigation Subcommittee shall be deemed present if a representative of the member is attending in person, by telephone or by proxy.

(h) Except as expressly provided herein, the affirmative vote of a majority of the non-recused, voting members of the Litigation Subcommittee shall be

the act of the Litigation Subcommittee with respect to any matter that requires the determination, consent, approval or agreement of such subcommittee. If an equal number of the non-recused voting members of the Litigation Subcommittee vote for and against a particular matter, the Liquidating Trustee shall only in such circumstances have the authority to cast a vote with respect to such matter. Any or all of the members of the Litigation Subcommittee may participate in a regular or special meeting by, or conduct the meeting through the use of, conference telephone or similar communications equipment by means of which all persons participating in the meeting may hear each other, in which case any required notice of such meeting may generally describe the arrangements (rather than or in addition to the place) for the holding thereof. Any member of the Litigation Subcommittee participating in a meeting by this means is deemed to be present in person at the meeting. In all matters submitted to a vote of the Litigation Subcommittee, each Litigation Subcommittee member shall be entitled to cast one vote, which vote shall be cast personally by such Litigation Subcommittee member or such member's representative as appointed pursuant to <u>Section 6.5(e)</u>. In a matter in which the Liquidating Trustee cannot obtain direction or authority from the Litigation Subcommittee, the Liquidating Trustee may file a motion requesting such direction or authority from the Bankruptcy Court; <u>provided</u>, <u>however</u>, that any member of the Litigation Subcommittee may oppose such motion.

(i) A Litigation Subcommittee member and its representative shall be recused from the Litigation Subcommittee's deliberations and votes on any and all matters as to which such member has a conflicting interest. If a Litigation Subcommittee member or its representative does not recuse itself from any such matter, that Litigation Subcommittee member and its representative may be recused from such matter by the majority vote of the remaining, voting members of the Litigation Subcommittee that are not recused from the matter.

(j) Any action required or permitted to be taken by the Litigation Subcommittee at a meeting may be taken without a meeting if the action is taken by unanimous written consent of the Litigation Subcommittee as evidenced by one or more written consents describing the action taken, signed by the Litigation Subcommittee and filed with the minutes or proceedings of the Litigation Subcommittee.

(k) The members of the Litigation Subcommittee shall be compensated as set forth in the attached <u>Annex B</u> from the Litigation Funding. Any member of the Litigation Subcommittee shall also be reimbursed by the Liquidating Trustee from the Litigation Funding for its actual, reasonable out-of-pocket expenses incurred for serving on such committee and for reasonable legal fees incurred by any member of the Litigation Subcommittee in their capacity as such with respect to outside counsel in the same manner and priority as the compensation and expenses of the Liquidating Trustee under this Trust Agreement, in accordance with the Budget, after submission of reasonably detailed receipts or invoices evidencing such expenses and the approval of such expenses by the Bankruptcy Court. Except as provided for in this <u>Section 6.5</u>, the members of the Litigation Subcommittee shall not be entitled to receive

31

any other form of compensation for their services as such members.  The Budget shall include a reserve for the fees and expenses of the Litigation Subcommittee.

      6.6 <u>Resolution of Claims</u>.

      (a) Except as otherwise provided in <u>Section 6.3(c)</u>, the Trust Advisory Board shall have the authority, subject to Bankruptcy Court review and approval, to settle (A) all GUC Claims (other than any De Minimis GUC Claim), (B) all Claims relating to Dime Warrants, and (C) all Claims that, if litigated, could result in the classification of such Claim as a GUC Claim (other than any De Minimis GUC Claim).  Notwithstanding the foregoing, and except as otherwise provided in <u>Section 6.3(c)</u>, the Litigation Subcommittee shall have authority to settle all Recovery Claims and the Junior Disputed Claims, subject to Bankruptcy Court review and approval; <u>provided</u>, <u>however</u>, that, from and after the expiry of the six (6) month period beginning on the Effective Date, both the Trust Advisory Board and the Litigation Subcommittee shall have the authority to settle all Recovery Claims and the Junior Disputed Claims, subject to Bankruptcy Court review and approval; provided further that the Litigation Subcommittee shall not settle a Junior Disputed Claim if such settlement would result in the classification of all or any part of such Claim as a GUC Claim.

      (b) The Trust Advisory Board shall have the authority to retain counsel and professionals in conjunction with the GUC Claims (other than any De Minimis GUC Claim), subject to Bankruptcy Court review and approval.  The fees and expenses of such counsel and professionals shall be deducted from the Administrative Funding.

      (c) Except as provided in the proviso to <u>Section 6.5(c)(x)</u>, the Litigation Subcommittee shall have authority to retain counsel and professionals in conjunction with the Recovery Claims and the Junior Disputed Claims, subject to Bankruptcy Court review and approval.  The fees and expenses of counsel and professionals for the Recovery Claims shall be deducted from the Litigation Funding.  The fees and expenses of counsel for the Junior Disputed claims shall be paid from the Administrative Funding and not deducted from the Litigation Funding.

      (d) Notwithstanding any other provision hereof, if any portion of a Claim is disputed, no payment or distribution provided hereunder shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

      (e) To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan and this Trust Agreement.

      (f) In connection with the exercise of the powers that are vested in the Trust Advisory Board and the Litigation Subcommittee pursuant to <u>Section 6.6(a)</u>, the Trust Advisory Board and the Litigation Subcommittee, as applicable, may at any time request that the Bankruptcy Court estimate any GUC Claim or Junior Disputed

32

Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether any of the Debtors or any other Person previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any GUC Claim or Junior Disputed Claim, the amount so estimated shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim the Trust Advisory Board or the Litigation Subcommittee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

(g) The amount of any Liquidating Trust Assets allocable to, or retained on account of, any Disputed Claim in the Liquidating Trust Claims Reserve shall be determined based on the estimation of such Disputed Claim pursuant to <u>Section 6.6(f)</u> hereof or as otherwise agreed in writing by the Trust Advisory Board or the Litigation Subcommittee, as applicable, and the holder of such Claim.

6.7 <u>Actions Taken on Other Than A Business Day</u>.  In the event that any payment or act under the Plan or this Trust Agreement is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

6.8 <u>Agents, Employees and Professionals</u>.

(a) The Liquidating Trust may, but shall not be required to, from time to time enter into contracts with, consult with and retain employees, officers and independent contractors, including attorneys, accountants, appraisers, disbursing agents or other parties deemed by the Liquidating Trustee to have qualifications necessary or desirable to assist in the proper administration of the Liquidating Trust (collectively, the "<u>Trust Professionals</u>"), on such terms as the Liquidating Trustee deems appropriate.  The Liquidating Trustee may assume existing contracts and/or leases to which WMI is a party as of the date hereof including, without limitation, employment agreements, or may enter into new arrangements on substantially similar terms.  None of the professionals that represented parties-in-interest in the Chapter 11 Cases shall be precluded from being engaged by the Liquidating Trustee solely on account of their service as a professional for such parties-in-interest prior to the Effective Date.  Without limiting the foregoing, it is understood and agreed that the Liquidating Trustee may elect to hire Alvarez & Marsal North America, LLC and/or any of its Affiliates (together "<u>A&M</u>") notwithstanding that the Liquidating Trustee may be a member or Managing Director of A&M.  The Liquidating Trustee shall not be subject to any liability

33

whatsoever on account of the hiring of or the decision to hire A&M as a Trust Professional, notwithstanding the Liquidating Trustee's relationship with A&M.

(b) After the Effective Date, Trust Professionals shall be required to submit reasonably detailed invoices on a monthly basis to the Liquidating Trustee and the Trust Advisory Board, including in such invoices a description of the work performed, who performed such work, and if billing on an hourly basis, the hourly rate of such person, plus an itemized statement of expenses. Subject to the approval of the Bankruptcy Court, the Liquidating Trustee shall pay such invoices thirty (30) days after such invoices are approved by the Bankruptcy Court. In the event of any dispute concerning the entitlement to, or the reasonableness of any compensation and/or expenses of any Trust Professionals, either the Liquidating Trustee or the affected party may ask the Bankruptcy Court to resolve the dispute.

(c) Except as provided in the following sentence, all payments to Trust Professionals shall be paid out of the Administrative Funding or, if all of the Administrative Funding has been spent, any remaining Liquidating Trust Assets, subject to the approval of a Supermajority of the Trust Advisory Board. All payments to Trust Professionals related to the Recovery Claims shall be paid out of the Litigation Funding.

6.9 Investment of Liquidating Trust Monies. All monies and other assets received by the Liquidating Trustee as Liquidating Trust Assets (including the proceeds thereof as a result of investment in accordance with this Section 6.9) shall, until distributed or paid over as herein provided, be held in trust for the benefit of the Liquidating Trust Beneficiaries, and shall not be segregated from other Liquidating Trust Assets, unless and to the extent required by the Plan. The Liquidating Trustee shall promptly invest any such monies (including any earnings thereon or proceeds thereof) as permitted by section 345 of the Bankruptcy Code, in the manner set forth in this Section 6.9, but shall otherwise be under no liability for interest or income on any monies received by the Liquidating Trust hereunder and held for distribution or payment to the Liquidating Trust Beneficiaries, except as such interest shall actually be received. Investment of any monies held by the Liquidating Trust shall be administered in accordance with the general duties and obligations hereunder. The right and power of the Liquidating Trustee to invest the Liquidating Trust Assets, the proceeds thereof, or any income earned by the Liquidating Trust, shall be limited to the right and power to (i) invest such Liquidating Trust Assets (pending distributions in accordance with the Plan or this Trust Agreement) in (a) short-term direct obligations of, or obligations guaranteed by, the United States of America or (b) short-term obligations of any agency or corporation which is or may hereafter be created by or pursuant to an act of the Congress of the United States as an agency or instrumentality thereof; or (ii) deposit such assets in demand deposits at any bank or trust company, which has, at the time of the deposit, a capital stock and surplus aggregating at least $1,000,000,000 (collectively, the "Permissible Investments"); provided, however, that the scope of any such Permissible Investments shall be limited to include only those investments that a liquidating trust, within the meaning of Treasury Regulations section 301.7701-4(d), may be permitted to

34

hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, whether set forth in IRS rulings, other IRS pronouncements or otherwise.

6.10 <u>Termination</u>.  The duties, responsibilities and powers of the Liquidating Trustee shall terminate on the date the Liquidating Trust is wound up and dissolved in accordance with Delaware law pursuant to <u>Section 3.2</u> hereof, under applicable law in accordance with the Plan, by an order of the Bankruptcy Court or by entry of a final decree closing the Debtors' Chapter 11 cases; <u>provided</u>, that <u>Sections 7.2, 7.4, 7.5</u> and <u>7.6</u> hereof shall survive such termination, dissolution and entry.

6.11 <u>Resident Trustee</u>.

(a) The Resident Trustee has been appointed and hereby agrees to serve as the trustee of the Liquidating Trust solely for the purpose of complying with the requirement of Section 3807(a) of the Trust Act that the Liquidating Trust have one trustee, which, in the case of a natural person, is a resident of the State of Delaware, or which in all other cases, has its principal place of business in the State of Delaware.  The duties and responsibilities of the Resident Trustee shall be limited solely to (i) accepting legal process served on the Liquidating Trust in the State of Delaware, (ii) the execution of any certificates required to be filed with the office of the Delaware Secretary of State that the Resident Trustee is required to execute under Section 3811 of the Trust Act, and (iii) any other duties specifically allocated to the Resident Trustee in this Trust Agreement.  Except as provided in the foregoing sentence, the Resident Trustee shall have no management responsibilities or owe any fiduciary duties to the Liquidating Trust, the Liquidating Trustee, the Trust Advisory Board or the Liquidating Trust Beneficiaries.  Contemporaneously with the execution of this Trust Agreement, the Resident Trustee is hereby authorized and directed to file a Certificate of Trust with the Secretary of State of the State of Delaware as provided under the Trust Act.

(b) By its execution hereof, the Resident Trustee accepts the Liquidating Trust created herein.  Except as otherwise expressly required by <u>Section 6.11(a)</u>, the Resident Trustee shall not have any duty or liability with respect to the administration of the Liquidating Trust, the investment of the Liquidating Trust Assets or the distribution of the Liquidating Trust Assets to the Liquidating Trust Beneficiaries, and no such duties shall be implied.  The Resident Trustee shall not be liable for the acts or omissions of the Liquidating Trustee or the Trust Advisory Board, nor shall the Resident Trustee be liable for supervising or monitoring the performance of the duties and obligations of the Liquidating Trustee or the Trust Advisory Board under this Trust Agreement, except as expressly required by <u>Section 6.11(a)</u>.  The Resident Trustee shall not be obligated to give any bond or other security for the performance of any of its duties hereunder.  The Resident Trustee shall not be personally liable under any circumstances, except for its own willful misconduct, bad faith or gross negligence.  Without limiting the foregoing:

(i) the Resident Trustee shall not be personally liable for any error of judgment made in good faith, except to the extent

35

such error of judgment constitutes willful misconduct, bad faith or gross negligence;

(ii) no provision of this Trust Agreement shall require the Resident Trustee to expend or risk its personal funds or otherwise incur any financial liability in the performance of its rights or powers hereunder if the Resident Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to it;

(iii) the Resident Trustee shall not be personally liable for the validity or sufficiency of this Trust Agreement or for the due execution hereof by the other parties hereto;

(iv) the Resident Trustee may accept a certified copy of a resolution of the board of directors or other governing body of any corporate party as conclusive evidence that such resolution has been duly adopted by such body and that the same is in full force and effect;

(v) the Resident Trustee may request the Liquidating Trustee to provide a certificate with regard to any fact or matter the manner of ascertainment of which is not specifically prescribed herein, and such certificate shall constitute full protection to the Resident Trustee for any action taken or omitted to be taken by it in good faith in reliance thereon;

(vi) in the exercise or administration of the Liquidating Trust hereunder, the Resident Trustee (a) may act directly or through agents or attorneys pursuant to agreements entered into with any of them, and (b) may consult with nationally recognized counsel selected by it in good faith and with due care and employed by it, and it shall not be liable for anything done, suffered or omitted in good faith by it in accordance with the advice or opinion of any such counsel; and

(vii) the Resident Trustee acts solely as Resident Trustee hereunder and not in its individual capacity, and all persons having any claim against the Resident Trustee by reason of the transactions contemplated by this Trust Agreement shall look only to the Liquidating Trust Assets for payment or satisfaction thereof.

(c) The Resident Trustee shall be entitled to receive compensation out of the Administrative Funding from the Liquidating Trust for the services that the Resident Trustee performs in accordance with this Trust Agreement in

36

accordance with such fee schedules as shall be agreed from time to time by the Resident Trustee, the Liquidating Trustee and the Trust Advisory Board, as approved by the Bankruptcy Court.  The Resident Trustee may also consult with counsel (who may be counsel for the Liquidating Trustee or for the Resident Trustee) with respect to those matters that relate to the Resident Trustee's role as the Delaware resident trustee of the Liquidating Trust, and the reasonable legal fees incurred in connection with such consultation shall be reimbursed out of the Administrative Funding to the Resident Trustee pursuant to this Section 6.11(c) provided such fees are approved by the Bankruptcy Court and provided further that no such fees shall be reimbursed to the extent that they are incurred as a result of the Resident Trustee's gross negligence, bad faith or willful misconduct.

(d) The Resident Trustee shall serve for the duration of the Liquidating Trust or until the earlier of (i) the effective date of the Resident Trustee's resignation, or (ii) the effective date of the removal of the Resident Trustee.  The Resident Trustee may resign at any time by giving thirty (30) days' written notice to the Liquidating Trustee and the Trust Advisory Board; provided, however, that such resignation shall not be effective until such time as a successor Resident Trustee has accepted appointment.  The Resident Trustee may be removed at any time by the Liquidating Trustee, with the consent of the Trust Advisory Board, by providing thirty (30) days' written notice to the Resident Trustee; provided, however, such removal shall not be effective until such time as a successor Resident Trustee has accepted appointment.  Upon the resignation or removal of the Resident Trustee, the Liquidating Trustee, with the consent of the Trust Advisory Board, shall appoint a successor Resident Trustee.  If no successor Resident Trustee shall have been appointed and shall have accepted such appointment within forty-five (45) days after the giving of such notice of resignation or removal, the Resident Trustee may petition the Bankruptcy Court for the appointment of a successor Resident Trustee.  Any successor Resident Trustee appointed pursuant to this Section 6.11(d) shall be eligible to act in such capacity in accordance with this Trust Agreement and, following compliance with this Section 6.11(d), shall become fully vested with the rights, powers, duties and obligations of its predecessor under this Trust Agreement, with like effect as if originally named as Resident Trustee.  Any such successor Resident Trustee shall notify the Resident Trustee of its appointment by providing written notice to the Resident Trustee and upon receipt of such notice, the Resident Trustee shall be discharged of its duties herein.

## ARTICLE VII

## CONCERNING THE LIQUIDATING TRUSTEE

7.1 Reliance by the Trustees and the Members of the Trust Advisory Board and the Litigation Subcommittee.  Except as otherwise provided in this Trust Agreement, the Plan or the Confirmation Order, the Trustees and the Members of the Trust Advisory Board and the Litigation Subcommittee may rely and shall be protected in acting upon any resolution, statement, instrument, opinion, report, notice, request,

consent, order or other paper or document reasonably believed by the Trustees to be genuine and to have been signed or presented by the proper party or parties.

7.2 <u>Liability to Third Persons</u>. No Liquidating Trust Beneficiary shall be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person in connection with the Liquidating Trust Assets or the affairs of the Liquidating Trustee. The Liquidating Trustee, the Trust Professionals and the members of the Trust Advisory Board and the Litigation Subcommittee shall not be subject to any personal liability whatsoever, in tort, contract or otherwise, to any person (including, in the case of the Liquidating Trustee and members of the Trust Advisory Board and the Litigation Subcommittee, to any Trust Professionals retained by the Liquidating Trustee in accordance with this Trust Agreement) in connection with the Liquidating Trust Assets or the affairs of the Liquidating Trust and shall not be liable with respect to any action taken or omitted to be taken in good faith, except for actions and omissions determined by a final order of the Bankruptcy Court to be due to their respective gross negligence, intentional fraud, criminal conduct or willful misconduct, and all such persons shall look solely to the Liquidating Trust Assets for satisfaction of claims of any nature arising in connection with affairs of the Liquidating Trust. Other than as set forth in the Plan or in the Confirmation Order, nothing in this <u>Section 7.2</u> shall be deemed to release any Liquidating Trust Beneficiary from any actions or omissions occurring prior to the Effective Date.

