121 East 12th Street, #7C
New York, NY 10003
646-337-3577
206-333-0367 (Fax)
griffincounselpc@earthlink.net

November 16, 2019

Via First-Class Mail

The Honorable Richard G. Andrews
United States District Judge
J. Caleb Boggs Federal Building
844 N. King Street, Unit 9, Room 6325
Wilmington, Delaware 19801

Re:   Alice Griffin v. WMI Liquidating Trust (Case No. 1:19-cv-00775-RGA)

Dear Judge Andrews:

It has come to my attention that an Internet link in my letter to this Court dated August 13, 2019 (D. I. 24) (the "Letter") is inaccessible, and therefore I am providing herewith a copy of the document, 'Closing Argument of the Equity Committee' (In re Washington Mutual, Inc. et al.), December 7, 2010, that was at that link and is referred to in the Letter in footnotes 1 and 2.

Respectfully,

/s/Alice Griffin
Alice Griffin, *Pro Se*

121 East 12th Street, #7C
New York, New York 10003
646-337-3577

Enc. Copy of 'Closing Argument of the Equity Committee' (In re Washington Mutual, Inc. et al.), December 7, 2010
Cc (w/Enc.):

Via Email and First-Class Mail

Brian Rosen, Esq., Proskauer Rose LLP, Eleven Times Square, 8th Avenue and 41st Street, New York, NY 10036-8299

Via Email

Brian Rosen, Esq., Proskauer Rose LLP, brosen@proskauer.com
Charles E. Smith, Esq., WMI Liquidating Trust, chad.smith@wamuinc.net
John Maciel, WMI Liquidating Trust, jmaciel@alvarezandmarsal.com
Marcos Ramos, Esq., Richards Layton & Finger PA, ramos@rlf.com
Amanda Steele, Esq., Richards Layton & Finger PA, steele@rlf.com
Paul N. Heath, Esq., Richards Layton & Finger PA, heath@rlf.com
Mark D. Collins, Esq., Richards Layton & Finger PA, collins@rlf.com
Cory Kandestin, Esq., Richards Layton & Finger PA, Kandestin@rlf.com
Benjamin Finestone, Esq., Quinn, Emanuel Urquhart & Sullivan LLP, benjaminfinestone@quinnemanuel.com
Michael A. Rosenthal, Esq., Gibson, Dunn & Crutcher, mrosenthal@gibsondunn.com
Alan Moskowitz, Esq., Gibson, Dunn & Crutcher, amoskowitz@gibsondunn.com
William Bowden, Esq., Ashby & Geddes, P.A., WBowden@ashbygeddes.com
Thomas P. Tinker, Esq., Assistant United States Trustee, thomas.p.tinker@usdoj.gov

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In Re:
WASHINGTON MUTUAL, INC., et al.,

Vs
JP MORGAN CHASE BANK, N.A., et al.,

## Closing Argument of Equity Committee

December 7, 2010

# Why The Plan Should Not Be Confirmed

1. The Debtors Failed to Consider the Interests of All Stakeholders

2. Insufficient Showing of the Likelihood of Success

3. At a Minimum, Major Issues in the Plan Prevent Confirmation

# Fair And Equitable Standard

The court must decide whether "the compromise is fair, reasonable, and in the best interest of the estate." *In re TSIC, Inc.*, 393 B.R. 71, 78 (Bankr.D.Del. 2008) quoting *In re Louise's, Inc.*, 211 B.R 798, 801 (D.Del. 1997). "Under the 'fair and equitable' standard, [the court looks] to the fairness of the settlement to the other persons, i.e., the parties who did not settle." *Will v. Northwestern Univ. (In re Nutraquest, Inc.)*, 434 F.3d 639, 645 (3d Cir. 2006).

*Source: Spansion Opinion, p.7*

collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors. *Martin*, 91 F.3d at 393.

*See also Nutraquest*, 434 F.3d at 644.

"In the final analysis, the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr.D.Del. 2006)(internal quotations and citations omitted). The Debtors carry the

The Debtors carry the burden of persuading the court that the compromise falls within the reasonable range of litigation possibilities. *Key3Media Group*, 336 B.R. at 93. "While a court generally gives deference to the Debtors' business judgment in deciding whether to settle a matter, the Debtors have the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved." *Id.*

8

Confidential

1. All of the complex issues in the case, which could otherwise take years to resolve through litigation, get resolved cleanly -- i.e., the assets of the estate that are in dispute, including tax refunds, pension plan, rabbi trusts, BOLI/COLI, Reit Trust Preferred Stock ... be allocated by JPM to either reorganized WMI or JPM, as appropri... ...cture provides an efficient mechanic regarding the alloca... ...that would otherwise be difficult to achieve. In a... ...rust Preferred Stock would allow for third...

**1.** <mark>All of the complex issues in the case, which could otherwise take years to resolve through litigation, get resolved cleanly</mark> --

etc.

**From:** Simonds, David [mailto:dsimonds@AkinGump.com]
**Sent:** Thursday, March 05, 2009 4:27 PM
**To:** Walsh, Michael; guzzi@ny.whitecase.com; Pfeiffer, Brian; Kosturos, Bill; Rosen, Brian; Steven Simms; Hodara, Fred; Scruton, Andrew
**Cc:** Sapeika, Tal
**Subject:** RE: WMI term sheet

Brian Pfeiffer, Have you circulated the email outline of the "bigger" deal? I believe that I have not seen it.

**From:** Walsh, Michael [mailto:michael.walsh@weil.com]
**Sent:** Thursday, March 05, 2009 1:21 PM
**To:** guzzi@ny.whitecase.com; brian.pfeiffer@friedfrank.com; Simonds, David; Kosturos, Bill; Rosen, Brian; Steven Simms
**Cc:** Sapeika, Tal
**Subject:** WMI term sheet

Restricted For Use in Connection with Plan Confirmation Only

WMI-TPS-S0114349

*Source: Exhibit-EC27 (WMI-TPS-S0114349)*

**Confidential**

**To:** Kosturos, Bill[BKosturos@alvarezandmarsal.com]; Goulding, Jon[JGoulding@alvarezandmarsal.com]
**From:** Walsh, Michael
**Sent:** Thur 3/5/2009 10:10:55 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** RE: WMI term sheet
**Categories:** True

right

**From:** Kosturos, Bill [mailto:BKosturos@alvarezandmarsal.com]
**Sent:** Thursday, March 05, 2009 5:09 PM
**To:** Walsh, Michael; Goulding, Jon
**Subject:** FW: WMI term sheet

It's about time that the seniors figured this out.