7.3 <u>Nonliability of Liquidating Trustee, Trust Advisory Board and the Litigation Subcommittee for Acts of Others</u>. Except as provided herein, nothing contained in this Trust Agreement, the Plan or the Confirmation Order shall be deemed to be an assumption by the Liquidating Trustee, the Trust Advisory Board (or its members) or the Litigation Subcommittee (or its members) or the Trust Professionals of any of the liabilities, obligations or duties of the Debtors or shall be deemed to be or contain a covenant or agreement by the Liquidating Trustee to assume or accept any such liability, obligation or duty. Any successor Liquidating Trustee, Trust Advisory Board member or Litigation Subcommittee member may accept and rely upon any accounting made by or on behalf of any predecessor Liquidating Trustee hereunder, and any statement or representation made as to the assets comprising the Liquidating Trust Assets or as to any other fact bearing upon the prior administration of the Liquidating Trust, so long as it has a good faith basis to do so. The Liquidating Trustee, the Trust Advisory Board members and the Litigation Subcommittee members shall not be liable for having accepted and relied in good faith upon any such accounting, statement or representation if it is later proved to be incomplete, inaccurate or untrue. The Liquidating Trustee or any successor Liquidating Trustee, the Trust Advisory Board members and the Litigation Subcommittee members shall not be liable for any act or omission of any predecessor Liquidating Trustee, Trust Advisory Board member or Litigation Subcommittee member, nor have a duty to enforce any claims against any predecessor Liquidating Trustee, Trust Advisory Board member or Litigation Subcommittee member on account of any such act or omission, unless directed to do so by the Trust Advisory Board or the Litigation Subcommittee, as applicable. No provision of this Trust Agreement shall require the

38

Liquidating Trustee to expend or risk his personal funds or otherwise incur any financial liability in the performance of his rights or powers hereunder if the Liquidating Trustee has reasonable grounds to believe that the payment of such funds or adequate indemnity against such risk or liability is not reasonably assured or provided to him.

       7.4  <u>Exculpation.</u>  As of the Effective Date, the Liquidating Trustee, the Trust Professionals and the members of the Trust Advisory Board and the Litigation Subcommittee shall be and hereby are exculpated by all Persons, including without limitation, Liquidating Trust Beneficiaries, holders of Claims, holders of Equity interests,  and other parties-in-interest, from any and all claims, causes of action and other assertions of liability arising out of or related to the discharge of their respective powers and duties conferred by the Plan, this Trust Agreement or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law or otherwise, except for actions or omissions to act that are determined by final order of the Bankruptcy Court to have arisen out of their own respective intentional fraud, criminal conduct, gross negligence or willful misconduct.  No Liquidating Trust Beneficiary, holder of a Claim, holder of an Equity Interest, or other party-in-interest shall have or be permitted to pursue any claim or cause of action against the Liquidating Trustee, the Liquidating Trust, the employees, professionals or representatives of either the Liquidating Trustee or the Liquidating Trust (including the Trust Professionals) or the members of the Trust Advisory Board and the Litigation Subcommittee, for making payments in accordance with, or for implementing, the provisions of the Plan, the Confirmation Order and this Trust Agreement.  Any action taken or omitted to be taken with the express approval of the Bankruptcy Court, the Trust Advisory Board or the Litigation Subcommittee shall conclusively be deemed not to constitute gross negligence or willful misconduct; <u>provided</u>, <u>however</u>, that, notwithstanding any provision herein to the contrary, the Liquidating Trustee shall not be obligated to comply with a direction of the Trust Advisory Board or the Litigation Subcommittee, whether or not express, which would result in a change to the distribution provisions of this Trust Agreement and the Plan.

       7.5  <u>Limitation of Liability.</u>  The Trustees, the members of the Trust Advisory Board, the members of the Litigation Subcommittee, and the Trust Professionals will not be liable for punitive, exemplary, consequential, special or other damages for a breach of this Trust Agreement under any circumstances.

       7.6  <u>Indemnity</u>.  The Trustees (including the individual(s) serving as or comprising the Liquidating Trustee), the employees of the Liquidating Trust, the members of the Trust Advisory Board and the members of the Litigation Subcommittee, and their respective agents, employees, officers, directors, professionals, attorneys, accountants, advisors, representatives and principals, including, without limitation, the Trust Professionals (collectively, the "<u>Indemnified Parties</u>") shall be indemnified by the Liquidating Trust solely from the Liquidating Trust Assets for any losses, claims, damages, liabilities and expenses occurring after the Effective Date, including, without limitation, reasonable attorneys' fees, disbursements and related expenses which the Indemnified Parties may incur or to which the Indemnified Parties may become subject in

39

connection with any action, suit, proceeding or investigation brought by or threatened against one or more of the Indemnified Parties on account of the acts or omissions in their capacity as, or on behalf of, the Trustees or a member of the Trust Advisory Board or the Litigation Subcommittee; provided, however, that the Liquidating Trust shall not be liable to indemnify any Indemnified Party for any act or omission arising out of such Indemnified Party's respective gross negligence, fraud or willful misconduct as determined by a Final Order of the Bankruptcy Court.  Notwithstanding any provision herein to the contrary, the Indemnified Parties shall be entitled to obtain advances from the Liquidating Trust to cover their reasonable expenses of defending themselves in any action brought against them as a result of the acts or omissions, actual or alleged, of an Indemnified Party in its capacity as such, except for any actions or omissions arising from their own respective willful misconduct, fraud or gross negligence; provided, however, that the Indemnified Parties receiving such advances shall repay the amounts so advanced to the Liquidating Trust immediately upon the entry of a final, non-appealable judgment or order finding that such Indemnified Parties were not entitled to any indemnity under the provisions of this Section 7.6.  The foregoing indemnity in respect of any Indemnified Party shall survive the termination of such Indemnified Party from the capacity for which they are indemnified.

7.7 Compensation and Expenses. The Liquidating Trustee (including the individual(s) serving as or comprising the Liquidating Trustee) shall receive compensation for its services, to be paid out of the Administrative Funding, in accordance with Annex D.  In addition, the Liquidating Trustee shall be entitled, with the consent of the Trust Advisory Board, and subject to the approval of the Bankruptcy Court, to reimburse itself from the Administrative Funding on a monthly basis for all reasonable out-of-pocket expenses actually incurred in the performance of duties in accordance with this Trust Agreement and the Plan.

ARTICLE VIII

SUCCESSOR LIQUIDATING TRUSTEES

8.1 Resignation.  The Liquidating Trustee may resign from the Liquidating Trust by giving at least sixty (60) days prior written notice thereof to each member of the Trust Advisory Board.  Such resignation shall become effective on the later to occur of (a) the date specified in such written notice and (b) the effective date of the appointment of a successor Liquidating Trustee in accordance with Section 8.4 hereof and such successor's acceptance of such appointment in accordance with Section 8.5 hereof.

8.2 Removal.  The Liquidating Trustee may be removed by a majority vote of the members of the Trust Advisory Board.  Such removal shall become effective on the date specified in such action by the Trust Advisory Board.

8.3 Effect of Resignation or Removal.  The resignation, removal, incompetency, bankruptcy or insolvency of the Liquidating Trustee shall not operate to

40

terminate the Liquidating Trust or to revoke any existing agency created pursuant to the terms of this Trust Agreement, the Plan or the Confirmation Order or invalidate any action theretofore taken by the Liquidating Trustee. All fees and expenses properly incurred by the Liquidating Trustee prior to the resignation, incompetency or removal of the Liquidating Trustee shall be paid from the Liquidating Trust Assets, unless such fees and expenses are disputed by (a) the Trust Advisory Board or (b) the successor Liquidating Trustee, in which case the Bankruptcy Court shall resolve the dispute and any disputed fees and expenses of the predecessor Liquidating Trustee that are subsequently allowed by the Bankruptcy Court shall be paid from the Liquidating Trust Assets. In the event of the resignation or removal of the Liquidating Trustee, such Liquidating Trustee shall: (i) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Liquidating Trustee or directed by the Bankruptcy Court to effect the termination of such Liquidating Trustee's capacity under this Trust Agreement; (ii) promptly deliver to the successor Liquidating Trustee all documents, instruments, records and other writings related to the Liquidating Trust as may be in the possession of such Liquidating Trustee; and (iii) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Liquidating Trustee.

8.4 <u>Appointment of Successor</u>. In the event of the death, resignation, removal, incompetency, bankruptcy or insolvency of the Liquidating Trustee, a vacancy shall be deemed to exist and a successor shall be appointed by a majority of the Trust Advisory Board; <u>provided</u>, <u>however</u>, that, under no circumstance, shall the successor Liquidating Trustee be a director or officer of any Affiliate of the Liquidating Trust. In the event that a successor Liquidating Trustee is not appointed within thirty (30) days after the date of such vacancy, the Bankruptcy Court, upon its own motion or the motion of a Liquidating Trust Beneficiary or any member of the Trust Advisory Board, shall appoint a successor Liquidating Trustee.

8.5 <u>Acceptance of Appointment by Successor Liquidating Trustee</u>. Any successor Liquidating Trustee appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and to the Trust Advisory Board and, in case of the Liquidating Trustee's resignation, to the resigning Liquidating Trustee. Thereupon, such successor Liquidating Trustee shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor in the Liquidating Trust with like effect as if originally named Liquidating Trustee and shall be deemed appointed pursuant to Bankruptcy Code section 1123(b)(3)(B). The resigning or removed Liquidating Trustee shall duly assign, transfer and deliver to such successor Liquidating Trustee all property and money held by such resigning or removed Liquidating Trustee hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Liquidating Trustee, execute and deliver an instrument or instruments conveying and transferring to such successor Liquidating Trustee upon the trusts herein expressed, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Liquidating Trustee.

41

ARTICLE IX

MISCELLANEOUS PROVISIONS

9.1 Governing Law.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent that any document to be entered into in connection herewith provides otherwise, the rights, duties, and obligations arising under this Trust Agreement shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code and, to the extent not inconsistent therewith, the laws of the State of Delaware, without giving effect to principles of conflicts of laws.

9.2 Jurisdiction.  Subject to the proviso below, the parties agree that the Bankruptcy Court shall have exclusive jurisdiction over the Liquidating Trust and the Liquidating Trustee, including, without limitation, the administration and activities of the Liquidating Trust and the Liquidating Trustee, and, pursuant to the Plan, the Bankruptcy Court has retained such jurisdiction; provided, however, that notwithstanding the foregoing, the Liquidating Trustee shall have power and authority to bring any action in any court of competent jurisdiction (including the Bankruptcy Court) to prosecute any Claims or Causes of Action assigned to the Liquidating Trust.

9.3 Severability.  In the event any provision of this Trust Agreement or the application thereof to any person or circumstances shall be determined by a final, non-appealable judgment or order to be invalid or unenforceable to any extent, the remainder of this Trust Agreement or the application of such provision to persons or circumstances or in jurisdictions other than those as to or in which it is held invalid or unenforceable, shall not be affected thereby, and each provision of this Trust Agreement shall be valid and enforceable to the full extent permitted by law.

9.4 Notices.  Any notice or other communication required or permitted to be made under this Trust Agreement shall be in writing and shall be deemed to have been sufficiently given, for all purposes, if delivered personally, by email, facsimile, sent by nationally recognized overnight delivery service or mailed by first-class mail:

(i)   if to the Liquidating Trustee, to:

William C. Kosturos
Alvarez & Marsal
100 Pine Street, Suite 900
San Francisco, CA 94111
Fax:  415-837-1684
Email:  bkosturos@alvarezandmarsal.com

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue

42

New York, New York  10153
Attention:  Brian S. Rosen, Esq.
Facsimile:  (212) 310-8007
Email:  brian.rosen@weil.com


if to the Resident Trustee, to:

CSC Trust Company of Delaware
2711 Centerville Road, Suite 400
Wilmington, DE 19808
Attention: Trust Administration
Fax:         302-636-8666
Email:         csctrust@cscinfo.com

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:             Brian S. Rosen, Esq.
Facsimile:             (212) 310-8007
Email:             brian.rosen@weil.com

(ii)  if to members of the Trust Advisory Board, then to
each of;

Wells Fargo Bank, N.A.
MAC: N9311-110
625 Marquette Avenue, 11th Floor
Minneapolis, MN 55479
Attention:             Thomas Korsman
Facsimile:             (612) 667-9825
Email:             Thomas.m.korsman@wellsfargo.com

Arnold Kastenbaum
655 Barrymore Lane
Mamaroneck, NY 10543
Email:         akastenbaum@yahoo.com

Joel Klein
PPM America, Inc.
225 West Wacker Drive, Suite 1200
Chicago, IL 60606
Facsimile:             (312) 634-0050

43

Email:        Joel.klein@ppmamerica.com

Michael Willingham
Email:        wservices@earthlink.net

Matthew Cantor
235 West 71st Street, 3rd Floor
New York, NY 10023
Email:        mcantor4@me.com

Marc S. Kirschner
Kirschner Consulting Company
18 East 94th Street, Suite 1A
New York, NY 10128
Facsimile:              (212) 722-0349
Email:        mskirschner@kirschnerconsulting.com

Hon. Douglas Southard
Email:        dksouthard@sbcglobal.net

Joe McInnis
GREYWOLF CAPITAL
4 Manhattanville Road, Suite 201
Purchase, New York  10577
Facsimile:              914-251-8244
Email:        joe.mcinnis@greywolfcapital.com

Misha Zaitzeff
HoldCo Advisors, LP
32 Broadway, Suite 1112
New York, NY 10004
Email:        misha@holdcoadvisors.com

Mayur Lakhani
Tricadia Capital
780 Third Ave., 29th floor
New York, NY 10017
Email:        mlakhani@tricadiacapital.com

(iii) if to the TPS Funds, to

Brown Rudnick LLP
One Financial Center
Boston, MA  02111
Attention: Jeremy Coffey

44

Facsimile: (617) 856-8200
Email: jcoffey@brownrudnick.com

(iv) if to any Liquidating Trust Beneficiary, to the last known address of such Liquidating Trust Beneficiary according to the Debtors' Schedules, such Liquidating Trust Beneficiary's proof of claim or the lists of record holders provided to the Liquidating Trustee; and

(v) To the Debtors or the Post-Effective Date Debtors:

Washington Mutual, Inc.
1201 Third Avenue, Suite 3000
Seattle, Washington  98101
Attention:            General Counsel
Facsimile:            (206) 432-8879
Email:                chad.smith@wamuinc.net

With a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attention:            Brian S. Rosen, Esq.
Facsimile:            (212) 310-8007
Email:                brian.rosen@weil.com

9.5 <u>Headings</u>.  The headings contained in this Trust Agreement are solely for convenience of reference and shall not affect the meaning or interpretation of this Trust Agreement or of any term or provision hereof.

9.6 <u>Relationship to the Plan</u>.  The terms of this Trust Agreement are intended to supplement the terms provided by the Plan and the Confirmation Order, and therefore this Trust Agreement incorporates the provisions of the Plan and the Confirmation Order (which may amend or supplement the Plan).  Additionally, the Liquidating Trustee, the Trust Advisory Board and the Litigation Subcommittee may seek any orders from the Bankruptcy Court, upon notice and a hearing in furtherance of implementation of the Plan, the Confirmation Order and this Trust Agreement.  However, to the extent that there is conflict between the provisions of this Trust Agreement, the provisions of the Plan, or the Confirmation Order, each document shall have controlling effect in the following rank order:  (1) this Trust Agreement, (2) the Confirmation Order, and (3) the Plan.

9.7 <u>Entire Trust Agreement</u>.  This Trust Agreement (including the recitals and annex hereto), the Plan and the Confirmation Order constitute the entire agreement by and among  the parties and supersede all prior and contemporaneous

agreements or understandings by and among the parties with respect to the subject matter hereof.

        9.8 <u>Cooperation</u>.  The Debtors shall turn over or otherwise make available to the Liquidating Trustee at no cost to the Liquidating Trust or the Liquidating Trustee, all books and records reasonably required by the Liquidating Trustee to carry out its duties hereunder, and agree to otherwise reasonably cooperate with the Liquidating Trustee in carrying out its duties hereunder, subject to the confidentiality provisions herein to preserve the confidential nature of the Debtors' books and records.

        9.9 <u>Amendment and Waiver</u>.  Any provision of this Trust Agreement may be amended or waived by the Liquidating Trustee with the consent of all voting members of the Trust Advisory Board; provided that any such amendment which alters the duties or liabilities of the Resident Trustee shall require the consent of the Resident Trustee.  Notwithstanding this <u>Section 9.9</u>, any amendment to this Trust Agreement shall not be inconsistent with the purpose and intention of the Liquidating Trust to liquidate in an expeditious but orderly manner the Liquidating Trust Assets in accordance with Treasury Regulations section 301.7701-4(d) and <u>Section 1.2</u> hereof.

        9.10 <u>Confidentiality</u>.  The Trustees and their employees, members, agents, professionals and advisors, including the Trust Professionals, and each member of the Trust Advisory Board and the Litigation Subcommittee (each a "<u>Confidential Party</u>" and, collectively, the "<u>Confidential Parties</u>") shall hold strictly confidential and not use for personal gain any material, non-public information of which they have become aware in their capacity as a Confidential Party, of or pertaining to any Debtor to which any of the Liquidating Trust Assets relates; <u>provided</u>, <u>however</u>, that such information may be disclosed if (a) it is now or in the future becomes generally available to the public other than as a result of a disclosure by the Confidential Parties; or (b) such disclosure is required of the Confidential Parties pursuant to legal process including but not limited to subpoena or other court order or other applicable laws or regulations.  In the event that any Confidential Party is requested to divulge confidential information pursuant to this clause (b), such Confidential Party shall promptly, in advance of making such disclosure, provide reasonable notice of such required disclosure to the Liquidating Trustee (or the Trust Advisory Board in case the Liquidating Trustee or the Resident Trustee is the disclosing party) to allow sufficient time to object to or prevent such disclosure through judicial or other means and shall cooperate reasonably with the Liquidating Trustee (or the Trust Advisory Board, as applicable) in making any such objection, including but not limited to appearing in any judicial or administrative proceeding in support of any objection to such disclosure.