**From:** Pfeiffer, Brian [mailto:Brian.Pfeiffer@friedfrank.com]
**Sent:** Thursday, March 05, 2009 2:00 PM
**To:** Simonds, David; Walsh, Michael; guzzi@ny.whitecase.com; Kosturos, Bill; Rosen, Brian; Steven Simms; Hodara, Fred; Scruton, Andrew; Sapeika, Tal
**Cc:** Kaden, Alan S.; Roose, Matthew
**Subject:** RE: WMI term sheet

Attached are some preliminary bullets on the structure and benefits of the alternative plan. It's a work in progress but we thought that it would be a good place to start our conversation.

Outline of Possible Plan Structure

Newly issued equity of reorganized WMI to be distributed to JPM under a Plan in respect of JPM's general unsecured claims against WMI (including, without limitation, its claims relating to past and future tax refunds). No incremental consideration would be provided by JPM in respect of its acquisition of the equity of reorganized WMI. All other creditors, as well as the holders of the Reit Trust Preferred Stock, will receive distributions in the form of cash, reinstated debt or as otherwise agreed.

Potential Benefits

...d For Use in Connection with Plan Confirmation Only

**EXHIBIT**
EC 27

WMI-TPS-S0114348

**From:** Kosturos, Bill
**Sent:** Thursday, March 05, 2009 5:09 PM
**To:** Walsh, Michael; Goulding, Jon
**Subject:** FW: WMI term sheet

It's about time that the seniors figured this out.

Q.  You say it's about time that the seniors figured this out, how long had you thought that the best resolution of the estate was a global settlement with JPMorgan?

A.  *I don't know.*

Q.  How long -- how much prior before March of 2009 did you think that the correct resolution of the estate was a settlement?

A.  *I don't know.*

Q.  Was it a month after you were hired?

A.  *I wouldn't be able to put it in context for you.*

Q.  How early did you think that a consensual settlement was what you wanted to strive for?

A.  *I don't know.*

*Source: pp. 96:13-16; 98:5-8; 98:17-18; 99:7-9*



WGM_00033671

S&C DRAFT 3/18/09
CONFIDENTIAL – SUBJECT TO FRE 408 AND ALL SETTLEMENT PROTECTIONS

WMI/JPMC SETTLEMENT TERM SHEET

PROTECTED BY FEDERAL RULE OF EVIDENCE

**WMI/JPMC SETTLEMENT TERM SHEET**

approved under Bankruptcy Rule 9019, will include a sale of all right, title or interest of the Debtors in or to the assets below to JPMC free and clear of all claims and interests under Bankruptcy Code § 363(f) and will provide for both party and third party releases covering ... described ... entry of ...

**WMI Proposal 3/12/09**

claims released pursuant to agreed mechanics to be embodied in the Plan.

| Issue | WMI Proposal 3/12/09 | JPMC Proposal 3/18/09 |
|---|---|---|
| ● Balances in "Deposit Accounts" | ● JPMC to (a) pay over $4.08 billion, including post-petition tax refunds received; plus (b) interest accrued through date of payment at the greater of 25 basis points or amount set forth in the agreement; plus (c) release claims to the $292 million released in December, 2008 | ● Agreed except payment is of $4.08 billion less the amount of approximately $250 million in tax refunds received on 9/30/08 and interest accrual is on balance due at agreed upon rates |

Restricted For Use in Connection with Plan Confirmation O
Highly Confidential Information

Q.  With respect simply to your offer, WMI's offer to JPMorgan in March of 2009, is it fair to say that generally speaking, within some rounding error, what the amount received in the current proposed settlement for the categories that we've discussed is essentially equivalent to the current proposed settlement?

A.  **It seems to be from the numbers that you've described, you know, they seem to be close but I couldn't give you an exact answer.**

--------------------------------------------------------------------------------

Q.  And I believe after going through that entire term sheet you agreed with Mr. Nelson that the economic result or culmination of the negotiations between March of 2009 and what was ultimately submitted by the parties as the proposed settlement, that the economic impact remained the same, essentially.  Do you remember that?

A.  **Yeah...**

*Source: p. 115:8-13, 115:17-19; 181:10-16*

Q. Again, without getting into the analysis or work product, was it Quinn who instructed you to create the solvency analysis? Was it your litigation counsel?

*A.* *Yes.*

Q. So in other words, it would then have to be after April of 2009?

*A.* *I would agree.*

---------------------------------------------------------------------------------

Q. By April 2009 had your attorneys provided you any work product with respect to the business tort claims against JPMorgan?

*A.* *No.*

*Source: pp. 121:22 - 122:3; pp. 122:25 - 123:3*

**To:** Kosturos, Bill[BKosturos@alvarezandmarsal.com]
**Cc:** Maciel, John[jmaciel@alvarezandmarsal.com]
**From:** Goulding, Jon
**Sent:** Fri 2/6/2009 10:32:58 PM
**Importance:** Normal
**Sensitivity:** None
**Subject:** Call today
**Categories:** urn:content-classes:message

Bill,

Just as an FYI, about 30 or 40 minutes on our call today focused on the meeting on the 23rd with the FDIC and JPMC. FTI/Akin want to be prepared to put a global settlement on the table on that date. There [were] a number of calls scheduled for next week to attempt to come to a c[onsensus on a] variety of items (intercompany, REIT Trust preferred). In addit[ion ...] back half of the week to discuss the status [...]

[...]

be work remaining on a large number of issues.

Just giving you a heads up. Have a good weekend.

**JON GOULDING**

Treasurer - Washington Mutual, Inc.

Senior Director - Alvarez & Marsal

SF Office: (415) 490 - 2257

Mobile: (415) 260 - 6061



EXHIBIT
EC 44

---

**To:** Kosturos, Bill[BKosturos@alvarezandmarsal.com]
**Cc:** Maciel, John[jmaciel@alvarezandmarsal.com]
**From:** Goulding, Jon
**Sent:** Fri 2/6/2009 10:32:58 PM

FTI/Akin want to be prepared to put a global settlement on the table on that date.

Q. I think you testified previously that the negotiations were reinvigorated by a possibility of a second tax settlement, correct?