        9.11 <u>Meanings of Other Terms</u>.  Except where the context otherwise requires, words importing the masculine gender include the feminine and the neuter, if appropriate, words importing the singular number shall include the plural number and vice versa and words importing persons shall include firms, associations, corporations and other entities.  All references herein to Articles, Sections and other subdivisions, unless referring specifically to the Plan or provisions of the Bankruptcy Code, the

Bankruptcy Rules, or other law, statute or regulation, refer to the corresponding Articles, Sections and other subdivisions of this Trust Agreement, and the words herein and words of similar import refer to this Trust Agreement as a whole and not to any particular Article, Section or subdivision of this Trust Agreement. The term "including" shall mean "including, without limitation."

9.12 <u>Counterparts</u>. This Trust Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but such counterparts shall together constitute but one and the same instrument. A facsimile or portable document file (PDF) signature of any party shall be considered to have the same binding legal effect as an original signature.

9.13 <u>Intention of Parties to Establish Liquidating Trust</u>. This Trust Agreement is intended to create a liquidating trust for United States federal income tax purposes and, to the extent provided by law, shall be governed and construed in all respects as such a trust and any ambiguity herein shall be construed consistent herewith and, if necessary, this Trust Agreement may be amended to comply with such United States federal income tax laws, which amendments may apply retroactively.

[Remainder of Page Blank — Signature Page Follows]

47

IN WITNESS WHEREOF, the parties hereto have executed this Trust Agreement or caused this Trust Agreement to be duly executed by their respective officers, representatives or agents, effective as of the date first above written.

WASHINGTON MUTUAL, INC.

By:  /s/  Charles Edward Smith
    Name:   Charles Edward Smith
    Title:    Executive Vice President &
         General Counsel

WMI INVESTMENT CORP.

By:  /s/  Charles Edward Smith
    Name:   Charles Edward Smith
    Title:    Executive Vice President &
         General Counsel

WILLIAM C. KOSTUROS

By:  /s/  William C. Kosturos
    Name:   William C. Kosturos

CSC TRUST COMPANY OF DELAWARE, not in its individual capacity, but solely as Resident Trustee

By:  /s/  Alan R. Halpern
    Name:   Alan R. Halpern
    Title:    Vice President

Annex A

Initial Trust Advisory Board Members

CC Members:

1.  Wells Fargo Bank, N.A.
2.  Arnold Kastenbaum
3.  Marc S. Kirschner

EC Members:

4.  Joel Klein
5.  Michael Willingham
6.  Hon. Douglas Southard
7.  Joe McInnis (TPS Member)

CC-EC Member:

8.  Matthew Cantor

Holdco Member:

9.  Misha Zaitzeff

Tricadia Member:

10.  Mayur Lakhani

Initial Litigation Subcommittee Members

1.  Hon. Douglas Southard
2.  Michael Willingham
3.  Marc S. Kirschner
4.  Joel Klein
5.  Joe McInnis

Annex B

Trust Advisory Board and Litigation Subcommittee Compensation

(a) Base Compensation

The annual base compensation of each member of the Trust Advisory Board shall be $40,000.00 per member, which amount shall be paid in twelve equal installments on a monthly basis in arrears. In addition, each member of the Litigation Subcommittee shall be paid an additional amount of $10,000.00 per annum, which amount shall be paid in twelve equal installments on a monthly basis in arrears.

(b) Incentive Compensation

In addition to the base compensation set forth above, each member of the Trust Advisory Board (excluding the Holdco Member) shall be entitled to receive such member's pro rata share (based on the total number of Trust Advisory Board members at the time at which such compensation is paid) of the following additional incentive compensation; provided, however, that the total annual incentive compensation of each Member shall not exceed $50,000.00:

(i) On an annual basis in arrears during the term of the Liquidating Trust, 0.1% of the aggregate value of the Liquidating Trust Assets (excluding any Runoff Notes, Funding and the Liquidating Trust Claims Reserve) that are distributed to the Liquidating Trust Beneficiaries during the preceding 12 month period, excluding the first distribution that the Liquidating Trust makes on or after the Effective Date;

(ii) Upon the dissolution of the Trust in accordance with the terms of this Trust Agreement, and after taking into account any reasonable reserve that may be required to be retained with respect to the winding up of the affairs of the Liquidating Trust in accordance with Section 3.3, 0.1% of any portion of the Funding that remains unspent immediately prior to such dissolution and the payment of any final distribution to the Liquidating Trust Beneficiaries; and

(iii) On an annual basis in arrears during the term of the Liquidating Trust, 0.1% of the aggregate reduction in the Liquidating Trust Claims Reserve which is the result of the disallowance of any Disputed Claims during the preceding 12 month period.

Annex C

| | Senior Fixed Rate Notes | Senior Floating Rate Notes | Senior Subordinated Notes | CCB Guarantees | PIERS | General Unsecured Creditors | 510(b) Sub. Claims | Preferred Stock |
|---|---|---|---|---|---|---|---|---|
| Tranche 1 | No LTIs | | | | | | | |
| Tranche 2 | • Senior Note Postpetition Interest (939322AL7) Liquidating Trust Interests<br>• Senior Note Postpetition Interest (939322AP8) Liquidating Trust Interests<br>• Senior Note Postpetition Interest (939322AX1) Liquidating Trust Interests<br>• Senior Note Postpetition Interest (939322AT0) Liquidating Trust Interests<br>• Senior Note Postpetition Interest (939322AV5) Liquidating Trust Interests | • Senior Note Postpetition Interest (939322AW3) Liquidating Trust Interests<br>• Senior Note Postpetition Interest (939322AQ6) Liquidating Trust Interests<br>• Senior Note Postpetition Interest (939322AS2) Liquidating Trust Interests<br>• Senior Note Postpetition Interest (939322AU7) Liquidating Trust Interests | • Prepetition Claim & Postpetition Interest Claim Subordinated Note (939322AE3) Liquidating Trust Interests<br>• Prepetition Claim & Postpetition Interest Claim Subordinated Note (939322AN3) Liquidating Trust Interests<br>• Prepetition Claim & Postpetition Interest Claim Subordinated Note (939322AY9) Liquidating Trust Interests | No LTIs | No LTIs | • General Unsecured Creditor Liquidating Trust Interests: Pro Rata Share based on Claims[4] [9]<br>• Liquidating Trust Interests on Late-Filed Claims[8] | No LTIs | No LTIs |

Recovery (1)(2)(3)

| | Senior Fixed Rate Notes | Senior Floating Rate Notes | Senior Subordinated Notes | CCB Guarantees | PIERS | General Unsecured Creditors | 510(b) Sub. Claims | Preferred Stock |
|---|---|---|---|---|---|---|---|---|
| | No LTIs | No LTIs | No LTIs | • Prepetition Claim & Postpetition Interest Claim CCB Capital Trust IV (22499AAB5) Liquidating Trust Interests[5]<br>• Prepetition Claim & Postpetition Interest Claim CCB Capital Trust V (19499AAI6) Liquidating Trust Interests[5]<br>• Prepetition Claim & Postpetition Interest Claim CCB Capital Trust VII (22899AAB1) Liquidating Trust Interests[5] | No LTIs | • General Unsecured Creditor Liquidating Trust Interests: Pro Rata Share based on Claims[4][9] | No LTIs | No LTIs |

| | Senior Fixed Rate Notes | Senior Floating Rate Notes | Senior Subordinated Notes | CCB Guarantees | PIERS | General Unsecured Creditors | 510(b) Sub. Claims | Preferred Stock |
|---|---|---|---|---|---|---|---|---|
| | | | | • Prepetition Claim & Postpetition Interest Claim CCB Capital Trust VIII (22899AAA3) Liquidating Trust Interests (5)<br><br>• Prepetition Claim & Postpetition Interest Claim HFC Capital Trust I (420542AD4) Liquidating Trust Interests (5)<br><br>• Prepetition Claim & Postpetition Interest Claim HFC Capital Trust I (420542102) Liquidating Trust Interests (5)<br><br>• Prepetition Claim & Postpetition Interest Claim CCB Capital Trust VI (124873AA8) Liquidating Trust Interests (5) | | | | |

| | Senior Fixed Rate Notes | Senior Floating Rate Notes | Senior Subordinated Notes | CCB Guarantees | PIERS | General Unsecured Creditors | 510(b) Sub. Claims | Preferred Stock |
|---|---|---|---|---|---|---|---|---|
| | | | | • Prepetition Claim & Postpetition Interest Claim CCB Capital Trust IX (124871AA2) Liquidating Trust Interests[5] | | | | |
| | No LTIs | • Senior Note Postpetition Interest (939322AW3) Liquidating Trust Interests • Senior Note Postpetition Interest (939322AQ6) Liquidating Trust Interests • Senior Note Postpetition Interest (939322AS2) Liquidating Trust Interests • Senior Note Postpetition Interest (939322AU7) Liquidating Trust Interests | No LTIs | No LTIs | • Residual PIERS (939322848) Liquidating Trust Interests[6] • Subordinated PIERS (93933U407) Liquidating Trust Interests[7] | • General Unsecured Creditor Liquidating Trust Interests: Pro Rata Share based on Claims[4] [9] | No LTIs | No LTIs |

| | Senior Fixed Rate Notes | Senior Floating Rate Notes | Senior Subordinated Notes | CCB Guarantees | PIERS | General Unsecured Creditors | 510(b) Sub. Claims | Preferred Stock |
|---|---|---|---|---|---|---|---|---|
| | No LTIs | No LTIs | No LTIs | No LTIs | No LTIs | No LTIs | No LTIs | No LTIs |
| | No LTIs | No LTIs | No LTIs | No LTIs | No LTIs | No LTIs | No LTIs | No LTIs |

Notes:

(1)    Within Tranche 2, the holders of Senior Notes Postpetition Interest Claim Liquidating Trust Interests and the holders of Subordinated Notes Prepetition Claim Liquidating Trust Interests and Postpetition Interest Claim Liquidating Trust Interests will share Pro Rata based on the size of those claims.  For the calculation of the General Unsecured Creditors' Pro Rata Share in all Tranches, see Note 4.

(2)    Holders of Liquidating Trust Interests in Tranches will be paid in order with Tranche 2 Liquidating Trust Interests (if any) receiving distributions first and Tranche 6 Liquidating Trust Interests (if any) receiving distributions last.  Claims of Tranche 2 Liquidating Trust Interests (if any) must be satisfied in full prior to Tranche 3 Liquidating Trust Interests receiving distributions and so forth.

(3) All CUSIP numbers that appear in this Annex C refer to the CUSIP numbers for the applicable tranches of debt, as applicable, as of December 2011.

(4) There shall be only one class of General Unsecured Creditor Liquidating Trust Interests. The Pro Rata Share of holders of General Unsecured Creditor Liquidating Trust Interests are calculated by dividing (a) the amount of General Unsecured Claims, by (b) the total cash distributed within the Tranche. The cash distributed within the Tranche is the lesser of (i) the amount necessary to satisfy all claims within the Tranche or (ii) the amount of cash available. Separate Liquidating Trust Interest sub-Tranches may need to be issued by claim in order to track interest accretion post the Effective Date.

(5) Each CCB Guarantee Liquidating Trust Interest under Tranche 3 represents the related class of CCB preferred securities only, in each case as described more specifically in Exhibits A and B of the Plan. In accordance with the terms of the Global Settlement Agreement, and upon implementation thereof, holders of CCB-related common securities will release all claims against the Debtors and will not receive a distribution related to such common securities. While no funds or Liquidating Trust Interests will be distributed in relation to CCB-related common securities, amounts claimed by holders of CCB-related common securities with respect to CCB Guarantees will be taken into account for disbursement calculation purposes.

(6) See Note 9 below for a description of pro rata sharing with General Unsecured Creditor Liquidating Trust Interests.

(7) The Subordinated PIERS Liquidating Trust Interests are representative of the common PIERS securities and are owned by WMI. While Subordinated PIERS Liquidating Trust Interests will be issued for disbursement calculation purposes, as set forth in the Plan, WMI will not collect any funds in association with these Subordinated PIERS Liquidating Trust Interests. See Note 9 below for a description of pro rata sharing with General Unsecured Creditor Liquidating Trust Interests.

(8) Holders of Liquidating Trust Interests on account of Allowed Late-Filed Claims will be paid only after all other pre-Petition Date claims (other than Subordinated Claims) are paid in full without giving effect to applicable turnover provisions. Liquidating Trust Interests on Allowed Late-Filed Claims will not share pro rata with Liquidating Trust Interests based on any other claims. Therefore, to the extent holders of Liquidating Trust Interests on Allowed Late-Filed Claims are paid, this will create a break in the recovery of other creditors prior to their recovery on account of post-petition interest. The placement of Liquidating Trust Interests for Allowed Late-Filed Claims in the chart above is illustrative only, as the size of the Allowed General Unsecured Claims and the amount of post-Petition Date interest turned over on account of contractual subordination provisions will influence the position of relevant Liquidating Trust Interests in the waterfall. The Liquidating Trust Interests for Allowed Late-Filed Claims will, in any event, be paid immediately after satisfaction of General Unsecured Creditor Liquidating Trust Interests, but prior to the payment of post-Petition Date interest and Liquidating Trust Interests on Subordinated Claims.

(9) If it is provided for in an applicable contract or by law, the General Unsecured Creditors Liquidating Trust Interests will share pro rata in distributions to holders of PIERS Liquidating Trust Interests on account of post-Petition Date interest with respect to all Postpetition Interest Claims, including Postpetition Interest Claims to which the holders of PIERS Claims have been subrogated (on account of turnover in accordance with contractual subordination provisions). The chart above is illustrative only, as the point at which the holders of Allowed General Unsecured Liquidating Trust Interests begin receiving post-Petition Date interest is dependent on the size of the Allowed General Unsecured Prepetition Claims and the amount of post-Petition Date interest paid pursuant to contractual subordination. Separate Liquidating Trust Interest sub-Tranches may need to be issued by claim in order to track interest accretion post the Effective Date.

## Annex D

### Liquidating Trustee Compensation

The Liquidating Trustee shall be compensated on a monthly rate for any services that the Liquidating Trustee provides while acting as Liquidating Trustee. The Liquidating Trustee's monthly rate as of the date of this Agreement is $15,000, which rate is subject to adjustment on an annual basis on January 1 each year.

# Appendix B

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------------x
                                          :
*In re*                                   :         Chapter 11
                                          :
WASHINGTON MUTUAL, INC., et al.,[1]       :         Case No. 08-12229 (MFW)
                                          :
          Debtors.                        :         (Jointly Administered)
                                          :
-------------------------------------------------------------------x

### STIPULATION BETWEEN CLAIMANTS CREDIT SUISSE SECURITIES (USA) LLC, GOLDMAN, SACHS & CO., AND MORGAN STANLEY & CO., INC., AND WMI LIQUIDATING TRUST RESOLVING THE EIGHTY-THIRD OMNIBUS (SUBSTANTIVE) OBJECTION TO CLAIMS FOR INDEMNIFICATION RELATING TO SECURITIES LITIGATION

WMI Liquidating Trust ("WMILT"), as successor in interest to Washington Mutual, Inc.

("WMI") and WMI Investment Corp. (collectively, the "Debtors"), and Credit Suisse Securities

(USA) LLC, Goldman, Sachs & Co., and Morgan Stanley & Co. Incorporated, as representatives

of the Underwriting Syndicates for certain issuances of public debt and equity securities of WMI

("Claimants," and, together with the Trust, the "Parties"), by and through their undersigned

counsel, hereby enter into this stipulation (the "Stipulation"), and agree as follows:

### RECITALS

A.    On September 26, 2008 (the "Commencement Date"), each of the Debtors

commenced a case under chapter 11 of title 11 of the United States Code (the "Bankruptcy

Code") in the United States Bankruptcy Court for the District of Delaware (the "Court").

B.    On or about March 30, 2009 and after, Claimants filed proofs of claim against

WMI and its chapter 11 estate, as representatives of the Underwriting Syndicates of certain

---

[1]  The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax
     identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp.
     (5395).  The Debtors' principal offices are located at 925 Fourth Avenue, Seattle, Washington 98104.

issuances of public debt and equity securities of WMI as more further described in the proofs of claim. These claims, which were assigned claim numbers 2569 ("Claim 2569"), 2584 ("Claim 2584"), 2909 ("Claim 2909"), and 3794 ("Claim 3794"),[1] (collectively, the "Original Claims"), were for defense costs incurred in connection with the consolidated multidistrict securities litigation pending against Claimants (and numerous other defendants) in the United States District Court for the Western District of Washington, captioned In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation., Case No. 2:08-md-1919 (W.D. Wash.) (MJP) (the "Securities Litigation"), asserting, *inter alia*, claims for alleged violations of the federal securities laws.

D.    By their Claims, Claimants contend that WMI is obligated to reimburse and indemnify Claimants, and the Underwriting Syndicates represented by the Claimants, for attorneys' fees, costs and expenses in defending the Securities Litigation, as well as any settlement or judgment amounts, incurred pursuant to certain underwriting agreements executed between Claimants and WMI in 2006 and 2007.

E.    On March 19, 2010, the Debtors filed the *Debtors' Twenty-Ninth (Substantive) Objection to Claims Filed by Morgan Stanley & Co. Incorporated, Goldman, Sachs & Co., and Credit Suisse Securities (USA) LLC (Claim Nos. 2584, 2909 and 3794) Pursuant to Section 510(b) of the Bankruptcy Code* [Docket No. 2574], pursuant to which the Debtors objected to Claim 2584, Claim 2909, and Claim 3794 on the ground that each such Claim is subject to mandatory subordination pursuant to section 510(b) of the Bankruptcy Code (the "Twenty-Ninth Claims Objection"). On May 12, 2010, the Court entered an order approving a stipulation

---

[1]    Claim 3794 was filed as an amendment to Claim 2586 on October 29, 2009.

between the Debtors and Morgan Stanley & Co., Inc. [Docket No. 3700], pursuant to which it was agreed that Claim 2569 was subject to the Twenty-Ninth Claims Objection.