*A. Yes.*

Q. The creditors were involved in reinvigorating these negotiations, correct?

*A. Yes. Certain of a couple of the creditors, yes.*

Q. And in fact, it was I think the creditors who sent the term sheet to JPMorgan. Isn't that right?

*A. Yes, it was, actually.*

*Source: p. 125:13-18*

Fax: (212) 310-8353

Email: brian.rosen@weil.com

**From:** Buono, Jeannine [mailto:Jeannine.Buono@friedfrank.com] **On Behalf Of** Scheler, Brad Eric
**Sent:** Tuesday, February 09, 2010 9:38 AM
**To:** Rosen, Brian; 'BKosturos@alvarezandmarsal.com'
**Cc:** FFHSJ WaMu Team
**Subject:** FW: WMI - Term Sheet

Brian and Bill –

Our clients believe that the structure presented in the term sheet provides the Debtors with a fair and  efficient means to distribute value and proceeds to creditors.

Our clients believe that the structure presented in the term sheet provides the Debtors with a fair and  efficient means to distribute value and proceeds to creditors. Given the comprehensive and diverse holdings of WMI debt and securities by our clients, our clients trust, anticipate and believe that the structure set forth in the term sheet will be embraced by all of WMI's creditors.  In addition to the distributions to creditors of the deposit, proceeds of tax refunds as received and cash and other assets, the attached term sheet provides funding for the purpose of capitalizing and expanding the business of WM Mortgage Reinsurance Company with the goal of maximizing the value of the Debtors' residual assets which our clients anticipate will benefit WMI's creditors.  The attached term sheet is presented on a preliminary basis and is subject to the better wisdom of each of you, your colleagues, our clients and our FFHS&J colleagues.

As suggested above, our clients and we believe that all of us should meet forthwith to

Restricted For Use in Connection with Plan Confirmation Only

WMI-TPS-S0117396

*Source: Exhibit-EC28 (WMI-TPS-S0117396)*

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

----------------------------------------------------------x
                                    :
*In re*                             :   **Chapter 11**
                                    :
**WASHINGTON MUTUAL, INC., et al.,[1]**   :   **Case No. 08-12229 (MFW)**
                                    :   **(Jointly Administered)**
                                    :
        **Debtors.**                :   **Hearing Date:  January 28, 2010 at 4:00 p.m.**
                                    :   **Objection Deadline:  January 21, 2010 at 4:00 p.m.**
----------------------------------------------------------x

MOTION OF WASHINGTON MUTUAL, INC. AND WMI
INVESTMENT CORP. FOR AN ORDER (A) DISBANDING
THE OFFICIAL COMMITTEE OF EQUITY HOLDERS APPOINTED

2.      By all measures, the Debtors are insolvent – a conclusion supported by all known facts and submissions to date in these chapter 11 cases. Indeed, this conclusion is confirmed by the public markets. The Debtors' junior subordinated debentures are trading, as of January 8, 2010, at approximately 50 cents on the dollar – a steep discount to par value. In addition, WMI's common stock trades at approximately 19 cents per share, indicating the market's assessment that equity will not receive any distribution. In short, WMI's equity holders are unlikely to receive any recovery and, therefore, have little, if any, economic interest in these chapter 11 cases.

US_ACTIVE:\43245934\06\79831.0003

*Source: Motion Of Washington Mutual, Inc. And WMI Investment Corp. For An Order (A) Disbanding The Official Committee Of Equity Holders Appointed By The United States Trustee Or (B) Limiting The Fees And Expenses Which May Be Incurred By Such Committee, January 28, 2010; p.2.*

Q.   ... in the negotiations that led to the global settlement you did not invite or include the equity committee in those negotiations, did you?

A.   *That's correct.*

*Source: p. 248:3-7*

**From:** Horton, William [/O=WEILX/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=35048BD-AE890FCE-8525686A-81BCDC]
**Date:** 3/10/2010 12:33:13 PM
**To:** tyrus [tyrus@mac.com]
**Subject:** FW: WMI -- Some JPM Tax Revisions to Settlement Agreement

From: Goldring, Stuart
Sent: Tuesday, March 09, 2010 9:46 PM
To: Goldring, Stuart; Horton, William; Howard Jacobson; Alan Kaden (alan.kaden@friedfrank.com);
Kevin Keyes (Kevin.Keyes@friedfrank.com)
Cc: 'Curt Brouwer'; 'jmaciel@alvarezandmarsal.com'; 'chad.smith@wamuinc.net';

3.-- They later address Group Related Refunds based on a 50/50 split. **This raises a possible TARP sensitivity.**

1.-- They realize the reference to the 2.1 re... the full number and may change "referred" to "re...

2.-- As to the definition of Group Related Refunds, their changes w... the tax impact of an excess loss account recapture. They have asked us t... encompass that. Their change to direct and their additions were intended to ... charged for the use of NOLs and the reduction of real tax basis.

3.-- They later address Group Related Refunds based on a 50/50 split. This raises a possible TARP sensitivity.

estricted For Use in Connection with Plan Confirmation Only
ghly Confidential Information

Q.  To be clear, you believe that the March settlement that was between 270 million to 300 million dollars lower than the May settlement also maximized the value of the estate, correct?

A.  *I think the March settlement was a very good settlement.  The May settlement was a better settlement.  Yes.*

# Current Sources Of Assets



JPMC Payment
for VISA Shares
**$25 Million**

Investment in
Subsidiaries & Other
**$25 Million**

Goodwill Litigation
**$55 Million**

Reorganized WMI
**$158 Million**

BOLI/COLI
**$166 Million**

Tax Refunds
**$2.195 Billion**

Pre-Exisiting Cash
**Approx. $900 Million**

$180M

Approx. $4B

WMI Assets on WMB Books
**$4.2 Billion**
*(with two sub parts: Intercompany Loans $180 Million & Deposits $4 Billion)*

| | |
|---|---|
| **Gross Estate Proceeds** | **$7.575 Billion** |
| **Estate Expenses** | **($116 Million)** |
| **Net Estate Proceeds** | **$7.459 Billion** |





Q.    You gave Blackstone the assumption that reorganized WMI would not take on new business, correct?

A.    *We gave Blackstone a set of financial projections which projected the only operating asset of reorganized WMI, which is Wimrick, which is a captive reinsurance company in run-off. We gave them a projection that was based solely on the captive reinsurance company Wimrick continuing to run off its business through the run-off period.*

Q.    Those assumptions and projections did not consider whether WMRIC would take on new business correct?

A.    *We did not project new business.*

----------------------------------------------------------------

Q.    Well, okay.  One of the reasons why you didn't consider the potential of new business is because you claim not to know who the owners of the reorganized WMI stock would be, correct?

A.    *That's right.*

*Source: pp. 62:22- 63:7; 64: 14-17*

Q.   …"[The Creditors Committee] had an idea that the going forward business of reorganized WMI will have the benefit of a large NOL based on the company's ability to claim a worthless stock deduction related to its with WMB stock."  Do you see that?