      F.      On April 9, 2010, Claimants filed their Response to the Twenty-Ninth Claims Objection (the "Response") [Docket No. 3164], pursuant to which Claimants disputed that the Claims are subject to mandatory subordination. On May 14, 2010, the Debtors filed their Reply to the Response [Docket No. 3737].

      G.      On February 3, 2011, the Debtors and Claimants agreed to resolve the Twenty-Ninth Claims Objection by (i) the Debtors agreeing to an Allowed General Unsecured Claim of $250,000 (the "Allowed General Unsecured Claim"), to be classified in Class 12 of the *Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 5548] (the "Sixth Amended Plan"); and (ii) Claimants agreeing that the remainder of the Original Claims shall be subordinated, with Claim Nos. 2584, 3794, 3937, and 3936 to be classified in Class 18 of the Sixth Amended Plan (as supplemented, the "Class 18 Claims"), and Claim Nos. 2909, 2569, 3935, and 3938[2] to be classified in then Class 20 of the Sixth Amended Plan (as supplemented, the "Class 20 Claims," and together with the Class 18 Claims, the "Subordinated Claims"). This settlement was embodied in a stipulation (the "Original Stipulation"), approved by Court Order dated February 4, 2011 [Docket No. 6687].

      H.      Thereafter, the Debtors filed their *Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code* [Docket No. 9178] (as amended, the "Plan"). Claims and interests that had been classified in Class 20 of the Sixth Amended Plan were re-classified into Class 19 of the Plan, and therefore Claimants' Class 20

---

[2]   Claimants supplemented the Original Claims as a result of further expenditures of defense costs in the Securities Litigation (Claim Numbers 3938, 3937, 3935 and 3936, respectively) (the "First Supplemental Claims"). Claimants subsequently and finally supplemented the First Supplemental Claims after incurring further defense

Claims were converted to Class 19 Claims (the "Class 19 Claims"). On February 23, 2012, the Court entered an order confirming the Plan [D.I. 9759] (the "Confirmation Order"), and, upon satisfaction or waiver of the conditions described in the Plan, the transactions contemplated by the Plan were substantially consummated on March 19, 2012. Pursuant to the Plan, Confirmation Order and the WMI Liquidating Trust Agreement, WMILT was created as successor in interest to WMI.

I.      On September 14, 2012, WMILT filed the *Eighty-Third Omnibus (Substantive) Objection of WMI Liquidating Trust to Proofs of Claim Filed by Morgan Stanley & Co., Inc., Goldman, Sachs & Co., Credit Suisse Securities (USA) LLC, and Other Underwriter Defendants (Claim Nos. 3935, 4045, 4046, 4047) Asserting Claims for Indemnification Relating to Securities Litigation* (the "Eighty-Third Omnibus Objection") [Docket No. 10666]. Pursuant thereto, WMILT seeks to disallow Claimants' Subordinated Claims in their entirety. Since the filing of the Eighty-Third Omnibus Objection, the Parties have stipulated to extensions of time to file a response to engage in settlement negotiations.

NOW, THEREFORE, IT IS HEREBY AGREED by and among WMILT and Claimants as follows:

## AGREEMENT

1.      Each of the Recitals shall be incorporated herein as part of this Stipulation and Order. The terms of this Stipulation shall become effective immediately upon execution by the parites (the "Effective Date").

2.      Except as modified by this Stipulation, the Original Stipulation shall remain in full force and effect, and shall be binding on WMILT pursuant to paragraph 9 thereof.

---

and settlement costs in the Securities Litigation (Claim Numbers 4045, 4046, and 4047, respectively) (together with ClaimNumber 3935, the "Final Supplemental Claims").

3.    The Subordinated Claims shall be treated as follows:

a.    The Class 18 Claims shall be disallowed with prejudice in their entirety;
and

b.    The Class 19 Claims shall be allowed in the amount of $71,953,530.09
and treated in accordance with Section 23.1 of the Plan (the "Allowed Class 19 Claim").
Pursuant to Section 23.1 and 41.6 of the Plan, Claimants shall execute and deliver to WMILT the
release provided for thereunder (the "Section 41.6 Release"); provided, however, the Section
41.6 Release will not preclude or prejudice the assertion of any defenses, counterclaims, or setoff
by any or all of the Claimants or members of the Underwriting Syndicates in the event WMILT
asserts a claim against any or all of the Claimants or members of the Underwriting Syndicates,
including pursuant to or in connection with the *Motion by WMI Liquidating Trust for an Order
Authorizing an Examination of Goldman Sachs Pursuant to Bankruptcy Rule 2004* [Docket No.
10869]; and, provided, further, that the assertion of any such defenses, counterclaims, or setoff
shall be limited to defensive in nature and will not afford or enable the Claimants or members of
the Underwriting Syndicates to any affirmative recovery from WMILT or any other Released
Party that would otherwise be barred by the provisions of the Section 41.6 Release.

4.    The terms of this Stipulation resolve with finality the Eighty-Third Omnibus
Objection, the Original Claims, the First Supplemental Claims, the Final Supplemental Claims,
the Class 18 Claims and the Class 19 Claims.

5.    Upon the Effective Date, Kurtzman Carson Consultants, LLC, the Debtors' court-
appointed claims and noticing agent, shall be authorized and directed to reflect the Allowed
General Unsecured Claim and the Subordinated Claims (as modified by this Stipulation) in the
official claims register in the chapter 11 cases. The Disbursing Agent under the Plan shall make

all distributions to Claimants in the same manner as distributions are made to holders of other claims in Classes 12 and 19 of the Plan. The distribution pursuant to Section 23.1 of the Plan on account of the Allowed Class 19 Claim (and, to the extent not already distributed, the cash distribution on account of the Allowed General Unsecured Claim pursuant to the Original Stipulation and the Plan), shall be distributed to Claimants pursuant to instructions provided by Gibson, Dunn & Crutcher LLP, as counsel of record for Claimants.

6. This Stipulation, together with the Original Stipulation, contain the entire agreement between the Parties as to Claimants' Original Claims, the First Supplemental Claims, the Final Supplemental Claims, the Class 18 Claims, the Class 19 Claims, and any Objections thereto, and supersede all prior agreements and undertakings between the Parties relating thereto.

7. This Stipulation is subject to the approval of the Court and shall be of no force and effect unless and until it is approved.

8. Each person who executes this Stipulation represents that he or she is duly authorized to execute this Stipulation on behalf of the respective Parties hereto and that each such Party has full knowledge and has consented to this Stipulation.

9. This Stipulation shall be binding upon and inure to the benefit of WMILT, Claimants, and their respective successors and assigns. This Stipulation may not be modified other than by a signed writing executed by the Parties hereto or by further order of the Court. This Stipulation may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

10. The Court shall have sole and exclusive jurisdiction to hear disputes related to this Stipulation.

Dated: New York, New York
      March 2̲8̲, 2013

_____

Susheel Kirpalani
David Elsberg
Benjamin I. Finestone
**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**
51 Madison Avenue
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

_Counsel to WMI Liquidating Trust, as successor
in interest to Washington Mutual, Inc. and WMI
Investment Corp., formerly Debtors and Debtors
in Possession (But Not With Respect to Claims
Filed by or on behalf of Morgan Stanley & Co.,
Inc.)_

-and-

Scott Cousins
COUSINS CHIPMAN & BROWN, LLP
1007 North Orange Street, Suite 1110,
Wilmington, Delaware 19801

_Co-Counsel to WMI Liquidating Trust, as
successor in interest to Washington Mutual,
Inc. and WMI Investment Corp., formerly
Debtors and Debtors in Possession (And
Principal Counsel With Respect to Claims
Filed by or on
behalf of Morgan Stanley & Co., Inc.)_

_____

Michael A. Rosenthal
Jonathan C. Dickey
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-2403
Facsimile: (212) 351-5303

_Counsel for Claimants_

# Appendix C

1  UNITED STATES BANKRUPTCY COURT

2  DISTRICT OF DELAWARE

3  CASE NO. 08-12229 (MFW)

4  - - - - - - - - - - - - - - - - - - x

5  In the Matter of:

6

7  WASHINGTON MUTUAL, INC., ET AL,

8

9       Debtors.

10  - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    824 North Market Street

14                    Wilmington, Delaware  19801

15

16                    April 22, 2019

17                    11:30 AM

18

19

20  B E F O R E :

21  HON. MARY F. WALRATH

22  U.S. BANKRUPTCY JUDGE

23

24

25

1    HEARING Re First Omnibus Objection (Substantive) of Alice

2    Griffin, Class 19 Interest Holder, to Claims (Nos. 3935 and

3    4045) Allowed Pursuant to a Stipulation Dated March 28, 2013

4    Between the WMI Liquidating Trust and Morgan Stanley & Co.,

5    Incorporated, Credit Suisse Securities (USA) LLC, and

6    Goldman Sachs & Co., on behalf of Themselves and Certain

7    Underwriters (Docket No. 12595 - filed March 22, 2019)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sheila Orms

```
1   A P P E A R A N C E S :

2   RICHARDS, LAYTON & FINGER, P.A.

3        Attorneys for the Debtors and Debtors-in-Possession

4        One Rodney Square

5        920 North King Street

6        Wilmington, DE 19081

7

8   BY:  AMANDA R. STEELE, ESQ.

9

10  PROSKAUER ROSE LLP

11       Attorneys for Washington Mutual, Inc.

12       Eleven Times Square

13       New York, NY  10036

14

15  BY:  BRIAN ROSEN, ESQ.

16       FRANK ZARB, ESQ.

17

18  QUINN EMANUEL

19       Attorneys for Washington Mutual, Inc.

20

21  BY:  BENJAMIN FINESTONE, ESQ.

22

23

24

25
```

```
1   CIARDI ASTIN

2         Attorneys for Alice Griffith

3

4   BY:  JACK MCLAUGHLIN, ESQ.

5         DANIEL ASTIN, ESQ.

6

7   GRIFFITH LAW

8         Attorneys for Alice Griffith

9

10  BY:  ALICE GRIFFITH, ESQ.

11

12  ASTY & GEDDE

13        Attorneys for Underwriters

14

15  BY:  BILL BOWDEN, ESQ.

16        DAVID COOK, ESQ.

17

18  GIBSON DUNN

19        Attorneys for Underwriters

20

21  BY:  ALAN MOSKOWITZ, ESQ.

22

23

24

25
```

1                  P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Good morning.

4              UNIDENTIFIED:  Good morning, Your Honor.

5              MR. MCLAUGHLIN:  Good morning, Your Honor.

6              THE COURT:  Mr. McLaughlin, how are you?

7              MR. MCLAUGHLIN:  For the record, Jack McLaughlin

8    of Ciardi Ciardi and Astin, on behalf of Alice Griffin.  Ms.

9    Griffin is present in court today.  She's actually a member

10   of the New York Bar and had been admitted in this case

11   properly, so she'll be presenting her own case.  We're here

12   for moral support and for administrative purposes.

13             THE COURT:  All right.

14             MR. MCLAUGHLIN:  With me this morning is my

15   partner Dan Astin.  Also I will note we had some exhibit

16   binders I think may have been wrongfully delivered to your

17   chambers rather than the courtroom.

18             THE COURT:  I did get four copies of them.  I

19   wondered --

20             MR. MCLAUGHLIN:  Yeah, that was an error.

21             THE COURT:  -- why I needed --

22             MR. MCLAUGHLIN:  Parcels was coming around and try

23   and fetch them.

24             THE COURT:  I have them.

25             MR. MCLAUGHLIN:  Okay.  May I approach?

1          THE COURT:  May I keep one?

2          MR. MCLAUGHLIN:  Absolutely.  I apologize.

3          THE COURT:  That's fine.

4          MR. MCLAUGHLIN:  And, Your Honor, with that then,

5   I will cede the podium to Ms. Griffin for her argument.

6          THE COURT:  All right.  Thank you.

7          MR. MCLAUGHLIN:  Thank you, Your Honor.

8          MS. GRIFFIN:  Good morning, Your Honor.

9          THE COURT:  Good morning.

10         MS. GRIFFIN:  Alice Griffin, Class 19 interest

11  holder here to defend my objection to inclusion of certain

12  underwriters in Class 19.

13         THE COURT:  Okay.

14         MS. GRIFFIN:  Your Honor, I mean, for the reasons

15  I've stated in the objection, I think it's very clear that

16  these underwriters' claims on their merits were essentially

17  worthless according to the liquidating trust in their

18  September 14, 2012 objection.  And based on that, in my

19  review of the stipulation which the final stipulation that's

20  dated March 28th, 2013 which by its own terms didn't become

21  operational until presented to this Court and reviewed by

22  this Court, which my understanding is it never was.  It was

23  invalid.

24         My understanding is that they were given -- these

25  underwriters were given 1.4 million shares in the

1  reorganized debtor and I'm assuming also escrow interest as

2  other Class 19 members, but I do not believe that their

3  claims, that they should be in Class 19 for the reasons I've

4  set forth in that objection.

5       I think, you know, it's extremely perplexing to me

6  that in the face of that September 14, 2012 objection where

7  the claims were designated as basically worthless --

8       THE COURT:  Well, you understand as in litigation

9  that there are two sides to every argument.

10      MS. GRIFFIN:  Yes, ma'am.

11      THE COURT:  The underwriters didn't concede that

12  their claims were worthless.

13      MS. GRIFFIN:  That's right.

14      THE COURT:  In fact, they asserted they were

15  entitled to creditor claims, not -- which would have

16  priority over the preferred shareholders, correct?

17      MS. GRIFFIN:  That's correct.  They would have --

18  if anything, they would have had a place in Class 18 or

19  another creditor class, not Class 19 or 22.

20      THE COURT:  But you understand that in bankruptcy,

21  creditors get paid before shares or any equity get paid

22  anything.

23      MS. GRIFFIN:  Yes, I do, yes.

24      THE COURT:  So how would it have benefitted Class

25  19 shareholders to have a 72 million or almost $100 million

1    claim in a class ahead of them?

2             MS. GRIFFIN:  Well, obviously, you know, Your

3    Honor, again I go back to my point about the claims being

4    essentially by -- in the liquidating trust's own words,

5    unambiguously worthless, that they wouldn't have even been

6    there.

7             THE COURT:  Well, that's again one side of the

8    argument --

9             MS. GRIFFIN:  Yes.

10             THE COURT:  -- and there is case law on both sides

11    --

12             MS. GRIFFIN:  Yes.

13             THE COURT:  -- on that point.  And the liquidating

14    trustee would have had to win a hundred percent of its

15    argument --

16             MS. GRIFFIN:  Yes.

17             THE COURT:  -- in order to have rendered those

18    claims worthless.

19             MS. GRIFFIN:  Yes.  I -- my reading, though, of

20    the objection where I believe it was stated in -- where it

21    was stated that under no circumstance can the settlement

22    amounts, that's the $72 million portion be paid.  I mean, I

23    -- Your Honor, I just could not -- it seemed to me that even

24    to have any kind of dialogue once you've made a statement

25    like that that's so unambiguous and so encompassing it just

1    seems like it's incomprehensible that you can get back from

2    that.

3              THE COURT:  Well but --

4              MS. GRIFFIN:  It's almost as though --

5              THE COURT:  -- lawyers and pleadings state things

6    in the absolute all the time and nonetheless they settle.

7              MS. GRIFFIN:  Yes, yes, I understand that, Your

8    Honor.  This is an extraordinary settlement for 100 percent.

9              THE COURT:  Well, 100 percent not as a claim

10   though --

11             MS. GRIFFIN:  Yes.

12             THE COURT:  -- not as a creditor.

13             MS. GRIFFIN:  Yes.  No, I get that.

14             THE COURT:  In a class below creditors.

15             MS. GRIFFIN:  Yes.  Yes.

16             THE COURT:  So -- and I think even in this case

17   shareholders are -- that class is not going to get a hundred

18   percent, is it?

19             MS. GRIFFIN:  We don't know.

20             THE COURT:  Class 19?

21             MS. GRIFFIN:  Well, Your Honor, I -- there's hope.

22             THE COURT:  Okay.

23             MR. MCLAUGHLIN:  Your Honor, may I be heard?

24             THE COURT:  Yes.

25             MR. MCLAUGHLIN:  Just very briefly.  Your Honor,

1    one of the issues here is more a procedural issue than a

2    substantive one.  Leaving aside the complexities of the

3    trading of the stocks, which I'll confess I really don't

4    understand.  But the big problem here, Your Honor, is the

5    final stipulation that was entered into back when the deal

6    was cut.  It is Exhibit E in the binder I gave you there.

7    It is an exhibit to one of the pleadings filed by the

8    respondents.

9              THE COURT:  And I think it was attached to the

10   objection, wasn't it?

11             MR. MCLAUGHLIN:  No.

12             THE COURT:  But I did see it, okay.

13             MR. MCLAUGHLIN:  And that was the problem, Your

14   Honor, Ms. Griffin had requested a copy of that stipulation

15   for a long time --

16             THE COURT:  Uh-huh.

17             MR. MCLAUGHLIN:  -- and was unable to obtain that

18   until we finally had to engage in formal discovery and all

19   of a sudden it popped up.

20             But again, Your Honor, part of the problem here is

21   that that final stipulation which was entered into between

22   the trust and the claimants years ago, and presumably

23   drafted by the trust contains a specific provision at

24   paragraph 7 that says it's required to be approved by the

25   Court prior to becoming effective, and of course, this is

1    the -- the stipulation says the document sort of triggered

2    this whole complex reclassification.

3            So Ms. Griffin's position is that the stipulation

4    never become effective because it was never provided, it

5    never went out notice, it was never provided to the Court

6    for approval.  I understand that there were multiple, dozens

7    of other stipulations that were filed with the Court, and

8    for which approval was sought over the years, and this is

9    the one that never was.