*A.  Yes.*

Q.   It is true that in the final settlement there is a reorganized WMI that may have a large NOL, correct?

*A.   That's correct.*

*Source: p. 95: 13-21*

Q.  These hedge funds urged you to create a reorganized company for -- to take advantage of the debtors' NOL; isn't that right?

**A.  *We had several discussions with them about that, sure, yes.***

-------------------------------------------------------------

... their plan is to capitalize WMRIC and expand its business, correct?

**A.  *That's what the term sheet says.***

*Source: p. 135:12-16; 139:11-13*

Confidential

1. All of the complex issues in the case, which could otherwise take years to resolve through litigation, get resolved cleanly -- i.e., the assets of the estate that are in dispute, including the tax refunds, pension plan, rabbi trusts, BOLI/COLI, Reit Trust Preferred Stock, deposits, etc., would be allocated by JPM to either reorganized WMI or JPM, as appropriate. In that regard, this plan structure provides an efficient mechanic regarding the allocation and division of assets and liabilities that would otherwise be difficult to achieve. In addition, the distributions to the holders of Reit Trust Preferred Stock would allow for third party releases from such holders.

2. Reorganized WMI could be well capitalized. Depending on plan structure and the amount of debt to be reinstated, there could be significant cash left in reorganized WMI that could be utilized by the company going forward.

3. At some point in the future, the going forward business of reorganized WMI will have the benefit of a large NOL based on the company's ability to claim a worthless stock deduction relating to its WMB stock.

4. All parties ... finality on all points, including with ...

**3. At some point in the future, the going forward business of reorganized WMI will have the benefit of a large NOL based on the company's ability to claim a worthless stock deduction relating to its WMB stock.**

Brian Pfeiffer, Have you circulated the email outline of the "bigger" deal? I believe that I have not seen it.

From: Walsh, Michael [mailto:michael.walsh@weil.com]
Sent: Thursday, March 05, 2009 1:21 PM
To: guzzi@ny.whitecase.com; brian.pfeiffer@friedfrank.com; Simonds, David; Kosturos, Bill; Rosen, Brian; Steven Simms
Cc: Sapeika, Tal
Subject: WMI term sheet

Restricted For Use in Connection with Plan Confirmation Only

WMI-TPS-S0114349

Q. Your understand that PIERS -- certain PIERS holders are given the right to buy into WMMRC, the new reorganized company, correct?

*A. Certain PIERS holders are receiving subscription rights, yes.*

Q. The only --

*A. They have zero value and have the ability to subscribe to that. In our estimates, they have zero value. Should they have value, they can -- classes ahead of them should they not be paid, they will have to pay up that value.*

Q. The value that you have put on even without any ongoing business of WMMRC is 157.5 million dollars, correct?

*A. You're mischaracterizing my testimony.*

Q. All right. Well, let me rephrase. I want to understand and get your testimony on how different members of the same PIERS class are treated. It is true that only certain members of the PIERS class are able to buy into these subscription rights, correct?

*A. I don't believe that's true, no.*

-----------------------------------------------------------

Q ...According to paragraph 6 submitted by WMI, the subscription right exists if such holder based on its pro rata share was entitled to subscribe for shares for an aggregate subscription purchase price of at least two million dollars, correct?

*A. That's what this says, yes.*

*Source: p. 187:10-188:9; 189:7-13*

# Equity In The Money



# EC 34



**From:** Rosen, Brian [/O=WEILX/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=95F2636C-3513399F-85256498-522BF4]

**Date:** 3/9/2010 2:08:03 PM

**To:** 'Scheler, Brad Eric' [Brad.Eric.Scheler@friedfrank.com], 'BKosturos@alvarezandmarsal.com' [BKosturos@alvarezandmarsal.com]

**Subject:** RE:

To me, the biggest issues in your email were the two economic ones: the price on the Visa Shares and the .5%. On the first, I cannot help you and Bill must respond. On the second, your clients said they did not care about that long ago and what if JPM gives all that away?

Restricted For Use in Connection with Plan Confirmation Only
Highly Confidential Information

WGM_00002622

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

*In re:* : Chapter 11

WASHINGTON MUTUAL, INC., *et al.*,[1] : Case No. 08-12229 (MFW)

Debtors. : (Jointly Administered)

JPMORGAN CHASE BANK, N.A., :

Plaintiffs, :

v. :

WASHINGTON MUTUAL, INC. and :
WMI INVESTMENT CORP., :

for an order dismissing the counterclaims of Washington Mutual, Inc. and WMI Investment Corp., it is hereby

ORDERED that the Motion and the relief requested therein is denied.

Dated: Wilmington, Delaware
Sept. 14, 2009

THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

For the reasons stated on the record of the hearing held on August 24, 2009, the motion, dated June 18, 2009 (the "Motion") [Docket No. 41], of JPMorgan Chase Bank, N. A. for an order dismissing the counterclaims of Washington Mutual, Inc. and WMI Investment Corp., it is hereby

ORDERED that the Motion and the relief requested therein is denied.

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's federal tax identification number are: (i) Washington Mutual, Inc. (3725); and (ii) WMI Investment Corp. (5395). The Debtors' principal offices are located at 1301 Second Avenue, Seattle, Washington 98101.

- 2 -

*Source: Order Denying Motion To Dismiss Debtor's Counterclaims Filed By JPMorgan Chase Bank, National Association, September 14, 2009, p. 1-2*

28

Q. Have you ever been involved in any negotiation where the other side has conceded the strength of your claims?

*A. Very rarely.*

Q. Did you rely on JPMorgan's word about how valid your claims were in deciding whether to settle these claims?

*A. As it related to the settlement negotiations and those discussions, absolutely not.*

*Source: p. 247:7-13*

Q. Well, did you discuss the merits of litigation positions
   with your counterparts at JPMorgan?

A. **I don't remember discussing our merits with
   JPMorgan.  Certainly, there would be in
   conversation as we were negotiating what
   potential positions could be, what potential
   defenses could be, but I don't remember having a
   very detailed discussion about merits.**

Q.   You did not have any discussions in detail with JPMorgan about the business tort claims, did you?

*A.   I don't if you want to point me to the deposition that'd be great.  But as I'm sitting here from what you're talking about is a business person to business person would it come up?  Sure.  It would absolute the context of are you going to sue me?  Of course we are if we don't have a settlement agreement we'll pursue all of our claims.  In that context, absolutely, it came up.  A detailed discussion of the business tort claims I don't believe was had with JPMorgan.*