10           So the question is, why was it not presented to

11   the Court by its own terms, again the trustee albeit having

12   broad discretion under the confirmation order of the plan

13   and the trust agreement, stipulating that they may have

14   broad discretion.  Nonetheless the document itself required

15   Court approval and never obtained Court approval.

16           THE COURT:  But they assert, the trustee asserts

17   that the parties waived that requirement and could have

18   waived that requirement, because as you say in the plan and

19   the liquidating trust agreement bankruptcy court approval

20   was not required after confirmation.

21           MR. MCLAUGHLIN:  However, when they drafted the

22   document, they specifically included unambiguous language

23   saying Court approval is required.

24           There is a provision somewhere in the trust

25   agreement that also says they can waive it, but it has to be

1    waived in writing.  And we have not been produced -- we have

2    not been provided with any document of any nature whatsoever

3    that suggests that that requirement was ever waived.

4            At the last in time, Your Honor, we suggest is

5    last and right, that this was the last writing that

6    addressed the issue, and it says Court approval is required.

7    And while the trustee may have that prerogative, he never

8    apparently took any steps to effectuate a written waiver of

9    that provision.

10           THE COURT:  Which paragraph requires any waiver in

11   writing?

12           MR. MCLAUGHLIN:  Your Honor, give me one moment.

13           THE COURT:  I mean, it says it can't be modified

14   except in writing but.

15           MR. MCLAUGHLIN:  Well, I think that's what we're

16   drawing upon.  Again, given the -- Your Honor,

17   philosophically the question of whether or not there's broad

18   discretion the trustee is given post confirmation is

19   desirable first, but be that as it may, that's what the

20   confirmation order said.

21           THE COURT:  Uh-huh.

22           MR. MCLAUGHLIN:  But again, you know, you've got a

23   requirement -- they've agreed to have it approved by the

24   Court and they never did and they never waived it formally

25   and this is a technical argument, there's no question about

 1   it.

 2              THE COURT:  Uh-huh.

 3              MR. MCLAUGHLIN:  And whether or not a dime comes

 4   to Class 19 is really irrelevant to the fact that this deal

 5   was never properly approved by the Court or put on notice to

 6   the shareholders.

 7              THE COURT:  Well, if you -- if I'm required to or

 8   if they're required to ask for my approval, why should I not

 9   approve this?

10              MR. MCLAUGHLIN:  Well, maybe you should but that's

11   a different issue.  That's, you know --

12              THE COURT:  Well, but --

13              MR. MCLAUGHLIN:  -- it would go out on notice and

14   Ms. Griffin or other -- apparently there's a lot of

15   disgruntled class members.

16              THE COURT:  I'm struggling to see why this is

17   unfair to Class 19.  I'm trying to see why this settlement

18   is unfair to all creditors and shareholders.

19              MR. MCLAUGHLIN:  Do you want to address that?

20              MS. GRIFFIN:  Your Honor, my feeling and I restate

21   this, is that the claims for -- there were two claims.

22   Originally there was this --

23              THE COURT:  Right.

24              MS. GRIFFIN:  -- $24 million claim for legal

25   expenses and then there was the 72 million claim for

1    settlement amounts for indemnification and the -- in the

2    October -- in the September 14, 2012 objection --

3              THE COURT:  Uh-huh.

4              MS. GRIFFIN:  -- the liquidating trust made it

5    crystal clear that in no event could those be paid on the

6    settlement amount portion.

7              THE COURT:  I understand but the underwriters

8    contest that, they assert otherwise that they are entitled

9    to this, they have a contractual indemnification provision

10   and there is case law that says in certain circumstances

11   that could be allowed.

12             MS. GRIFFIN:  Right.  But again going back to the

13   liquidating trust's own words that --

14             THE COURT:  Okay.

15             MS. GRIFFIN:  -- indemnification where there's

16   been a settlement I guess is sort of a moral hazard --

17             THE COURT:  I understand.

18             MS. GRIFFIN:  -- that you have to prove -- you

19   have to litigate to the end not settle because otherwise --

20             THE COURT:  Or you have to show that you were not

21   one of the tort feasers, you were not responsible.

22             MS. GRIFFIN:  Right.  And none of that was proved

23   on the --

24             THE COURT:  Because they settled.

25             MS. GRIFFIN:  Yeah.

1          THE COURT:  But they assert that they could have

2    proven that.  I mean, that's the point of a settlement is

3    two sides have diametrically opposed positions.

4          MS. GRIFFIN:  Right.

5          THE COURT:  And clearly if they had litigated

6    this, it would have been costly.

7          MS. GRIFFIN:  Yes.

8          THE COURT:  It would have been lengthy.  It would

9    have taken a long time.  There would have been discovery and

10   depositions, really they would have to relitigate or

11   litigate the actual underlying securities fraud claims

12   against the underwriters, right?

13         MS. GRIFFIN:  Yes.  If they were litigating on --

14   they would have had to have determined that the underwriters

15   --

16         THE COURT:  Were not grossly negligent or not --

17         MS. GRIFFIN:  Exactly, yes, yes.  Yes, I --

18         THE COURT:  -- responsible.

19         MS. GRIFFIN:  But what I'm saying is, Your Honor,

20   upon my review of their strident objections --

21         THE COURT:  Well --

22         MS. GRIFFIN:  -- that's my view.  I mean,

23   obviously they might have a very different opinion but I did

24   not understand how you could unsee -- Your Honor, it's sort

25   of like, you know, when you talk about what could come in

1    and the recoveries, to show, you know, I cannot prove

2    definitively that there is going to be recovery to Class 19

3    and Class 22, which are pari passu, but there certainly is a

4    possibility there could be a recovery.

5          And I don't believe that anybody here can say

6    otherwise that -- there's never been an ambiguous --

7    unambiguous statement.  Now, the liquidating trust has

8    updated its fact sections on its website in part because of

9    I think my agitation, in which it said that WMB, they don't

10   expect anything from WMB and the WMB waterfall in the FDIC,

11   which is understandable because right now it seems to be

12   insolvent to the tune of 14 billion.

13         THE COURT:  All right.  But either way, again,

14   let's go back to if they had tried this and what if the

15   liquidating trustee had lost, there would have been a $100

16   million contractual claim, creditor claim ahead of --

17         MS. GRIFFIN:  Right.

18         THE COURT:  -- Classes 19 and 22.

19         MS. GRIFFIN:  Right.  But if something came in

20   excess --

21         THE COURT:  Well, but isn't better to --

22         MS. GRIFFIN:  I would rather have them than, Your

23   Honor, as creditors then have them diluting Class 19 by 1

24   percent.

25         THE COURT:  Rather than them getting a hundred

1 percent before you got anything.

2    MS. GRIFFIN:  Well, if there's a -- it depends on

3 how much comes into the waterfall, Your Honor.  If it's

4 enough, because it's capped as a creditor claim.  It's

5 capped.  Once they're paid, it's over.  This -- and the

6 thing about being in Class 19 --

7    THE COURT:  Okay.  But getting $100 million --

8    MS. GRIFFIN:  Yes.

9    THE COURT:  -- versus getting 1 percent of your

10 recovery which could be anything, isn't a hundred percent

11 better than -- worse for you than sharing 1 percent?

12    MS. GRIFFIN:  I don't -- not -- depends on what

13 comes in, Your Honor.

14    THE COURT:  Well, currently how much has come in?

15    MS. GRIFFIN:  Well, we don't know.  We don't know.

16    THE COURT:  You've gotten nothing under the

17 waterfall, right?

18    MS. GRIFFIN:  No.  Class 19 and Class 22 we're

19 pari passu with Class 22 getting 25 percent and Class 19

20 getting 75.

21    THE COURT:  And getting seventy -- right.

22    MS. GRIFFIN:  And just for further illustration,

23 Your Honor, you know, basically you need $10 billion for the

24 face securities in Class 19 to get par, but hypothetically

25 if there were twice that much it would mean that the --

1    these -- the underwriters would get actually more like 144.

2              THE COURT:  But you'd also get more than a hundred

3    percent.

4              MS. GRIFFIN:  Right.  But the thing is --

5              THE COURT:  So --

6              MS. GRIFFIN:  I -- Your Honor, you know, if they

7    were capped to the creditor claim and say 20 billion came

8    in, they would get -- say if they got their full 72, they

9    would get that, but the Class 19 wouldn't -- would not be

10   giving up any value to these interest holders.

11             THE COURT:  Well, but if they had a creditor claim

12   of a hundred million --

13             MS. GRIFFIN:  Yes.

14             THE COURT:  -- that would be paid before you got

15   anything.

16             MS. GRIFFIN:  Yes, absolutely.

17             THE COURT:  So I'm --

18             MS. GRIFFIN:  But they --

19             THE COURT:  Based on what is currently

20   anticipated, that would be a worst recovery for you if they

21   got their hundred million.

22             MS. GRIFFIN:  Currently, Your Honor, but you know,

23   we -- a good many of us feel that there's a possibility that

24   we could get substantially more than par.  We could get

25   substantially more than par, you know, and -- Your Honor,

1    one of the things that has intrigued me about, you know,

2    when you confirmed the plan I went and I read the release --

3    definition of released claims to find out what WMI, then WMI

4    now the LT --

5            THE COURT:  Okay.

6            MS. GRIFFIN:  -- preserved under.  And there's

7    identical language in the definition of released claims at

8    Section 1.183 under the plan, and in the GSAs, these

9    identical language.

10           But I also did something else, and I believe it's

11   the last exhibit.  It's Exhibit M.

12           THE COURT:  The portion of the disclosure

13   statement?

14           MS. GRIFFIN:  Yeah, but, Your Honor, I put them

15   altogether.  These are the different incarnations I believe

16   every incarnation of the plan.  So this disclosure was --

17   statement was for March 26th, 2012 and if you look the

18   definition of released claims, that comes in at 1.148.  And

19   that provision right there is sue generous, but in every

20   other iteration that follows, the next one came out March --

21   May 16, 2010.  The next one succeeded 5/17 and further on.

22   You will notice the difference between the first one, Your

23   Honor, and the second one.

24           For example, contains what you call -- we call a

25   carve-out, an exception that create -- that says that the --

1    that says that WMI released claims do not include claims

2    that the -- that WMI may have against the FDIC receiver, the

3    receivership or FDIC corporate.

4           THE COURT:  But that was not the one that was

5    approved.

6           MS. GRIFFIN:  Well, what I'm saying is from the

7    first one that you see, that -- there's no language about

8    recourse to the FDIC or -- receiver or corporate.

9           THE COURT:  So what?

10          MS. GRIFFIN:  So what I'm saying is that that was

11    added subsequently and it's in every iteration until the

12    last one.  And the last one is the one that is actually in

13    the plan, Section 1.183, I just gave the documents as

14    background.

15          And if you look at the last page in Exhibit M --

16          THE COURT:  Uh-huh.

17          MS. GRIFFIN:  -- you see Section 1.183 and this

18    says that not released are any and all claims against the

19    FDI receiver, solely with respect to the receivership.

20    That's the carve-out.

21          THE COURT:  Okay.  So?

22          MS. GRIFFIN:  What I take it to mean, and then I

23    went and looked at the GSA to see what was actually

24    transferred in the GSA.  The GSA, as you know, administered

25    like the tax refunds, they were divided among the --

1          THE COURT:  Okay.  This is all speculative.

2          MS. GRIFFIN:  Yes, ma'am.

3          THE COURT:  It's all speculative as to what the

4    trust may or may not recover.

5          MS. GRIFFIN:  Right, yes, I understand.  So

6    there's no --

7          THE COURT:  So it doesn't matter if it's a --

8          MS. GRIFFIN:  -- dollar amount, there's no dollar

9    amount that we can put on it, Your Honor.

10         THE COURT:  If it's 1 billion or 10 billion or

11   nothing more --

12         MS. GRIFFIN:  Right.  But if it is substantial

13   then I would rather have that 100 million paid and gone than

14   have -- sorry --

15         THE COURT:  Yeah, but what if it's not substantial

16   you'll get nothing --

17         MS. GRIFFIN:  Right.

18         THE COURT:  -- if that $100 million is paid first.

19         MS. GRIFFIN:  Right.  You know --

20         THE COURT:  You think that's better for your class

21   to get nothing than to get a share of $100 million?

22         MS. GRIFFIN:  Your Honor, we think it could be

23   more than that.  I do anyway.

24         THE COURT:  I know you think it could be --

25         MS. GRIFFIN:  Yes.

1            THE COURT:  -- but you're one entity and there's

2    no guarantee.

3            MS. GRIFFIN:  Right.

4            THE COURT:  You have to consider this from the

5    perspective of the liquidating trustee at the time of

6    considering the settlement.

7            MS. GRIFFIN:  Your Honor, but when you look at --

8            THE COURT:  Which is better for shareholders

9    generally and creditors generally.

10            MS. GRIFFIN:  Your Honor, and also looking back at

11    the stipulation that you did approve, the earlier one

12    February 3rd, 2011 where you're dealing with the whole 96

13    million, you had -- there was 24 million in for the legal

14    expenses that went into Class 18 --

15            THE COURT:  Yes.

16            MS. GRIFFIN:  -- a creditor claim.  And then there

17    was 72 million that went into Class 20 which was, at that

18    time under that iteration that one of the versions of Plan 6

19    that would not have been paid because plan -- because they -

20    - Class 20 wasn't going to get anything under the plan.

21            So under that -- and that seems to comport, Your

22    Honor, with what was subsequently done in the September 14,

23    2012 objection --

24            THE COURT:  But Class 20 was ultimately renamed

25    Class 19 and when the plan was confirmed Class 19 got

1    something.

2              MS. GRIFFIN:  Yes.  That is correct.

3              THE COURT:  Okay.

4              MS. GRIFFIN:  That is --

5              THE COURT:  So the 72 million was put into the

6    class in which you are --

7              MS. GRIFFIN:  Yes.

8              THE COURT:  -- that ultimately did get something.

9    So whether the prior plan provided to give them --

10             MS. GRIFFIN:  But based --

11             THE COURT:  -- nothing or not is not relevant.

12             MS. GRIFFIN:  But, Your Honor, when you look at

13   the earlier stipulation and you look at the legal arguments

14   it seems that Class -- the Class 18 claim of 24 million

15   seems to basically have more merit because basically they

16   said, well, look, if you can show that these legal expenses

17   are valid, here they're treated like a creditor in Class 18

18   and would -- but Class 19, the Class 20 there was nothing

19   there, they never intended to pay anything there.

20             THE COURT:  Well, but that plan was not approved -

21   -

22             MS. GRIFFIN:  That's true.

23             THE COURT:  -- because the equity shareholders

24   objected.

25             MS. GRIFFIN:  This is true.

 1                THE COURT:  And said there is something available

 2      for shareholders.

 3                MS. GRIFFIN:  Yes.

 4                THE COURT:  And ultimately it was allowed.

 5                MS. GRIFFIN:  Yes.  Well, Your --

 6                THE COURT:  So whether -- that is the plan that

 7      was confirmed.

 8                MS. GRIFFIN:  Well.

 9                THE COURT:  But they got the benefit of their

10      bargain to be treated as the class below creditors --

11                MS. GRIFFIN:  The other thing --

12                THE COURT:  -- which is your class.

13                MS. GRIFFIN:  But the other thing is, Your Honor,

14      when you read the definition of preferred equity interests

15      it doesn't -- that definition -- it's in the plan, that's

16      immutable, can't be changed and it excludes those.  You had

17      to have been a member -- there were three types of preferred

18      securities, Your Honor.  The TPS which had $4 billion face,

19      there was the Series R, which had $3 billion face, and then

20      there was a Series K, which had $500 billion face, and if

21      you read the definition of preferred equity interest, it

22      says that those -- you had to be one of the preferred that

23      were created before I believe the debtor's plan was

24      confirmed.

25                And even though the claims contain language that

1    says -- that would seem to include -- let's see, so I don't

2    speculate on it.

3              THE COURT:  Which is the plan exhibit or

4    disclosure statement exhibit?

5              MS. GRIFFIN:  The definition of preferred.  Sorry.

6    I'm sorry, Your Honor, just bear with me.

7              All right.  Well, the definition of preferred

8    equity interest --

9              THE COURT:  Hold on.

10             MS. GRIFFIN:  -- is limited to --

11             THE COURT:  Hold on.

12             MS. GRIFFIN:  Okay.

13             THE COURT:  1.17?

14             MS. GRIFFIN:  Yes.

15             THE COURT:  170.

16             MS. GRIFFIN:  I know it's in there somewhere.

17             THE COURT:  Okay.  I have it.

18             MS. GRIFFIN:  Okay.  So you'll see that I think it

19   has a provision that says including without limitation.

20             THE COURT:  Right.

21             MS. GRIFFIN:  So they're listing the three, but

22   then it says it has a time bar.  It says that it is -- I

23   think that they can't -- that it was during -- before

24   confirmation issued by the debtor.  So that would preclude

25   including anything in Class 19.

1          THE COURT:  Where's the time bar, what are you

2    talking about?

3          MS. GRIFFIN:  When you read the very beginning it

4    says --

5          THE COURT:  Okay.  A stock -- an interest issued

6    prior to or on the petition date.

7          MS. GRIFFIN:  Yes.  So would -- and it says

8    including and those three.  So a Class 19 interest couldn't

9    -- now -- couldn't be created.

10         THE COURT:  Okay.  But they argue that 510 allows

11   subordination and allows claims to be added to classes.

12         MS. GRIFFIN:  Your Honor, and if you look at Class

13   -- the definition of common equity interest, I'm sorry I

14   don't have that one in front of me, common equity interest

15   contains a subpart B, common equity interest you can add to

16   common equity interest.  But that language is not in

17   preferred equity interest.

18         THE COURT:  Well, the reference in 510(b) to

19   common stock simply says that if -- it's the same as common

20   stock, it's not put below common stock, it's put in the same

21   class as common stock.

22         MS. GRIFFIN:  Right and I understand that, Your

23   Honor, but what I'm saying is that when the plan was

24   created, this -- their -- they could -- if they'd put it in

25   Class 22 first of all I wouldn't be here because I have no

1    Class 22 interest.  But in Class 22 you can expand it

2    because of that subparagraph B, the definition of common

3    equity interest.