Q.   And just to confirm here, you, in fact, in your deposition that was asked to you and on page 262, line 22.
     "Q.  During settlement discussions, did you discuss the business tort claim with JPMC.
*"A.  Not in any detail.  No.*

*Source: p. 131:18-132:7*

Q.   Okay. And what was WaMu's position with respect to the tax assets, tax refunds?

*A.   I'd have to refer back to the initial term sheet, but there was a percentage split of the taxes. I should characterize that very little of the term sheet discussion related to the merits of the individual assets but, rather, it was an effort, certainly on the part of a lot of the funds that were trying to be part of the settlement, to achieve certain hurdles of return.*

------------------------------------------------------------

Q. Who is "they" that you're referring to in this discussion?

*A. Well, again –*

Q. WaMu?

*A. No. It was Appaloosa, Centerbridge, Owl Creek, Aurelius. There was an entire other group of bank bondholders that were looking -- everyone had their hand out here, looking for some money from the pot of assets that constituted what we at JPMorgan Chase purchased pursuant to the purchase and assumption agreement. So there were many discussions about the split of assets that were more tilted towards how much and who gets what rather than the underlying -- you asked about a position with respect to taxes. Taxes were really almost a currency by which various parties could be allocated value to reach a settlement.*

Q. Okay. And that was the tenor of the discussion relating to taxes for the whole period?

*A. I think there were probably some merit-based discussions between counsel as – thrown in as well.*

Q. But you don't recall any of those?

*A. Not specifically.*

Q. You weren't present during any of those?

*A. No.*

*Source: pp. 179:4-13; 23 – 180:25*

"Q.  Do you have a ballpark of what value Chase is getting out of it?

*"A.  I don't know what dollar values that J.P. Morgan is getting out of this."*

Q.  Correct?
*A.  Right.*

*Yes, we were motivated to settle these cases. That's why we settled them. I can stipulate to that now.*

# TRUST US



costs (rather than payment directly to the attorneys); and (iv) that the Committee would receive information from Samsung regarding the calculation and amount of withholding taxes payable to Korean tax authorities. At the hearing, the Committee stated that its concerns regarding the additional provisions were resolved. (Tr. 5/18/09 at 28 - 29). While the Committee continued to express concern over the lack of mutuality and change in control provisions of the settlement agreement, it decided not to press its objection to the settlement on any remaining grounds. (Tr. 5/18/09 at 167).

APPLICABLE STANDARD FOR EVALUATION OF SETTLEMENTS

collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors. *Martin*, 91 F.3d at 393. *See also Nutraquest*, 434 F.3d at 644.

"In the final analysis, the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr.D.Del. 2006)(internal quotations and citations omitted). The Debtors carry the burden of persuading the court that the compromise falls within the reasonable range of litigation

**(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors.**

When considering the ... the value of the claim that is being ... the acceptance of the compromise proposal." *M...* ...d 389, 393 (3d Cir. 1996), citing *Protective Committee f... ...ders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-... ... 1157, 20 L.Ed.2d 1 91968). In striking this balance, the court should consider: (1) the probability of success in litigation; (2) the likely difficulties in

7

Rule 9019 and that the Settlement Agreement was the result of good faith negotiations, with both parties being represented by counsel. The Debtors argue that, notwithstanding their belief in the strength of their claims and defenses in the Actions, continuing with the Actions will be costly and time-consuming, and, like all litigation, inherently risky. Pursuing the Actions would require the Debtors to spend a significant portion of their limited financial resources, to the detriment of other business needs and operations. The Actions would also consume a significant amount of

8

costs (rather than payment directly to the attorneys); and (iv) that the Committee would receive
information from Samsung regarding the calculation and amount of withholding taxes payable to
Korean tax authorities.  At the hearing, the Committee stated that its concerns regarding the
additional provisions were resolved.  (Tr. 5/18/09 at 28 - 29).  While the Committee continued to
express concern over the lack of mutuality and change in control provisions of the settlement

When considering the best interest of the estate, the Court must "assess and balance the value of the claim that is being compromised against the value to the estate of the acceptance of the compromise proposal." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)

'fair and equitable' standard
persons, i.e., the partie                     …n Univ. (In re Nutraquest, Inc.),
434 F.3d 639, 64

When considering the best interest of the estate, the Court must "assess and balance the
value of the claim that is being compromised against the value to the estate of the acceptance of
the compromise proposal." *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996)
citing *Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v.
Anderson*, 390 U.S. 414, 424-25, 88 S.Ct. 1157, 20 L.Ed.2d 1 91968).  In striking this balance,
the court should consider:  (1) the probability of success in litigation; (2) the likely difficulties in

7

"It appears from the record made that the Debtors' motivation for entering into the Settlement Agreement was based less on an evaluation of the merits of the Actions, than due to a desire to negotiate a quick settlement."

# Spansion: Incredible Failure To Rely On Counsel

"Incredibly, [Restructuring Consultant] Brincko testified that in reviewing the Settlement Agreement and making his proposal to the Board of Directors, he did not rely upon advice received from counsel."

costs (rather than payment directly to the attorneys); and (iv) that the Committee would receive information from Samsung regarding the calculation and amount of withholding taxes payable to Korean tax authorities. At the hearing, the Committee stated that its concerns regarding the additional provisions were resolved. (Tr. 5/18/09 at 28 - 29). While the Committee continued to express concern over the lack of mutuality and change in control provisions of the settlement agreement, it decided not to press its objection to the settlement on any remaining grounds. (Tr. 5/18/09 at 167).

### APPLICABLE STANDARD FOR EVALUATION OF SETTLEMENTS

collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors. *Martin*, 91 F.3d at 393. *See also Nutraquest*, 434 F.3d at 644.

"In the final analysis, the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr.D.Del. 2006)(internal quotations and citations omitted). The Debtors carry the burden of persuading the court that the compromise falls within the reasonable range of litigation

**(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors.**

When considering the ... the value of the claim that is being ... the acceptance of the compromise proposal." M... 389, 393 (3d Cir. 1996) citing *Protective Committee f... ders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-... 1157, 20 L.Ed.2d 1 91968). In striking this balance, the court should consider: (1) the probability of success in litigation; (2) the likely difficulties in

Rule 9019 and that the Settlement Agreement was the result of good faith negotiations, with both parties being represented by counsel. The Debtors argue that, notwithstanding their belief in the strength of their claims and defenses in the Actions, continuing with the Actions will be costly and time-consuming, and, like all litigation, inherently risky. Pursuing the Actions would require the Debtors to spend a significant portion of their limited financial resources, to the detriment of other business needs and operations. The Actions would also consume a significant amount of

7

8

Q. In your deposition, this is page 142 of your deposition, you stated that the factual basis for your determination that the settlement is fair and reasonable is privileged, correct?