4              THE COURT:  And where is that?  In the definition

5    of --

6              MS. GRIFFIN:  Yes.

7              THE COURT:  -- Class 22?

8              MS. GRIFFIN:  In -- yes.  Yes, ma'am, in

9    subparagraph B.  It is in there.  And that is omitted from

10   the definition of preferred equity interest.

11             THE COURT:  Okay.

12             MS. GRIFFIN:  So if they had put it in there in

13   Class 22, well like I said I wouldn't have standing, but

14   also I wouldn't -- I don't think anybody --

15             THE COURT:  What if they had put it in Class 18?

16             MS. GRIFFIN:  If they -- they could have put it in

17   Class 18 or they could have put it in Class 22 by my

18   definition, Your Honor, because when I was researching for -

19   - to prepare for this, I just -- even though I didn't own

20   any common that's where I looked.  But, you know, if we --

21   if this had been brought up to the Court we could have had

22   these conversations years ago about whether it could have

23   been in Class 19 or Class 22 or Class 18.  But not Class

24   19's definition, Your Honor, because --

25             THE COURT:  All right.

1          MS. GRIFFIN:  -- before the petition date, on or

2    before.

3          THE COURT:  I understand your argument.

4          MS. GRIFFIN:  Your Honor --

5          THE COURT:  Anything else?

6          MS. GRIFFIN:  That's what I was going to ask you,

7    if you, you know -- if you had any specific questions for me

8    at this time.

9          THE COURT:  Well, let me hear from the trust and

10   see if I have any more questions.

11         MS. ROSEN:  Good morning, Your Honor.

12         THE COURT:  Good morning.

13         MS. ROSEN:  Brian Rosen, Proskauer Rose on behalf

14   of WMI Liquidating Trust.  With me is my partner Frank Zarb

15   who is here to address any questions you might have with

16   respect to certain securities issues and Amanda Steele from

17   Richard Layton & Finger.  Also, Your Honor, we have Mr. Ben

18   Finestone from Quinn Emanuel who was involved in the

19   preparation of the stipulation --

20         THE COURT:  Okay.

21         MS. ROSEN:  -- as well as counsel for the

22   underwriters of both Gibson Dunn and Mr. Bowden as local

23   counsel.

24         Your Honor, I'd like to just make a few things

25   clear and try to address any questions that you might have

1    because that our response was pretty complete and I do know

2    that Ms. Griffin did file a reply that tried to address some

3    additional issues, so I will try to address those.

4            Your Honor, just to clear up any confusion that

5    might be out there, in the February 2011 stipulation that

6    was on notice to everybody, including Ms. Griffin, including

7    the equity committee at that time, Your Honor, the Court did

8    approve the classification of two claims.  There was a Class

9    18 claim which was in the amount of approximately $24

10   million and it also approved the classification of $72

11   million claim in Class 20, and as the Court has already

12   recounted that Class 20 was then moved to Class 19 as

13   further iterations of the plan unfolded.

14           So it's not that there's $100 million in one

15   class, Your Honor, I just want to make sure the Court has

16   the facts.

17           THE COURT:  Yes, I do.

18           MS. ROSEN:  There's 24 in Class 18 that was there

19   before the final stipulation was entered into, and there was

20   72 million in Class 19.

21           Ms. Griffin noted that there have been some

22   modification to the FAQ's, she attributed to her agitation,

23   but, Your Honor, that was not the case because we've always

24   made clear that there are no claims, there are no assets

25   coming from the receivership to the trust.

1          The only thing that was to have come to the trust,

2     Your Honor, was pursuant to the global settlement agreement.

3     And once the receivership consummated the global settlement

4     agreement, once the receivership allowed for whatever was to

5     happen to come to the trust itself, there are no remaining

6     claims that the trust has against the receivership.

7          There were also, Your Honor, included in the most

8     recent 10-K that was filed, and this is based upon your

9     Court entering the order, Your Honor, most recently with

10    respect to the employee claims.  There was a distribution

11    that was made in February of approximately $50 million and

12    that was made, Your Honor, to the tranche in the waterfall

13    above Class 18.  And it finally paid off in full those

14    claims, which now opens up the door or the waterfall, Your

15    Honor, to Class 18 claims.

16         And as noted in our response, Your Honor, and is

17    noted in the 10-K that was filed, the amount of allowed

18    claims and disputed claims that have yet to be resolved in

19    Class 18 exceed the net assets which remain in the trust.

20         So as we noted in the response, we do not see the

21    likelihood of a distribution going to any holders of Class

22    19 or 21 or 22 claims other than the stock that has already

23    been provided on the effective date of the plan, Your Honor.

24         To us, Your Honor, we included in the response,

25    that should close the discussion entirely.  But what would

1    happen if, in fact, this somehow was opened up, which we

2    don't think it can be, Your Honor, because there is no

3    provision like Mr. McLaughlin said that requires written

4    approval, there is the absolute provision in the trust that

5    says the liquidating trustee can approve what the

6    liquidating trustee determines is in the best interests of

7    the trust including, Your Honor, based upon the fiduciary

8    obligations of the trustee advisory board, and that was what

9    happened here.

10           Yes, there was a provision paragraph 7 in the

11   final stipulation, yes, Your Honor, you indicated it and it

12   is correct that provision was waived by the parties.  That

13   stipulation became effective when the stock was distributed

14   on May 1st, 2013.  And that was duly noted, Your Honor, four

15   days after the stipulation had been entered into that it was

16   going to happen.

17           It was included, Your Honor, in the 2013 10-K

18   which actually relates back to the period ended 2012, Your

19   Honor, but it was almost immediate that it was included.

20   And for years afterwards it was also included verbatim, Your

21   Honor, the existence of the stipulation and that it was

22   consummated, Your Honor.

23           Ms. Griffin raises a few other points, Your Honor,

24   which I don't really think need to be further addressed

25   about 8-K's and 10-K's because just for Your Honor's benefit

1    there is no reporting obligation at all for the trust.  We

2    are doing it pursuant to a no action letter that was entered

3    into, and there is no obligation to actually file it, except

4    pursuant to that no action letter.

5              But even if there were, Your Honor, by the

6    inclusion of the information in the 10-K itself, it obviated

7    the need for any other filings.

8              Your Honor, the references, the 10 billion that

9    keeps coming up, there are no other assets of the trust,

10   Your Honor, we've made it abundantly clear we've included it

11   in FAQ's, we've included it in calls that we've had with

12   people like Ms. Griffin, other equity holders who constantly

13   call the trust, there are no more assets to be distributed

14   other than those net assets that I referred to before, Your

15   Honor, which will be insufficient to get us through Class

16   18.

17             So while I appreciate that Class 18 preferred

18   stockholders and Class 22 common stockholders are still

19   frustrated that the bank was seized by the FDIC.  There is

20   nothing that we can do about that, Your Honor, in fact,

21   there was nothing that anyone could do more than 30 days

22   after the seizure itself, because that was the period that

23   closed to fight the actual seizure by the FDIC.

24             There are also other issues that are raised in Ms.

25   Griffin's response, hypotheticals, Your Honor, positing that

1    the trust could do this transaction or that transaction to

2    essentially screw equity holders out of whatever recovery

3    might otherwise come their way.

4           No one but equity holders have ever thought of

5    those theories, no one but equity holders have ever thought

6    that there's additional assets, Your Honor.  We're just

7    trying to finish the liquidation and the reconciliation of

8    the estate, Your Honor.  We hope to do it in this calendar

9    year.  We have to reconcile the remaining Class 18 claims

10   which I indicated are very significant, Your Honor, because

11   as the Court may recall way back when, Your Honor, and I'm

12   going six years or more, there were claims that were

13   represented or for misrepresentation of bond claims

14   emanating out of Washington Mutual Bank.  We refer them to

15   Class 17-B and we never had to deal with those claims, Your

16   Honor, because we never thought we'd get to Class 18 for

17   distribution.

18          Now that we do, Your Honor, we have to reconcile

19   those claims.  And based upon the sheer magnitude of those

20   with what's already allowed there won't be a distribution to

21   anyone beneath those, Your Honor.

22          Lastly, Your Honor, I just want to -- I think one

23   more, I apologize.

24          THE COURT:  Let me ask one factual question --

25          MS. ROSEN:  Sure, Your Honor.

1          THE COURT:  -- and it's not -- may not even be

2    relevant, but what were the underlying securities that were

3    the --

4          MS. ROSEN:  That was what I wanted to go to.

5          THE COURT:  -- basis of the securities fraud

6    action?

7          MS. ROSEN:  There were debt and there were equity

8    claims, Your Honor, and the equity claims, that the claims

9    related to were preferred stock.  So when the subordination

10   occurred, that was why the stipulation in February of 2011

11   related to Class 19 that was whey we've included them in the

12   preferred stock, and ultimately in the final stipulation

13   because they got subordinated all the way down to that level

14   from the creditor claim.

15         THE COURT:  Okay.

16         MS. ROSEN:  The 24 million, Your Honor, related to

17   a debt claim, so we put it below all other general unsecured

18   claims and to the subordinated class.

19         THE COURT:  Uh-huh.

20         MS. ROSEN:  Thank you for reminding me of my last

21   point, Your Honor.  If you don't have any more questions,

22   Your Honor, I'll cede the podium.

23         THE COURT:  All right.  No thank you.

24         MR. BOWDEN:  Good morning, Your Honor, may it

25   please the Court, Bill Bowden of Ashby & Geddes on behalf of

1    the underwriters, Your Honor.  With me is my colleague David

2    Cook, and forwarding counsel Alan Moskowitz with the Gibson

3    Dunn Crutcher Firm.

4         Your Honor, we filed a joinder which I know Your

5    Honor has read.  We agree with the contents of Mr. Rosen's

6    response.  I agree with the comments that he's made here on

7    the record today.  I just have a couple of very brief points

8    --

9         THE COURT:  Okay.

10         MR. BOWDEN:  -- if I may.

11         One, Your Honor, to the extent Ms. Griffin, with

12    all due respect is complaining about the classification of

13    the $72 million settlement claim into Class 19, Your Honor,

14    the class -- what I call the classification stipulation,

15    first stipulation which was on notice which Your Honor did

16    approve that classification.

17         So I think that's water under the bridge, so to

18    speak.  Your Honor, the other couple of points I'd like to

19    make are first, with respect to the basis for disallowance,

20    if you would of the claims in Class 19, Allegheny requires a

21    showing of evidence and you don't have any evidence here

22    today other than speculative assertions in the pleadings.

23         And I know it's not lost on Your Honor that were

24    these issues litigated, rather than settled -- thank you --

25    the amount of claims ahead of Class 19 could have been

1    significantly greater and we did walk away from $24 million

2    in what were admittedly Class 18 claims that would have had

3    priority over Class 19.

4            And, Your Honor, Mr. Brian reminded me, we never

5    did respond to the 83rd omnibus objection filed by the

6    trust.  The parties engaged immediately after it was filed

7    in negotiations and reached a stipulation, which has been

8    the subject of much debate here today.

9            Your Honor, that's all I have unless Your Honor

10   has any questions for me.

11           THE COURT:  No, thank you.

12           MR. BOWDEN:  Thank you.

13           MR. MCLAUGHLIN:  Very briefly, Your Honor, again

14   to get back to the procedural matter.  Paragraph 7 of the

15   final stipulation required for approval, Court approval was

16   never obtained, that notice never went out to any of the

17   parties in interest including my client.  And the -- whether

18   or not all these -- we speculate now about whether there's

19   going to be more money or less money or not enough money,

20   whatever, all that's good and fine, but the bottom line is

21   there was a time -- there was a mechanism in the Bankruptcy

22   Code and in the stipulation for airing this before the Court

23   in an orderly fashion.

24           Now, here we are several years later arguing about

25   it.  The bottom line is the Class 19 shareholders feel that

1    they would have had a right to weigh in on that stipulation

2    pursuant to the terms of the stipulation itself directed by

3    the trust.  So we'd ask the Court to sustain the objection

4    to the proofs of claim.

5              THE COURT:  Anything else you have, Ms. Griffin?

6              MS. GRIFFIN:  Yes, Your Honor.  I understand that

7    the underwriters or that the trust is asserting that they

8    waived the provision 7 in the final stipulation.  Do they

9    have writing for that, because the agreement says they can't

10   be amended except in writing.

11             THE COURT:  All right.

12             MS. GRIFFIN:  The other thing I would say is I

13   reiterate, you know, if this had been done to Class 22 given

14   that it has an exception that allows it to expand in

15   subparagraph B it would be different, but the definition of

16   preferred equity interest is immutable and it has no --

17   there's no way of getting in after the petition date and

18   there were only three varieties and that's all there is, so

19   that's -- do you have anything else for me, Your Honor?

20             THE COURT:  No, thank you.

21             MS. GRIFFIN:  Thank you.

22             THE COURT:  Well, let me run through -- I'm sorry,

23   did --

24             MR. FINESTONE:  Your Honor, only if you had any

25   questions about the terms of the original stipulation, the

1    final stipulation.

2         THE COURT:  Well, was there a written waiver?

3         MR. FINESTONE:  For the record, Ben Finestone on

4    behalf of the trust.  I feel a little bit responsible for

5    all of the -- everybody's time here today in two respects.

6    One, Ms. Griffin, it was my pleadings that were filed on

7    behalf of the trust when I was adverse to the underwriters

8    telling them that they're never going to get any claim

9    allowed, and I do -- that is my thought and Judge Walrath

10   hit the nail on the head in terms of when you're dealing

11   with big money center banks like we were dealing with, you

12   have to let them know that the trust is being serious and

13   that we're going to assert all kinds of objections to the

14   end of the road.  And I think that we did, in fact, do that.

15        One thing that was a little bit unclear in the

16   record today is, the benefits of the settlement, Your Honor,

17   is not just subordination pursuant to 510(b), we got that in

18   the first stipulation, but it also was a disallowance of $24

19   million of what would be a senior claim and which were just

20   not legal fees.

21        So that was a consideration that the Board were to

22   reconsider this today, had any reason to reconsider this

23   today would sign up to that settlement again today.  I just

24   wanted that to be clear, but that was my fault, Ms. Griffin,

25   for which I apologize.

1          The other reason I wanted to stand up and take

2    some of the blame here today is because we did have that

3    appendage in the stipulation, and in the final stipulation

4    that said it required Court approval.  The reason that was

5    in there was because we had done a first stipulation which

6    subordinated the claim subject to allowance, that was in

7    their -- that was actually a mutual mistake, Your Honor,

8    that it was in the second stipulation, a mistake shared by

9    my firm and by firm to the underwriters, that's why there

10   was no question it was going to be immediately waived.

11          There is a writing, there is an e-mail writing,

12   but there was never -- the important thing it's not really a

13   question of waiver, it's a question of contemporaneous

14   intent, it was a mutual mistake.  The intent between the

15   trust and the underwriter banks was never to seek Court

16   approval, it was to rely on the language of the litigation

17   trust that did not require the trust to come to seek Court

18   approval, not because there was anything to hide, as

19   evidenced by the fact that in the 10-K all the material

20   terms were disclosed four days later.

21          I think this was just a matter of that you had a

22   different firm handling it for the objection, what I learned

23   from Mr. Rosen just recently is that Weil, Gotshal and

24   Proskauer and Rose were presenting stipulations to the

25   Court, it's not something I knew about, we just read the

1  trust and said, when you settle a claim objection you don't

2  have to seek Court approval.

3     So there was never any intent to seek Court

4  approval, and I apologize for the confusion, but I think the

5  important thing that there also was never any intent to hide

6  any of the material terms of the objection as evidenced by

7  the 10-K that was filed four days later, which didn't just

8  say Claim XYZ was settled, it said Claim XYZ was settled on

9  the following terms, Your Honor.

10    THE COURT:  Okay.

11    MR. FINESTONE:  Thank you.

12    THE COURT:  All right.

13    MS. GRIFFIN:  May I?  Your Honor, it's been a long

14 time since I've practiced bankruptcy law in my infancy as a

15 lawyer, but I do understand contract and this contract says

16 that it cannot be changed, except through a writing,

17 modified through a writing.

18    They've presented no writing.  This is -- it

19 doesn't matter what they were talking about, this is

20 contemporaneously before what have you, what matters what's

21 in this document, this contract.  And Section 9 says

22 absolutely not, they've presented no writings.

23    So this is parole evidence, this is --

24    THE COURT:  All right.

25    MS. GRIFFIN:  -- irrelevant.  Thank you, ma'am.

1          Mutual --

2          MR. MCLAUGHLIN:  May I?  Your Honor, just one

3   observation counsel suggested there was a mutual mistake.

4   As I remember contracts 1, a mutual mistake is a defense to

5   the formation of the contract, it's not a defense to -- it's

6   -- it doesn't age on interpretation, it's a mutual mistake,

7   then there wasn't any contract which is what we're kind of

8   saying anyway, so thank you.

9          THE COURT:  We're not going to get into this

10  because I'm really not going to consider that.

11          Let me just do this and I think based on the

12  pleadings that the parties have filed I do need to address

13  some preliminary matters that weren't argued today and the

14  first is whether or not Ms. Griffin or any other Class 19

15  creditor has standing to object to the underwriter's claims

16  or to raise this issue.

17          And while the trust asserts that Section 26.1 of

18  the plan of reorganization gives the liquidating trustee the

19  standing to object or to prosecute objections on behalf of

20  the estate, as Ms. Griffin points out that's not exclusive.

21  And Section 502 generally does allow any other creditor to

22  object to other creditor's claims.

23          But there is an issue raised even if Ms. Griffin

24  or other shareholders or creditors did have standing to

25  object to the claims is it quite simply just too late to do

1    that.  And I think that it's not simply an objection to the

2    claim.  What really Ms. Griffin is pressing is an objection

3    to the settlement of that claim.  The claims were settled.

4              First, the classification was settled in February

5    of 2011 over eight years ago.  The amount of the claims and

6    the final resolution of the claims was stipulated to by the

7    liquidating trustee over six years ago in March of 2013.

8              And although Ms. Griffin complains they did not --

9    the shareholders and other parties did not get notice of

10   that, the facts do not support that assertion.  There were

11   filings with the SEC immediately after the stipulation was

12   executed, and in several annual SEC filings thereafter, and

13   in the trustee's quarterly reports filed with this Court.

14   And those all make it clear what the terms of the settlement

15   were and the treatment of the underlying claims.