*A. That's what it says here...*

Q. When you were asked at your deposition whether you did any analysis into the fairness and reasonableness of the settlement without input of counsel, your answer was no, you did not, correct?

*A. Right. You were asking me if I did anything without counsel and I didn't...*

Q.  All of the analysis that you and WMI performed was done in connection with counsel, correct?

A.  *Again, it's the same issue.  We would've -- with all of these being legal disputes with respect to ownership of assets or different outcomes, we would've discussed them with counsel as is prudent...*

"Q. What analysis did WMI conduct with respect to the likelihood of success on its claims?"

*"A. Well, my discussions with my counsel obviously are privileged and confidential. Primarily we had several discussions amongst the legal team."*

Q.  And we've heard testimony about that already today. And again I just want to confirm that nowhere in this section of your declaration do you provide any testimony as to the likelihood of success of those claims.  Is that fair?

**A.  *That's fair.  Yes.***

Q. And you don't put any sort of range of assessment of risk on any particular claim. Is that right?

A. *It's difficult to put an attorney work product privilege into a public document. So I'm following it but we didn't put our work product in here.*

*Source: pp 161: 24 – 162:5*

Q. Okay. And the analysis that was performed with counsel, was that with respect to the merits of the legal claims involved in these Chapter 11 cases?

A. *Merits of potential legal claims, but analysis that we did throughout the case where counsel was involved...*

*Source: p. 181:5-9*

Q. Okay.  So whatever Weil Gotshal had to say when it came time for you to assess the weaknesses and strengths of the claims for the purposes of evaluating a settlement, you erased anything that they told you from your mind....Is that fair?

A.  *I don't think you can  erase it from your mind.*

Q. But you never ascribed a particular value to those [business tort] claims?

*A.  I did not ascribe a point value, no.  We have talked about, in connection with our lawyers, a range of values--ranges of values particularly.  Obviously, those are privileged conversations.*

Q. As we sit here today then you can't tell us or won't tell us whether the value is one dollar or a hundred billion dollars.

*A.  I believe that those are privileged conversation.*

*Source: p.141: 6-14*

Q. The question was, you are asserting privilege on whether WMI conducted an analysis of whether or not it was likely to win the TPS preferred security counterclaim?

*A. I agree.*

Q. The question went on:

"Q. Did WMI determine that it would be successful on its claims with respect to the ownership of the trust preferred securities?

"Now turn to the top of 129. The question is repeated:

"Q. Are you following your counsel's instructions not to answer that question?

"A. All of those, all of that work has been conducted and completed by our attorneys and it's attorney work product privilege."

Is that your position still today?

*A. I stand by my deposition.*

*Source: pp. 89: 24 – 90:14*

Q.   Yes or no, sir, the analysis that the estate conducted with respect to BOLI-COLI that you just testified don't belong to the estate and belong to JPMorgan, that analysis was conducted by your counsel?

*A.   Our counsel participated in that analysis, yes.*

claims against WMB for all such costs and expenses. WMI will provide documentation with respect to any and all administrative claims when such documents become available.

**XII.    Employee/Employer Related Costs and Insurance Claims**

48.    Prior to the Receivership, WMI was the sponsor of all employee benefit plans, including, among others, the Washington Mutual, Inc. Cash Balance Pension Plan, the Washington Mutual, Inc. Savings Plan, and the Washington Mutual, Inc. Flexible Benefits Plan

WMI's Schedules, WMI's ownership interest in the BOLI-COLI Policies is reflected on its books and records and in certain other instances, WMI may have an ownership interest in BOLI-COLI Policies reflected on WMB's books and records. WMI reserves all rights to assert a claim against WMB for any and all premiums paid by WMI on account of BOLI-COLI Policies owned by WMI. WMI also reserves all rights to assert a claim against WMB for the value of any BOLI-COLI Policies owned by WMI, but reflected on the books

52.    In addition, WMI is the owner of certain bank-owned and corporation-owned life insurance policies (the "BOLI-COLI Policies"). In certain instances, as reflected in WMI's Schedules, WMI's ownership interest in the BOLI-COLI Policies is reflected on its books and records and in certain other instances, ==WMI may have an ownership interest in BOLI-COLI Policies reflected on WMB's books and records.==

51.    In addition, with respect to the Cash Balance Pension Plan (the "Pension Plan"), in the event it is determined that the Pension Plan is underfunded, WMI reserves all rights to assert a claim against WMB for the amount of such underfunding that is attributable to WMB and any other costs, expenses or liabilities associated therewith.

52.    In addition, WMI is the owner of certain bank-owned and corporation-owned life insurance policies (the "BOLI-COLI Policies"). In certain instances, as reflected in

extension of the coverage period for its directors' and officers' liability insurance policy. To the extent that this extended insurance coverage benefits officers of WMB, WMI asserts a claim against WMB and/or its subsidiaries for their share of the cost of procuring the extended coverage.

NY2:\1946459\20\15PW720!.DOC\79831.0003    18

NY2:\1946459\20\15PW720!.DOC\79831.0003    19

Source:

Q.  Just to be clear, for the record, you cannot tell us with respect to the intellectual property whether, in terms of how much it's worth, the value of it is in the billions and billions of dollars, correct?  Yes or no.

**A.  *I wouldn't be able to testify on the value of the IP.***

Q.   ...Again, without getting into the substance, Weil and Quinn both undertook analysis about the worth of the tax refund claim, correct?

A.  *I would say all of that analysis was completed by the financial team and relied upon to me from the financial team.*

Q. There is a separate issue about the ownership of the tax issues and tax refunds, regardless of historical practices. You're aware of that, correct?

A. *I am aware of the dispute concerning the tax refund, yes.*

Q. You are not here to testify in any form about the ownership of the overall tax issues as it respects to the legal disputed aspect; is that right?

A. *I'm not here to testify with respect to the ownership of the refund. I am generally aware of the parties' positions, but that's just based on my general knowledge.*

Q. So for example, with respect to the purchase assumption agreement, whether that belongs to WMI or the FDIC or to JP Morgan, you have no opinion on that whatsoever; is that right?

A. *I have deferred to our counsel with respect to any contract legal interpretation along those lines.*

Q.  The [Kosturos] testimony is not accurate, is it? You know in Quinn at least, Quinn, Quinn and Weil did provide analysis of the tax claim, don't you?