16             So I believe that the equitable doctrine of laches

17   precludes this objection from being prosecuted at this time.

18   But even if it were not too late, again, my analysis would

19   be predicated on whether or not this settlement was proper

20   because the objection is to the settlement, not to the

21   underlying claims.

22             And the 3rd Circuit has told us the factors a

23   Court must consider in approving a settlement are the

24   probability of success in the litigation, the likely

25   difficulties in collection, the complexity of the

1    litigation, and the amount of expense, inconvenience, and

2    delay involved in prosecuting the litigation rather than

3    settling, and the paramount interests of creditors and other

4    parties in interest.

5            In this case, I think all those factors support

6    approval of the final settlement by a liquidating trustee.

7    While Ms. Griffin asserts that it was clearly underwriters

8    had no claim as evidenced by the 83rd omnibus objection, I

9    think it is clear that the underwriters disagreed with that.

10   And the underwriters in filing their original claim and

11   responding to the debtor's initial objection to that claim

12   made it clear that they believed they had a valid claim

13   against the estate.

14           And it is not hornbook law that an indemnity claim

15   cannot be allowed for defense of a securities litigation,

16   but really it depends as the 2nd Circuit in the Globas (ph)

17   case, it depends on whether or not the underwriters can show

18   that they were not the tort feaser, and they were nothing

19   more than simply negligent.

20           Again, the claim of the underwriters was a

21   contractual claim, not an equity claim.  And if allowed in

22   full, potentially could have been paid or allowed prior to

23   any shareholders getting paid, including the preferred

24   shareholders.

25           So there was substantial risk.  The liquidating

1    trustee would have had to, in essence, retry the securities

2    litigation and would have had to try a subordination claim

3    under 510.  All of that, the liquidating trustee had no

4    guarantee of success in that litigation, there were no

5    difficulties in collection, but there certainly were

6    difficulties, expense, inconvenience, and probably a

7    substantial delay if that litigation had proceeded.

8         The fourth factor, the paramount interest of

9    creditors and other parties in interest, I am having a lot

10   of difficulty in trying to understand why the preferred

11   shareholders believed that had the underwriters proceeded

12   with their -- prosecution of their claim, and if in fact,

13   they're -- at least the $24 million had been allowed as a

14   Class 18 or higher creditor claim, and been paid a hundred

15   percent for the preferred shareholders got anything, how

16   that would have been better than the settlement, which

17   disallowed any claim ahead of the Class 19, but allowed a

18   partial claim in Class 19.

19        So I think that all of the factors and approval of

20   a settlement make it clear that this settlement was not in

21   bad faith, was not a breach of fiduciary duty, but really

22   was a proper exercise of the liquidating trust obligation

23   under the trust agreement.  And if it had been presented to

24   me I think I would have approved it at the time.

25        So quite frankly I think whether or not it was

1    required to be presented to me under the agreement between

2    the parties or whether the parties could mutually waive that

3    requirement I still would have approved it.

4              I think a hundred percent of a claim is worse for

5    those in classes below it than 1 percent of their claim

6    distribution.  So I will deny the objection of Ms. Griffin

7    to that underwriters claims as settled in the second

8    stipulation.

9              MS. STEELE:  Thank you, Your Honor.  Would you

10   like us to confer with the other side and submit an order

11   under certification of counsel?

12             THE COURT:  That would be great.

13             MS. STEELE:  Okay.  We'll go do that.  Thank you.

14             MS. ROSEN:  Thank you, Your Honor.

15             THE COURT:  Thank you.  We'll stand adjourned.

16   (Proceedings concluded at 12:28 p.m.)

17                          *  *  *  *  *

18

19

20

21

22

23

24

25

1                       I N D E X

2

3                     R U L I N G S

4     DESCRIPTION                                        PAGE

5     First Omnibus Objection (Substantive) of            41

6     Alice Griffin, Class 19 Interest Holder, to

7     Claims (Nos. 3935 and 4045) Allowed Pursuant

8     to a Stipulation Dated March 28, 2013 Between

9     the WMI Liquidating Trust and Morgan Stanley & Co.,

10    Incorporated, Credit Suisse Securities (USA) LLC,

11    and Goldman Sachs & Co., on behalf of Themselves

12    and Certain Underwriters (Docket No. 12595 - filed

13    March 22, 2019)

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2    I, Sheila G. Orms, certify that the foregoing is a true and

3    accurate transcript from the official electronic sound

4    recording.

5    Shelia Orms

Digitally signed by Shelia Orms
DN: cn=Shelia Orms, o, ou,
email=digital@veritedt.com,
c=US
Date: 2019.04.23 16:04:47 -04'00'

6

7    SHEILA ORMS, APPROVED TRANSCRIBER

8

9    DATED:  April 23, 2019

10

11

12

13

14

15

16    Veritext Legal Solutions

17    330 Old Country Road

18    Suite 300

19    Mineola, NY 11501

20

21

22

23

24

25

# Appendix D



# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| *In re:* | Chapter 11 |
| WASHINGTON MUTUAL, INC.,[1] *et al.*, | Case No. 08-12229 (MFW) |
| Debtors. | Jointly Administered |
| | |
| BLACK HORSE CAPITAL LP, et al., | Adv. Pro. No. 10-51387 (MFW) |
| Plaintiffs, | |
| v. | |
| JPMORGAN CHASE BANK, N.A., et al., | |
| Defendants. | |

## ORDER APPROVING STIPULATION AND AGREEMENT AMONG THE DEBTORS, THE TPS GROUP, THE TPS CONSORTIUM, THE EQUITY COMMITTEE, THE CREDITORS' COMMITTEE, AND JPMORGAN CHASE BANK, N.A. WITH RESPECT TO THE DEBTORS' SEVENTH AMENDED PLAN

Washington Mutual, Inc. WMI Investment Corp., as debtors and debtors in possession (collectively, the "Debtors"), the TPS Group, the TPS Consortium, the Equity Committee, the Creditors' Committee, and JPMorgan Chase Bank, N.A. (collectively, the "Parties"), having entered into that certain *Stipulation and Agreement Among the Debtors, the TPS Group, the TPS Consortium, the Equity Committee, the Creditors' Committee, and JPMorgan Chase Bank, N.A. With Respect to the Debtors' Seventh Amended Plan* (the "Stipulation"); and the Court having reviewed the Stipulation; and the Court having determined

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1201 Third Avenue, Suite 3000, Seattle, Washington 98101.



that good cause has been demonstrated for approving the Stipulation;

NOW, THEREFORE, IT IS HEREBY ORDERED as follows:

1.      The Stipulation, a copy of which is attached hereto as Exhibit 1, is APPROVED.

2.      The Parties are hereby authorized to take any and all actions reasonably necessary to effectuate the terms of the Stipulation.

3.      The Court shall retain jurisdiction over the implementation and enforcement of the Stipulation and this Order.

Dated: February 17, 2012
        Wilmington, Delaware

THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT 1**

**(Stipulation)**

| | |
|---|---|
| *In re:* | Chapter 11 |
| WASHINGTON MUTUAL, INC., [1] *et al.*, | Case No. 08-12229 (MFW) |
| Debtors. | Jointly Administered |

| | |
|---|---|
| BLACK HORSE CAPITAL LP, et al., | Adv. Pro. No. 10-51387 (MFW) |
| Plaintiffs, | |
| v. | |
| JPMORGAN CHASE BANK, N.A., et al., | |
| Defendants. | |

**STIPULATION AND
AGREEMENT AMONG THE DEBTORS,
THE TPS GROUP, THE TPS CONSORTIUM, THE EQUITY
COMMITTEE, THE CREDITORS' COMMITTEE, AND JPMORGAN CHASE
BANK, N.A. WITH RESPECT TO THE DEBTORS' SEVENTH AMENDED PLAN**

Washington Mutual, Inc. ("WMI") and WMI Investment Corp., as debtors and

debtors in possession (collectively, the "Debtors"),[2] the Consortium of Trust Preferred Security

Holders (the "TPS Consortium"), the TPS Group (together with the TPS Consortium, the "TPS

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1201 Third Avenue, Suite 3000, Seattle, Washington 98101.

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the *Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code,* dated December 12, 2011 [D.I. 9178] (as it has, and may be amended from time to time, the "Seventh Amended Plan"). As used herein, the Seventh Amended Plan shall incorporate the Plan Modification (as defined herein).

Funds"[3]), the Equity Committee, the Creditors' Committee, and JPMorgan Chase Bank, N.A. ("JPMC"), by and through their respective counsel, hereby enter into this stipulation and agreement (this "Stipulation"), and do hereby stipulate as follows:

## RECITALS

A.     On September 26, 2008, each of the Debtors commenced a case under chapter 11 of the Bankruptcy Code by filing a voluntary petition for relief in the Bankruptcy Court.

B.     As of the date hereof, the Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

C.     On October 3, 2008, the Bankruptcy Court entered an order pursuant to Bankruptcy Rule 1015(b) authorizing the joint administration of the Debtors' Chapter 11 Cases. On October 15, 2008, the U.S. Trustee appointed the Creditors' Committee. On January 11, 2010, the U.S. Trustee appointed the Equity Committee.

**The TPS Litigation**

D.     On July 6, 2010, certain holders of Trust Preferred Securities, including, among others, the TPS Funds (collectively, the "TPS Plaintiffs"), commenced litigation styled *Black Horse Capital Master Fund Ltd v. JPMorgan Chase Bank, N.A.*, Adv. Proc. No. 10-51387 (MFW) (Bankr. D. Del.) (the "TPS Action"), against JPMC, WMI and certain other entities.

---

[3] The TPS Funds consist of Black Horse Capital LP; Black Horse Capital Master Fund Ltd; Greywolf Capital Partners II LP; Greywolf Capital Overseas Master Fund; Greywolf Opportunities Fund II LP; Greywolf Structured Products Master Fund, Ltd.; Greywolf Capital Overseas Fund II; Pines Edge Value Investors Ltd.; Pine River Convertibles Master Fund Ltd. (f/k/a Nisswa Convertibles Master Fund Ltd.); Pine River Fixed Income Master Fund Ltd. (f/k/a Nisswa Fixed Income Master Fund Ltd.); Pine River Master Fund Ltd. (f/k/a Nisswa Master Fund Ltd.); LMA SPC for and on behalf of the MAP 89 Segregated Portfolio; Visium Global Master Fund, Ltd.; Visium Catalyst Credit Master Fund, Ltd.; VR Global Partners, L.P.; Scoggin Worldwide Fund Ltd.; Scoggin Capital Management II LLC; Scoggin International Fund Ltd, Karnak Partners, L.P., Ermitage Selz Fund, Ltd., GAM Selection Hedge Investments, Inc., and Varana Onshore, LP.

E.     By separate motions, each dated November 2, 2010, WMI and JPMC (collectively, the "TPS Defendants") sought summary judgment with respect to the claims asserted by the TPS Plaintiffs in the TPS Action [TPS Action, D.I. 105 & 109].

F.     On January 7, 2011, the Bankruptcy Court issued an opinion [TPS Action, D.I. 179] and entered an accompanying order [TPS Action, D.I. 180] finding that the TPS Plaintiffs have no interest in the Trust Preferred Securities and hold interests in WMI preferred equity (collectively, the "TPS Order").

G.     On January 14, 2011, certain of the TPS Plaintiffs appealed the TPS Order to the United States District Court for the District of Delaware (the "District Court"), styled as *Black Horse Capital LP v. JPMorgan Chase Bank NA, Inc. (In re Washington Mutual, Inc.)*, No. 11-124 (GMS) (D. Del. Jan. 19, 2012) (the "TPS Appeal," and together with the TPS Action, and all other litigations, appeals and petitions for review relating to the Chapter 11 Cases, the Initial Global Settlement Agreement, the Global Settlement Agreement, the January Opinion, or the September Opinion, the "TPS Litigation").

**Sixth Amended Plan and the Modified Plan**

H.     On October 6, 2010, the Debtors filed the Sixth Amended Plan. The Sixth Amended Plan was premised upon a global settlement and compromise contained in that certain Amended and Restated Settlement Agreement, dated as of October 6, 2010, by and among the Debtors, JPMC, the Federal Deposit Insurance Corporation, and certain creditor constituencies (as amended, the "Initial Global Settlement Agreement"). Pursuant to the Sixth Amended Plan, holders of shares of REIT Series that voted to accept the Sixth Amended Plan, and elected to grant the releases set forth in Section 2.24 of the Initial Global Settlement Agreement (the "REIT Releases"), were eligible to receive a pro rata distribution of $50 million from JPMC. Pursuant

to the solicitation of the Sixth Amended Plan, holders of shares of REIT Series holding approximately twenty-five percent (25%) of the shares of REIT Series elected to grant the REIT Releases and, thus, share in the JPMC distribution. Each member of the TPS Funds elected not to grant the REIT Releases.

I. On January 7, 2011, the Bankruptcy Court entered the January Opinion.

J. On February 8, 2011, the Debtors filed the Modified Plan [D.I. 6696]. Pursuant to an order of the Bankruptcy Court, the Debtors did not resolicit elections to grant the REIT Releases from holders of REIT Series in connection with the Debtors' solicitation of the Modified Plan.

K. On September 13, 2011, the Bankruptcy Court issued the September Opinion and entered the September Order.

**The Seventh Amended Plan**

L. Following court-ordered mediation, on December 12, 2011, the Debtors filed the Seventh Amended Plan and a related Disclosure Statement.

M. On January 11, 2012, the Bankruptcy Court held a hearing (the "Disclosure Statement Hearing") to consider, among other things, the adequacy of the information in the Disclosure Statement, and certain motions filed by the TPS Consortium seeking, respectively, (i) a stay pending appeal of the Bankruptcy Court's ruling in an adversary proceeding commenced by the TPS Consortium, and (ii) separate classification of the REIT Series from all other Preferred Equity Interests. See *Motion of the Consortium of Trust Preferred Security Holders for Stay of Confirmation Proceedings Pending Appeal*, dated December 23, 2011 [D.I. 9260] (the "Stay Motion"); *Motion of the Consortium of Trust Preferred Security Holders to Determine Propriety of Proposed Classification of Interests Subject to Treatment Under Class 19 of the Seventh Amended Plan of Liquidation*, dated December 23, 2011 [D.I. 9257]. At the

Disclosure Statement Hearing, the Bankruptcy Court, by bench ruling, see Hr'g Tr. 1/11/2012 at 73:3 (denying stay motion); id. at 94:3 (denying motion to separately classify REIT Series), and by order, [D.I. 9397], denied each of the motions filed by the TPS Consortium.

N.     By order, dated January 19, 2012, the District Court denied the TPS Consortium's motion to stay the Confirmation Hearing and their petition for a writ of mandamus (the "District Court Rulings").

O.     On February 10, 2012, the United States Court of Appeals for the Third Circuit dismissed the TPS Consortium's appeal of the District Court Rulings for lack of jurisdiction and denied their remaining requests for relief.

P.     Pursuant to the Disclosure Statement Order [D.I. 9414], the Bankruptcy Court, among other things, approved the adequacy of the information contained in the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code and established certain procedures in connection with the solicitation of acceptances and rejections of the Seventh Amended Plan and the granting of releases and the making of elections in connection therewith.

Q.     As of the date hereof, the TPS Funds hold shares of REIT Series, as defined in the Seventh Amended Plan, in the face amount, calculated by applicable liquidation preference, of One Billion Six Hundred Fifty Four Million Nine Hundred Sixty Five Thousand Dollars ($1,654,965,000.00) (collectively, the "REIT Series Preferred Equity Interests"). On or prior to February 8, 2012, substantially all of the members of the TPS Funds tendered ballots in the face amount, calculated by applicable liquidation preference, of One Billion Six Hundred Seven Million Two Hundred Twenty Five Thousand Dollars ($1,607,225,000.00) (collectively, the "Ballots") in connection with the Seventh Amended Plan, and voted each Ballot to (1) reject the

Seventh Amended Plan and (2) not provide the release required pursuant to Section 41.6 of the Seventh Amended Plan.

R.      On February 8, 2012, the TPS Consortium filed the *Objection of the Consortium of Trust Preferred Security Holders to Confirmation of Debtors' Plan of Liquidation* [D.I. 9594] (the "TPS Consortium Objection").

S.      On February 8, 2012, the TPS Group filed the *Objection of the TPS Group to Confirmation of the Modified Seventh Amended Plan of Liquidation* [D.I. 9593] (the "TPS Group Objection" and together with the TPS Consortium Objection, the "TPS Funds Objections").

T.      On February 13, 2012, the Debtors filed the Debtors' Omnibus Response to Objections to Confirmation of the Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code [D.I. 9663]. A hearing to consider confirmation of the Seventh Amended Plan is scheduled to commence on February 16, 2012.

U.      The Debtors, the Equity Committee, the Creditors' Committee, JPMC and the TPS Funds (collectively, the "Parties") have agreed to enter into this Stipulation for purposes of resolving the TPS Litigation and TPS Funds Objections. This is a compromise of matters that are in dispute and nothing shall be construed as evidence or an acknowledgement on the part of any Party that the positions of the any of the other Parties has merit.

V.      The TPS Funds represent that, through their retained professionals, Brown Rudnick LLP, Campbell & Levine LLC, Arkin Kaplan Rice LLP, Schnader Harrison Segal & Lewis LLP, and Mesirow Financial Consulting, LLC, the TPS Funds have incurred fees and expenses in the aggregate amount of approximately Fifteen Million Dollars ($15,000,000.00) (collectively, the "Fees and Expenses") in connection with the TPS Litigation, the TPS Funds Objections, and these Chapter 11 Cases.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the Debtors, the Equity Committee, the Creditors' Committee, JPMC and the TPS Funds:

## AGREEMENT

1. This Stipulation shall become effective and binding upon entry of an order by the Bankruptcy Court approving the Stipulation (the "Stipulation Effective Date"). The Debtors shall use their reasonable best efforts to obtain prompt approval hereof.

2. The Debtors shall file a modification to the Seventh Amended Plan, substantially in the form attached hereto as Exhibit "A" (the "Plan Modification").