**A.  *I know that we certainly consulted with counsel on various aspects of the settlement, including the entitlement to the tax refunds.***

*Source: p. 241:5-12*

Q.   What did WMI tell the board in order to approve the plan?

*A.   The conversation would've been in connection with counsel, so I think that would be a privileged conversation…*

*…I wasn't on the call in which the board actually approved the plan, so I don't know.*

Q.   …When the board discussed whether to approve the settlement, what did WMI discuss with the board regarding the worth of the assets that were planned to settled?

MR. MASTANDO:  Objection. I think the witness just answered he wasn't present, your Honor.

*Source: pp. 73: 21-23; 74: 2-4; 74: 16-21*

**Officers Present:**
Robert J. Williams, President
Charles Smith, General Counsel
Bill Kosturos, Chief Restructuring Officer
John Maciel, Chief Financial Officer
Jonathan Goulding, Senior Vice President and Treasurer
Chris Wells, Senior Vice President and Additional Restructuring Officer

# Debtors 95



Source: Debtors 95, p. 2-3

million, or net of $55 million, is a significant amount of money, particularly for a company in

bankruptcy." (Tr. 5/18/09 at 55-56). While this may have been understandable early in this case,

the Ad Hoc Consortium has argued (and the Debtors have not disputed) that the Debtors'

liquidity position has improved considerably since the bankruptcy filing. Mr. Brincko also

considered the adverse response from customers who were named in the ITC Action, but did not

> **Under these circumstances, it seems unlikely that a reasonable evaluation of the merits of litigation of this nature and extent could have been made without taking into account the advice of patent litigation counsel.**

business standpoint hav[...] viewpoint, I talked to t[...] [...]or it that
helped me frame a dec[...] [...]business decision, it's
not a legal decision.

(Tr. 5/18/09 at 48). Under these circumstances, it seems unlikely that a reasonable evaluation of

the merits of litigation of this nature and extent could have been made without taking into

account the advice of patent litigation counsel.

The second factor to consider in the *Martin* analysis is the likely difficulties in collection.

There is no evidence to suggest that collection of a judgment against Samsung would be a

problem.

The third *Martin* factor to consider is the complexity of the litigation involved, and the

14

costs (rather than payment directly to the attorneys); and (iv) that the Committee would receive information from Samsung regarding the calculation and amount of withholding taxes payable to Korean tax authorities.  At the hearing, the Committee stated that its concerns regarding the additional provisions were resolved.  (Tr. 5/18/09 at 28 - 29).  While the Committee continued to express concern over the lack of mutuality and change in control provisions of the settlement agreement, it decided not to press its objection to the settlement on any remaining grounds.  (Tr. 5/18/09 at 167).

## APPLICABLE STANDARD FOR EVALUATION OF SETTLEMENTS

collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors.  *Martin*, 91 F.3d at 393.  *See also Nutraquest*, 434 F.3d at 644.

"In the final analysis, the court does not have to be convinced that the settlement is the best possible compromise.  Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities."  *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr.D.Del. 2006)(internal quotations and citations omitted).  The Debtors carry the burden of persuading the court that the compromise falls within the reasonable range of litigation

(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors.

When considering the ... the value of the claim that is being ... the acceptance of the compromise proposal." *M...* ... 389, 393 (3d Cir. 1996) citing *Protective Committee f... ders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424- ... 1157, 20 L.Ed.2d 1 91968).  In striking this balance, the court should consider:  (1) the probability of success in litigation; (2) the likely difficulties in

Rule 9019 and that the Settlement Agreement was the result of good faith negotiations, with both parties being represented by counsel.  The Debtors argue that, notwithstanding their belief in the strength of their claims and defenses in the Actions, continuing with the Actions will be costly and time-consuming, and, like all litigation, inherently risky.  Pursuing the Actions would require the Debtors to spend a significant portion of their limited financial resources, to the detriment of other business needs and operations.  The Actions would also consume a significant amount of

7

8

# Martin Factors



costs (rather than payment directly to the attorneys); and (iv) that the Committee would receive information from Samsung regarding the calculation and amount of withholding taxes payable to Korean tax authorities. At the hearing, the Committee stated that its concerns regarding the additional provisions were resolved. (Tr. 5/18/09 at 28 - 29). While the Committee continued to express concern over the lack of mutuality and change in control provisions of the settlement agreement, it decided not to press its objection to the settlement on any remaining grounds. (Tr. 5/18/09 at 167).

### APPLICABLE STANDARD FOR EVALUATION OF SETTLEMENTS

collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors. *Martin*, 91 F.3d at 393. *See also Nutraquest*, 434 F.3d at 644.

"In the final analysis, the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr.D.Del. 2006)(internal quotations and citations omitted). The Debtors carry the burden of persuading the court that the compromise falls within the reasonable range of litigation

(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors.

When considering the ... the value of the claim that is being ... the acceptance of the compromise proposal." ... 389, 393 (3d Cir. 1996) citing *Protective Committee f... ...ders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-... 1157, 20 L.Ed.2d 1 91968). In striking this balance, the court should consider: (1) the probability of success in litigation; (2) the likely difficulties in

Rule 9019 and that the Settlement Agreement was the result of good faith negotiations, with both parties being represented by counsel. The Debtors argue that, notwithstanding their belief in the strength of their claims and defenses in the Actions, continuing with the Actions will be costly and time-consuming, and, like all litigation, inherently risky. Pursuing the Actions would require the Debtors to spend a significant portion of their limited financial resources, to the detriment of other business needs and operations. The Actions would also consume a significant amount of

*Source: Spansion Opinion, p.7-8*

expense, inconvenience, and delay necessarily attending it. The Debtors argue, generally, as to the significant cost, complexity, and inconvenience of the patent litigation. The *Nutraquest* Court noted that '[i]t is axiomatic that settlement will almost always reduce the complexity and inconvenience of litigation. . . . The balancing of the complexity and delay of litigation with the benefits of settlement is related to the likelihood of success in that litigation." *Nutraquest*, 434 F.3d at 646. There is insufficient information upon which to make a reasoned decision as to the likelihood of success ~~makes it difficult to conclude that the~~ ~~settlement is preferable to~~

> There is insufficient information upon which to make a reasoned decision as to the likelihood of success of the Actions. This likewise makes it difficult to conclude that the settlement is preferable to the expense, inconvenience and delay of litigation.

not to assert any patent or patent applications owned or controlled by its "Semiconductor Division" and the lack of mutuality of the releases raise additional concerns as to the fairness of the settlement.