3. Upon the Stipulation Effective Date, and without further action being taken by the TPS Funds, the Ballots shall be deemed modified, *nunc pro tunc* to their date of submission, to provide that (i) the TPS Funds shall be deemed to have voted the REIT Series Preferred Equity Interests to accept the Seventh Amended Plan, and (ii) the TPS Funds shall be deemed to have granted the releases contained in Section 41.6 of the Seventh Amended Plan; provided, however, that, in the event that a member of the TPS Funds has not executed and delivered a ballot with respect to the Seventh Amended Plan, within three (3) Business Days of the date hereof, such member shall execute and deliver a ballot accepting the Seventh Amended Plan and granting the release required in accordance with Section 41.6 of the Seventh Amended Plan.

4. Notwithstanding the Stipulation Effective Date, from and after the date hereof, the TPS Funds shall (a) not oppose, and otherwise support and take any and all actions reasonably requested by the Debtors (provided the same are at no material cost to the TPS Funds) to support confirmation of the Seventh Amended Plan in accordance with section 1129

of the Bankruptcy Code (or, subject to the provisions of section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, any modification thereof provided that such modification does not materially adversely affect the rights pursuant to this Stipulation), (b) be deemed to have withdrawn the TPS Funds Objections, (c) not oppose the partial vacatur of the September Opinion and the September Order as requested by the Debtors, (d) otherwise take no action to impede or preclude the entry of the Confirmation Order, or the consummation, implementation and administration of, the Seventh Amended Plan, and (e) not take any steps to prosecute, and shall take whatever steps are reasonably necessary to stay (including making filings with the District Court), the TPS Appeal, and any other appeals, petitions, or other filings seeking review of any decisions of the Bankruptcy Court.

5.     Upon the "Effective Date" of the Seventh Amended Plan in accordance with the provisions set forth therein (the "Plan Effective Date"), and the execution and delivery of the releases by each member of the TPS Funds in accordance with Section 41.6 of the Seventh Amended Plan and decretal paragraph 3 hereof, on account of the claims and causes of actions asserted or that could have been asserted by the TPS Funds in any litigation relating to WMI, WMB, the Trust Preferred Securities, the REIT Series, the Global Settlement Agreement and the Chapter 11 Cases, including, without limitation, the TPS Litigation, (a) the TPS Funds, in the aggregate, shall be deemed to have an Allowed Claim in Class 12 of the Seventh Amended Plan in the amount of Six Hundred Eighteen Thousand Three Hundred Fifty Six Dollars and Twenty Five Cents ($618,356.25), which Allowed Claim shall receive distributions in accordance with the provisions of the Seventh Amended Plan, and (b) within (5) Business Days of the foregoing, JPMC shall pay in the aggregate, by wire transfer, to a single payee to be designated by the TPS Funds, the sum of Eighteen Million

Dollars ($18,000,000.00) (a share of amounts previously offered by JPMC in the Sixth Amended Plan), which amount shall be allocated by the TPS Funds among the members of the TPS Funds as they shall determine.

6. In accordance with Section 41.18 of the Seventh Amended Plan, the TPS Funds shall file with the Bankruptcy Court an application seeking reimbursement of the Fees and Expenses, and, in the event that such application is equal to or less than Fifteen Million Dollars ($15,000,000.00), the Parties shall not oppose such application. If such application is approved, the TPS Funds shall be paid the first Three Million Dollars ($3,000,000.00) of the Fees and Expenses in cash, and the remaining allowed portion thereof, up to Twelve Million Dollars ($12,000,000.00), shall be treated and receive distributions as an Allowed Claim in Class 18 of the Seventh Amended Plan.

7. Upon the Plan Effective Date, with respect to their respective Pro Rata Share of REIT Series Preferred Equity Interests, each member of the TPS Funds shall be entitled to receive distributions pursuant to the terms and conditions of Section 23.1 of the Seventh Amended Plan.

8. The Equity Committee agrees to appoint a member selected by the TPS Funds to the Trust Advisory Board as an EC Member (the "TPS Related Member").

9. The Parties agree that the Debtors shall modify the Liquidating Trust Agreement to provide that the Litigation Subcommittee shall be increased from three (3) members to five (5) members by the addition of the TPS Related Member and Joel Klein as the Creditors' Committee's designee.

10. The board of directors of Reorganized WMI shall be increased to seven (7) members: six (6) members selected by the Equity Committee and one (1) member selected

by the lenders party to the Credit Facility. Subject to the approval of the Equity Committee, which approval shall not be unreasonably withheld, the Equity Committee agrees to designate a representative of the TPS Funds as one of its designees to the board of directors of Reorganized WMI.

11.     Upon the Plan Effective Date, pursuant to Rule 7041 of the Federal Rules of Bankruptcy Procedure and Rule 41(a) of the Federal Rules of Civil Procedure, any and all claims and causes of action asserted by the TPS Funds in the TPS Litigation shall be deemed dismissed, with prejudice and without the assessment of costs, and the TPS Funds shall take such actions as may be required to cause the dismissal of the TPS Litigation with prejudice and without the assessment of costs, including, without limitation, the filing of notices or a stipulation of dismissal as are necessary in the Bankruptcy Court and the District Court. Prior to the Plan Effective Date, all actions associated with the TPS Litigation shall be stayed.

12.     The TPS Funds shall not file any appeal from any order confirming the Seventh Amended Plan.

13.     Upon the Effective Date, Kurtzman Carson Consultants, LLC, the Debtors' court-appointed claims and noticing agent, shall be authorized and directed to take such action as is necessary to effectuate this Stipulation.

14.     Upon the Plan Effective Date, and upon payment of the amounts required pursuant to decretal paragraph 5 hereof, the TPS Funds, each member of the TPS Funds (but not with respect to each other), the Debtors, each of the Debtors' chapter 11 estates, the Reorganized Debtors, the JPMC Entities and each of their respective past or present parent entities and directors and officers, shall be deemed to have unconditionally,

fully, finally, and forever waived and released each other from any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, that they may have or claim to have, now or in the future, that are based upon, related to, or arise out of or in connection with the Chapter 11 Cases, the Debtors, the Trust Preferred Securities, the REIT Series, the Global Settlement Agreement, the TPS Litigation, or any claim, act, fact, transaction, occurrence, statement, or omission in connection with, or alleged or that could have been alleged in connection with the foregoing. The provisions of this paragraph 14 shall not, however, release any obligations benefiting the Parties established in this Stipulation and the Seventh Amended Plan.

15. This Stipulation contains the entire agreement between the Parties as to the subject matter hereof and supersedes all prior agreements and undertakings between the Parties relating thereto.

16. Other than with respect to the agreement of the Parties set forth in decretal paragraph 4 hereof, this Stipulation is subject to approval of the Bankruptcy Court and shall be of no force and effect in the event that the Bankruptcy Court denies approval hereof or confirmation of the Seventh Amended Plan or if the Plan Effective Date does not occur.

17. Each person who executes this Stipulation represents that he or she is duly authorized to execute this Stipulation on behalf of the respective Parties hereto and that each such party has full knowledge and has consented to this Stipulation. Counsel executing this on behalf of the TPS Consortium and the TPS Group represent that (i) all persons or entities party to the TPS Litigation have either (a) authorized the execution of this Stipulation by

counsel on their behalf or (b) executed a release in accordance with Section 41.6 of the
Seventh Amended Plan.

18. This Stipulation may not be modified other than by a signed writing executed by the Parties hereto or, upon consent of the Parties, by further order of the Bankruptcy Court. This Stipulation may be executed in one or more counterparts, any of which may be transmitted by facsimile or electronic (e-mail) transmission, and each of which shall be deemed an original, but all of which together shall constitute one and the same document.

→ and (ii) in connection with Paige Opportunity Partners LP
and Paige Opportunity Partners Master Fund (collectively, the
"Paige Funds"), that (a) on August 26, 2011, the Delaware Chancery
Court issued an order in favor of Lerner Master Fund, LLC
("Lerner") ordering the transfer of all Paige Funds' assets to
Lerner and (b) Lerner executed and delivered a release
in accordance with Section 41.6 of the Seventh
Amended Plan

19.     The Bankruptcy Court shall have sole and exclusive jurisdiction to hear

disputes arising out of or related to this Stipulation.

Dated: Wilmington, Delaware
          February 16, 2012

By: _____

Mark D. Collins, Esq. (No. 2981)
Michael J. Merchant, Esq. (No. 3854)
Travis A. McRoberts, Esq. (No. 5274)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for the Debtors and
Debtors in Possession*

By: _____

CAMPBELL & LEVINE LLC
Marla Rosoff Eskin, Esq. (DE 2989)
Bernard G. Conaway, Esq. (DE 2856)
Mark T. Hurford, Esq. (DE 3299)
Kathleen Campbell Davis, Esq. (DE 4229)
800 North King Street, Suite 300
Wilmington, DE 19809
Telephone: (302) 426-1900
Facsimile: (302) 426-9947

– and –

ARKIN KAPLAN RICE LLP
Howard J. Kaplan, Esq.
Joseph Matteo, Esq.
Deana Davidian, Esq.
590 Madison Avenue
New York, NY 10022
Telephone: (212) 333-0200
Facsimile: (212) 333-2350

*Counsel for the TPS Group*

By: _____

David B. Stratton (No. 960)
David M. Fournier (No. 2812)
James C. Carignan (No. 4230)
John H. Schanne, II (No. 5260)
PEPPER HAMILTON LLP
1313 N. Market Street, Suite 5100
Wilmington, Delaware 19801
Telephone: (302) 777-6500
Facsimile: (302) 421-8390

– and –

Fred S. Hodara (admitted pro hac vice)
Robert A. Johnson (admitted pro hac vice)
AKIN GUMP STRAUSS HAUER &
FELD LLP
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Attorneys for the Official Committee of
Unsecured Creditors of Washington
Mutual, Inc., et al.*

By: _____

CAMPBELL & LEVINE LLC
Marla Rosoff Eskin, Esq. (DE 2989)
Bernard G. Conaway, Esq. (DE 2856)
Mark T. Hurtford, Esq. (DE 3299)
Kathleen Campbell Davis, Esq. (DE 4229)
800 North King Street, Suite 300
Wilmington, DE 19809
Telephone: (302) 426-1900
Facsimile: (302) 426-9947

– and –

BROWN RUDNICK LLP
Robert J. Stark, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

– and –

James Stoll, Esq.
Jeremy B. Coffey, Esq.
Daniel J. Brown, Esq.
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Facsimile: (617) 856-8201

*Counsel for the TPS Consortium*

By: _____

LANDIS & COBB LLP
Adam . Landis (No. 3407)
Matthew B. McGuire (No. 4366)
919 Market Street Suite 1800
Wilmington, Delaware 19801
Tel: (302) 467-4400
Fax: (302) 467-4450

— and —

Robert A. Sacks
Brent J. McIntosh
Brian D. Glueckstein
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Tel: (212) 558-4000
Fax: (212) 558-3588

*Counsel for JPMorgan Chase Bank, N.A.*



By: _____

William P. Bowden (No. 2553)
Gregory A. Taylor (No. 4008)
Stacy L. Newman (No. 5044)
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware 19899
Telephone: (302) 654-1888
Facsimile: (302) 654-2067

– and –

Stephen D. Susman, Esq.
Seth D. Ard, Esq.
Susman Godfrey, L.L.P.
SUSMAN GODFREY, L.L.P.
654 Madison Avenue, 5th Floor
New York, New York 10065
Telephone: (206) 516-3880
Facsimile: (206) 516-3883

– and –

Parker C. Folse, III, Esq.
Edgar Sargent, Esq.
Justin A. Nelson, Esq.
1201 Third Avenue, Suite 3800
Seattle, Washington 98101
Telephone: (212) 336-8330
|Facsimile: (212)336-8340

*Counsel to the Official Committee of
Equity Security Holders of Washington
Mutual, Inc., et al.*

# EXHIBIT A

Plan Modification

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

---------------------------------------------------------------x
                               :

*In re*                          :       **Chapter 11**
                               :

**WASHINGTON MUTUAL, INC.,** *et al.,*   :
                               :       **Case No. 08-12229 (MFW)**
                               :

            **Debtors.**            :       **(Jointly Administered)**
                               :
                               :
---------------------------------------------------------------x

## THIRD MODIFICATION OF
## SEVENTH AMENDED JOINT PLAN OF AFFILIATED DEBTORS
## PURSUANT TO CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
(212) 310-8000

- and -

RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
(302) 651-7700

Dated: February 16, 2012

Washington Mutual, Inc. and WMI Investment Corp. hereby modify the Seventh Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated December 12, 2011 (the "Plan"),[1] as follows:

1.    Definitions. Section 1.231 of the Plan, entitled "**Trust Advisory Board**", is hereby amended by deleting the provisions therein and inserting the following in lieu thereof:

> "The trust advisory board provided for in the Liquidating Trust Agreement, which board shall (a) be initially comprised of ten (10) members: (i) four (4) members selected solely by the Creditors' Committee, (ii) four (4) members selected solely by the Equity Committee, (iii) one (1) member selected by the Creditors' Committee and approved by the Equity Committee, which approval shall not be unreasonably withheld, and (iv) one (1) member selected by HoldCo Advisors, LLC serving in a non-voting *ex officio* capacity, and (b) have an oversight function with respect to the Liquidating Trust, and the composition of which may change only in accordance with the provisions of the Liquidating Trust Agreement."

2.    Section 3.3 of the Plan, entitled "**Priority Tax Claims**", is hereby amended by inserting the following after the words "Allowed Claim," in the seventh line thereof:

> "and to the extent that payment is made after the Effective Date, together with interest accrued thereon at the applicable non-bankruptcy rate as of the calendar month in which the Confirmation Order is entered,"

3.    Treatment of Preferred Equity Interests. Section 23.1 of the Plan, entitled "**Treatment of Preferred Equity Interests**," is hereby amended by deleting the reference to "seventy percent (70%)" in the fifth line thereof and inserting "seventy-five percent (75%)" in lieu thereof.

4.    Treatment of Dime Warrants. Section 24.1 of the Plan, entitled "**Treatment of Dime Warrants**", shall be amended by deleting the provisions set forth therein and inserting the following in lieu thereof:

> "Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of Dime Warrants shall be entitled to receive such holder's Pro Rata Share of distributions to be made in accordance with the terms and provisions of the LTW Stipulation."

---

[1] All terms used but not defined herein shall have the meanings ascribed to them in the Plan.

5. Treatment of Common Equity Interests. Section 25.1 of the Plan, entitled "**Treatment of Common Equity Interests**", is hereby amended by deleting the provisions set forth therein and inserting the following in lieu thereof:

> "Commencing on the Effective Date, and subject to the execution and delivery of a release in accordance with the provisions of Section 41.6 of the Plan, each holder of Common Equity Interests shall be entitled to receive such holder's Pro Rata Share of twenty-five percent (25%) of (a) subject to (i) the right of election provided in Sections 6.2(b), 7.2(b), 16.1(b)(ii), 18.2(b), 19.2(b), and 20.2(b) of the Plan and (ii) the rights of holders of Dime Warrants pursuant to the LTW Stipulation, the Reorganized Common Stock, and (b) in the event that all Allowed Claims and Postpetition Interest Claims in respect of Allowed Claims are paid in full (including with respect to Allowed Subordinated Claims), any Liquidating Trust Interests to be redistributed; provided, however, that, in the event at the Confirmation Hearing and in the Confirmation Order, the Bankruptcy Court determines that a different percentage should apply, the foregoing percentage shall be adjusted in accordance with the determination of the Bankruptcy Court and be binding upon each holder of a Common Equity Interest."

6. Section 40.4 of the Plan, entitled "**Directors of the Reorganized Debtors**", is hereby amended by deleting the first sentence thereof and inserting the following in lieu thereof:

> "On the Effective Date, the board of directors of each of the Reorganized Debtors shall consist of seven (7) persons: six (6) members selected by the Equity Committee and one (1) member selected by the lenders party to the Credit Facility."

7. Section 41.6(e) of the Plan, entitled "**Tranquility Claim**", is hereby deleted in its entirety and the words "Intentionally Deleted" are inserted in lieu thereof.

8. Section 41.6(f) of the Plan, entitled "**Truck and Fire**", is hereby amended by deleting the words "Supplemental Disclosure Statement Order" in the second line thereof and inserting the words "Order [D.I. 7081] approving the Supplemental Disclosure Statement" in lieu thereof.

9. Section 41.8 of the Plan, entitled "**Exculpation**", is hereby amended by deleting the second proviso in the first sentence thereof.

10. Section 41.12 of the Plan, entitled "**Supplemental Injunction**", is hereby amended by inserting the following prior to the period at the conclusion thereof:

> "**and, provided, further, that the supplemental injunction provided pursuant to the terms of this Section 41.12 shall not preclude any current or former officers or directors of WMI**

from asserting any setoff or recoupment rights against any judgment or other obligation due to the Debtors, the Debtors' estates, or the Liquidating Trust or against the property of the Debtors or the Debtors' estates, to the extent such individuals have such rights pursuant to applicable non-bankruptcy law."

11.     Section 41.18 of the Plan, entitled "**Payment of Fees and Expenses of Certain Creditors**", is hereby amended by deleting "and (viii)" in the fifth line thereof and inserting "(viii) Kilpatrick Townsend & Stockton LLP, (ix) Brown Rudnick LLP, (x) Arkin Kaplan Rice LLP, (xi) Campbell & Levine, LLC, (xii) Mesirow Financial Consulting, LLC, (xiii) Schnader Harrison Segal & Lewis LLP, and (xiv)" in lieu thereof.

12.     Except as expressly provided herein, the terms and provisions of the Plan shall remain in full force and effect.

Dated:   Wilmington, Delaware
         February 16, 2012

WASHINGTON MUTUAL, INC.

By:     _/s/ William C. Kosturos_____
        Name:  William C. Kosturos
        Title:   Chief Restructuring Officer

WMI INVESTMENT CORP.

By:     _/s/ William C. Kosturos_____
        Name:  William C. Kosturos
        Title:   President & Chief Executive
                 Officer

4

_/s/ Travis A. McRoberts_

Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Travis A. McRoberts (No. 5274)
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
902 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

Brian S. Rosen, Esq.
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

ATTORNEYS TO THE DEBTORS
AND DEBTORS IN POSSESSION