At the hearing, the Committee advised that it no longer opposes the proposed settlement. However, its "support" of the settlement appears based primarily upon an unwillingness to let go of a "bird in the hand" (Tr. 5/18/09 at 166): that accepting the payment of a $70 million

15

settlement now is better than taking the risk of the patent litigation. However, because this record does not allow a proper evaluation of the strengths and weaknesses of the Actions or the appropriateness of the proposed settlement payment, I cannot weigh heavily the Committee's position.

> Litigation and delay are always the alternative to settlement, and whether that alternative is worth pursuing necessarily depends upon a reasoned judgment as to the probable outcome of litigation.

*TMT Trailer*, 390 U.S. at 434.

In summary, given the above reasons and the largely conclusory record with which I am presented to evaluate likelihood of success of the Actions, there is not enough evidence before me to conclude whether the proposed settlement amount is within the "range of reasonableness." I am unconvinced that, taken as a whole, the process undertaken involved the sound exercise of the Debtors' business judgment. Therefore, I cannot conclude, on the basis of the record before me, that the Settlement Agreement is fair, reasonable and in the best interest of the estate.

16

costs (rather than payment directly to the attorneys); and (iv) that the Committee would receive information from Samsung regarding the calculation and amount of withholding taxes payable to Korean tax authorities. At the hearing, the Committee stated that its concerns regarding the additional provisions were resolved. (Tr. 5/18/09 at 28 - 29). While the Committee continued to express concern over the lack of mutuality and change in control provisions of the settlement agreement, it decided not to press its objection to the settlement on any remaining grounds. (Tr. 5/18/09 at 167).

APPLICABLE STANDARD FOR EVALUATION OF SETTLEMENTS

collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors. *Martin*, 91 F.3d at 393. *See also Nutraquest*, 434 F.3d at 644.

"In the final analysis, the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities." *In re World Health Alternatives, Inc.*, 344 B.R. 291, 296 (Bankr.D.Del. 2006)(internal quotations and citations omitted). The Debtors carry the burden of persuading the court that the compromise falls within the reasonable range of litigation

(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (4) the paramount interest of creditors.

When considering the _____ the value of the claim that is being _____ the acceptance of the compromise proposal." _____ 389, 393 (3d Cir. 1996) citing *Protective Committee f*_____ *ders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-_____ . 1157, 20 L.Ed.2d 1 91968). In striking this balance, the court should consider: (1) the probability of success in litigation; (2) the likely difficulties in

Rule 9019 and that the Settlement Agreement was the result of good faith negotiations, with both parties being represented by counsel. The Debtors argue that, notwithstanding their belief in the strength of their claims and defenses in the Actions, continuing with the Actions will be costly and time-consuming, and, like all litigation, inherently risky. Pursuing the Actions would require the Debtors to spend a significant portion of their limited financial resources, to the detriment of other business needs and operations. The Actions would also consume a significant amount of

7

8

1. The Debtors Failed to Consider the Interests of All Stakeholders

2. Insufficient Showing of the Likelihood of Success

3. At a Minimum, Major Issues in the Plan Prevent Confirmation

# Treatment of Preferred?

Q.  They provision intended to apply to preferred stockholders because they receive ballots; is that a fair interpretation?

*A.  I don't know whether that's a fair interpretation or not...*

-----------------------------------------------------------------

Q.  Preferred shareholders receive a ballot, correct?

*A.  I don't recall if the preferred shareholders received a ballot, actually.*

*Source:* Hearing Testimony Of Smith, 12/06/10 *p. 179:19-23; 185:21-24*

Q. My question for you: are there releases in here that release claims by the debtor which would, as a result, release claims being asserted derivatively by shareholders? Did you consider that question when you analyzed the fairness of these provisions, sir?

A. **I don't recall taking that specific question under consideration.**

*Source:* Hearing Testimony Of Smith, 12/06/10 *p. 237:24-238:8*

# Still Not Right

Q.  Do you see an exception in section C for equity holders who do not receive a release?

A.  *I don't and perhaps this some  language that needs to be clarified in this regard.*

-----------------------------------------------------------

Q.  So this would be a release that equity holders are granting to JPMC, wouldn't it?

A.  *In its current form it would appear to do so.  Unfortunately its current form it would appear to.*

*Source:* Hearing Testimony Of Smith, 12/06/10 *p. 222:12 – 17; 214: 12-17*

On this record, the Debtors have not met their burden of establishing that the revised releases are appropriate, because of the failure of the affected class (the Noteholders) to support the Modified Plan. We conclude that the "overwhelming support" factor articulated in *Master Mortgage* requires that the affected class accept the plan by at least the percentages required by section 1126 of the Bankruptcy Code

*In re Global Ocean Carriers Ltd., 251 BR 31 - Bankruptcy Court, D. Delaware 2000*

# Cases Rejecting Third-Party Releases

- **"[N]on-consensual releases by a non-debtor of other non-debtor third parties are to be granted only in extraordinary cases."**
*In re Continental Airlines 203 F.3d 203, 212 (3rd Cir. 2000)*

- **Non-debtor releases are proper only in rare cases and may be "tolerated if the affected creditors consent."**
*In re Metromedia Fiber Network, Inc., 416 F.3d 136, 141-42 (2nd Cir. 2005)*

- **"[A] permanent injunction limiting the liability of non-debtor parties is `a rare thing' that should not be considered absent `a showing of exceptional circumstances' in which several key factors are present."**
*In re Genesis Health Ventures, Inc., 266 BR 591, (Bankr. D. Del. 2001)*

# No Jurisdiction Over Third-Party Releases

"But with respect to the third party releases, I, quite simply, don't think I have any authority to grant them for the third parties. The third parties, to the extent they have any claim against any party in this case, I just don't have jurisdiction over that . . .I think you need to get affirmative consent of the creditor."

*In re Magn Entm't Corp. Bankr. Case No. 09-10720 (MFW) (April 26, 2010 confirmation hearing transcript).*

# Post Petition Interest

- **"Most courts, however, conclude that term ['interest at the legal rate'] means the federal judgment rate" (citing cases).**

- **Contractual rate of interest only appropriate where "fair and equitable"**

- **Post-petition interest at federal rate**

*In Re Coram*, 315 B.R. at 343-47

# Claim Amount - $7.807 Billion



# Claim Distribution At Federal Post-Petition Rate



# Liquidating Trust

Q. You assume in your November report that there will be a zero dollar cancellation of debt. Is that correct?

*A. That's my understanding, yes.*

Q. And that's based on what the debtors told you?

*A. The analysis they had done, yes, that's correct.*

*Source: p. 88:10-17*

**END**